No. 23-1125

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Eric Ollison,
Plaintiff-Appellant,

v.

Gregory Gossett et al.,
Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois, Peoria Division
Case No. 17-cv-01077-JES-JEH
The Honorable James E. Shadid

BRIEF AND REQUIRED SHORT APPENDIX OF
PLAINTIFF-APPELLANT, ERIC OLLISON,

Irene K. Dymkar
Attorney for the
Plaintiff-Appellant,
Eric Ollison

Irene K. Dymkar
Law Offices of Irene K. Dymkar
53 West Jackson, Suite 733
Chicago, IL 60604
(312) 345-0123

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: ___23-1125_____

Short Caption: ____Eric Ollison v. Gregory Gossett, et al._____

     To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P 26.1.

     The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed R. App P 26.1 by completing item #3):
    Eric Ollison
(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Law Offices of Irene K. Dymkar
(3)  If the party or milieus is a corporation;
    i)  Identify all its parent corporations, if any; and
    N/A_____
    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:
    N/A_____

Attorneys Signature:/s/   Irene K. Dymkar_____   Date: 1/4/2024

Attorneys Printed Name: Irene K. Dymkar_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes X__  No _____
Address: Irene K, Dymkar,  Suite 733, 53 W. Jackson, Chicago, Illinois 60604

Phone Number: 312-345-0123_____   Fax Number: 312-345-0066_____
Email Address: irene.dymkar@dymkarlaw.com_____

# APPELLANT BRIEF

# TABLE OF CONTENTS

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    I.    **Court Applied the Wrong Accrual Date in Rule 12(b)(6) Ruling Dismissing Warden Nicholson on Statute of Limitations Grounds and Erred in Determining There Was No Personal Involvement** . . . . . . . . . . 29

        A.    **Standard of review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        B.    **Complaint need not anticipate nor refute affirmative defenses like statute of limitations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        C.    **Plaintiff's cause of action accrued no earlier than January 16, 2014, when he found out about his injury and learned who caused it** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.     Court erred in ruling that the complaint, and additional facts presented, do not sufficiently allege supervisory liability for Nicholson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

II.     Court Erred in its *Daubert* Decision, Barring All Opinions of Certified Correctional Health Care Expert Salke (134) and Nephrologist Samra (53) as Irrelevant and Not Helpful to the Jury . . . . . . . . . . . . . . . . . . . . 38

     A.     Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

     B.     Court did not properly understand its role in applying *Daubert* to the Salke and Samra reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

     C.     Court erroneously limited inquiry of Gossett's personal involvement to only direct involvement and the 17-day period of the grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

     D.     Court erroneously held that a medical person is not competent to give opinions relevant to a non-medical person's conduct, even to explain what happened medically as result of the non-medical person turning a blind eye . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

     E.     Court erroneously held that jurors themselves, without the aid of expert experience and opinion, could understand how prisons function and what caused Plaintiff's acute renal failure and brain injury . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III.    Court Erred in Ruling That Gossett's Sworn Testimony That He Arrived at IRCC in 2011 and Was Promoted to Warden in July 2012 Was Simply a "Mistake" That Plaintiff Could Not Use Against Him . . . . . . 47

IV.    Decision Granting Defendant Gossett Summary Judgment Was Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

     A.     Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    **B.**    Court's erroneous *Daubert* ruling weakened
           Plaintiff's ability to oppose the summary
           judgment motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    **C.**    Defendant waived arguments about supervisory
           liability by not making them in his motion . . . . . . . . . . 52

    **D.**    Court erred in accepting Defendant's false
           argument in his reply that Plaintiff was relying
           on "radically new factual allegations." . . . . . . . . . . . . . . 53

    **E.**    The grievances gave Gossett actual knowledge,
           but Plaintiff's case was broader than the
           content of the grievances and their timing . . . . . . . . . . 57

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**CERTIFICATE OF COMPLIANCE WITH Fed. R.App.P. RULE 32 (a)(7)** . . 60

**CIRCUIT RULE 31 (e) (1) CERTIFICATION** . . . . . . . . . . . . . . . . . . . . . . . . 61

**PROOF OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**CIRCUIT RULE 30(d) STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

**ATTACHED REQUIRED SHORT APPENDIX**

# TABLE OF AUTHORITIES

## Cases

*188 LLC v. Trinity Industries, Inc.*
300 F.3d 730 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 49

*Antonelli v. Sheahan*
81 F.3d 1422 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Brooks v. Ross*
578 F.3d 574 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Brown v. Burlington Northern Santa Fe Ry. Co.*
765 F.3d 765 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Burks v. Raemisch*
555 F.3d 592 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Childress v. Walker*
787 F.3d 433 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37, 45

*Daubert v. Merrell Dow Pharmaceuticals*
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Devbrow v. Kalu*
705 F.3d 765 (7th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Draper v. Martin*
664 F.3d 1110 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Estate of Perry v. Wenzel*
872 F.3d 439 (7th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Farmer v. Brennan*
511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Flannery v. Recording Indus. Ass'n of Am.*
354 F.3d 632 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Flournoy v. Ghosh*
881 F. Supp. 2d 980 (N.D.Ill. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Gayton v. McCoy*
593 F.3d 610 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Geinosky v. City of Chicago*
675 F.3d 743 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gonzalez v. McHenry County, Illinois*
40 F.4th 824 (7th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Goodhand v. United States*
40 F.3d 209 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Griffin v. Bell*
694 F.3d 817 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Gunn v. Continental Casualty Co.*
968 F.3d 802 (7th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Heard v. Sheahan*
253 F.3d 316 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Hollander v. Brown*
457 F.3d 688 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Jackson v. Sheriff of Winnebago County, Illinois*
74 F.4th 496 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Johnson v. Rivera*
272 F.3d 519 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Luna Vanegas v. Signet Builders, Inc.*
46 F.4th 636 (7th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*
986 F.3d 711 (7th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Milchtein v. Milwaukee County*
42 F.4th 814 (7th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Miranda v. County of Lake*
900 F.3d 335 (7th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Moy v. County of Cook*
159 Ill.2d 519 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Richards v. Mitcheff*
696 F.3d 635 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 35

*Ross v. Stolberg*
2018 WL 4760992 (Ill.App. 1st 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sanders v. St. Joseph County, Indiana*
806 F. App'x 481 (7th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Sanville v. McCaughtry*
266 F.3d 724 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Sargeant v. Barfield*
87 F.4th 358 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Schmees v. HC1.COM, Inc.*
77 F.4th 483 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Shanahan v. City of Chicago*
82 F.3d 776 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Smykla v. Molinaroli*
85 F.4th 1228 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Stoleson v. United States*
629 F.2d 1265 (7th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Stuhlmacher v. Home Depot U.S.A., Inc.*
774 F.3d 405 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 46

*Thomas v. Wexford Health Sources, Inc., et al.*
414 F.Supp.3d 1154 (N.D. Ill. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Sineneng-Smith*
590 U.S. \_\_\_, 140 S. Ct. 1575 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Vasquez v. Indiana Univ. Health, Inc.*
40 F.4th 582 (7th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Williams v. Prison Health Services, Inc.*
167 F. App'x 555 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## Statutes & Rules

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Fed. R. Civ. P. 8(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fed. R. Civ. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Fed. R. Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. P. 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 50

Fed. R. Civ. P. 56(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Fed. R. Civ. P. 72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 46

# JURISDICTIONAL STATEMENT

The United States District Court had original jurisdiction pursuant to 28 U.S.C. §§1343, 1331, and 1367. The action was brought pursuant to the United States Constitution and 42 U.S.C. §§1983, 2201, to address deprivations of the civil rights of Plaintiff, Eric Ollison, through the acts and/or omissions of Defendants.

On January 15, 2016, Plaintiff, Eric Ollison, filed a complaint (R. 1), naming these Defendants: Wexford Health Sources, Inc. (Wexford), Marcus Hardy, Arthur Funk, MD, Medical Director John Doe, MD, D. Schwarz, MD, Steven Taller, MD, John Doe, MD, Sarah L. Mays, Nurse Morris, RN, Walter Nicholson, Greg Gossett, Carla B. Greby, MD, Rebecca S. Einwohner, MD, Lisa Bishop, Connie Sword, Edna L. Greenhagen, RN, Shirley Law, RN, C. Pelliter, C. Reynolds, Nurse Candy "Doe," Kandis Critz, RN, Nurse David "Doe," K. Barker, LPN, F. Maurice, RN, J. Easley, LPN, C. Wise, Robbie Johnson, Unknown Medical Personnel, Unknown Employees of the Illinois Department of Corrections.

The complaint set forth four counts: Count I: Violation of the Eighth Amendment (deliberate indifference to Plaintiff's serious medical condition) against all Defendants; Count II: *Monell* claim against Wexford; Count III: *Respondeat superior* claim against Wexford; and Count IV: Indemnification.

A stipulation (R. 130), approved by the court (R. 131), stated that:

Nurse Candy "Doe" and Kandis Critz, RN are the same person;

Dr. D. Schwarz, MD and John Doe, MD are the same person;

Sylvia Mahone is Medical Director John Doe, MD; and

David Hopkins is Nurse David "Doe."

Pursuant to 28 U.S.C. §1291, the Seventh Circuit Court of Appeals has appellate jurisdiction to review the final judgment of the District Court issued on January 17, 2023, labeled "Second Amended Judgment" (R. 555), dismissing all Defendants and all claims, referencing and rendering final the following previous orders:

> November 19, 2016, Order, dismissing Defendants Hardy, Funk, Mahone, Schwarz, Taller, Mays, Morris, and Nicholson, and Count IV. R. 133.

> September 13, 2019, Order, dismissing Unknown Medical Personnel, and Unknown Employees of the Illinois Department of Corrections.

> March 3, 2022, Order, dismissing, by stipulation, Defendants Wexford Health Sources, Inc., Greby, Einwohner, Bishop, Sword, Greenhagen, Law, Peltier, Reynolds, Critz, Hopkins, Barker, Maurice, and Easley, and dismissing Counts II and III. R. 526.

> December 20, 2022, Order, dismissing remaining Defendants, Gossett, Wise, and Johnson, and Count I. R. 549.

A notice of appeal was timely filed by Plaintiff-Appellant on January 17, 2023. R. 556.

There are no prior appellate proceedings in this case.

There is no motion now pending which tolls the time within which to appeal.


Dated: January 4, 2024        _/s/ Irene K. Dymkar_____
                             Irene K. Dymkar

Attorney for Plaintiff-Appellant:
Irene K. Dymkar
53 West Jackson, Suite 733
Chicago, Illinois 60604-3462
(312) 345-0123

# STATEMENT OF ISSUES

1.      Whether a prison inmate's claim of deliberate indifference to a serious medical condition accrues when he is taken to the emergency room and first learns he has acute renal failure and who caused it.

2.      If a warden's conduct is one of the causes of an inmate's injury, which the inmate does not discover until after the warden retires and leaves the prison, whether the claim against that defendant still accrues on the discovery date.

3.      Whether personal involvement includes supervisory liability for administering a grossly deficient prison health care system that made injury inevitable, regardless of whether the warden knew the inmate actually injured by that system and whether plaintiff names in his complaint other inmates who were harmed by the system.

4.      Whether it is proper to bar all opinions of a nephrologist and correctional health care expert as to causation and damages by limiting the case to what an uninformed non-medical inmate wrote in his grievances and the 17-day time period of those grievances.

5.      Whether a medical or correctional health care systems expert is competent to testify as to what happened medically to an inmate when a non-medical administrator turned a blind eye to serious systemic problems.

6.    Whether it is reasonable to believe that a jury could understand medical evidence about acute renal failure and brain damage, and evidence of how a prison health care system functions, without expert testimony.

7.    Whether it is proper to bar plaintiff from using defendant's prior sworn statements regarding his employment dates as admissions and for impeachment.

8.    Whether defendant waives argument that supervisory liability should be denied when he confuses it with the state doctrine of "respondeat superior" in his summary judgment motion and does not properly develop the argument.

9.    Whether in a summary judgment decision, it is proper to accept defendant's argument that plaintiff is relying on "radically new factual issues" of supervisory liability when the legal theory was pursued throughout litigation and was vigorously fought by defendant.

## STATEMENT OF THE CASE

### Factual Background of Claim

#### Plaintiff's medical condition

Plaintiff, Eric Ollison, born in 1983, was an inmate in the Federal Bureau of Prisons from February 7, 2010—November 23, 2011. R. 405-1 at ¶¶ 2, 4. He was transferred to Stateville Northern Reception and Classification Center (Stateville) of the Illinois Department of Corrections (IDOC) on November 23, 2011. Id., at ¶5. He was placed at Illinois River Correctional Center (IRCC) (IDOC) on January 17, 2012, where he stayed until January 16, 2014, when he was taken to Graham Hospital Emergency Room, seriously ill with acute renal failure. Id., at ¶6.

When in federal custody, it was discovered that Plaintiff had kidney disease. Appendix A7 at 6; R. 405-11 at 39. A local nephrologist, Dr. Paritosh Tiwari, who treated inmates on a voluntary basis, ordered tests and treated Plaintiff with medication. Id., at 23-24, 28-29, 53-54, 100. Plaintiff saw Tiwari five times; the care ended when Plaintiff was transferred to IDOC. Id., at 25-27.

Plaintiff's understanding was that his kidney disease was cured and that nothing more needed to be done, so long as he monitored his diet and exercise. R. 405-1 at ¶14; R. 405-6 at 78, 80; Appendix A7 at 6 (Court: "Plaintiff does not have any medical training, and after his last visit with the doctor on September 20, 2011, he believed his kidney problem 'was healed.'").

The intake laboratory tests at Stateville in November 2011 clearly showed kidney disease, although it was not noted in his chart. Appendix B3 at 7, 21[1], Opinion 4. No one discussed a kidney problem with Plaintiff. R. 405-6 at 82-83.

The intake laboratory tests at IRCC in January 2012 indicated Plaintiff needed monitoring by a nephrologist. Appendix B3 at 5-6. Plaintiff told the intake personnel that he had had a kidney problem, but that he believed with exercise, it would be fine. R. 405-6 at 80-81. Nothing about kidney disease was noted in the intake reports. Appendix B3 at 6.

Plaintiff first saw Dr. Carla Greby, Medical Director and only doctor at IRCC, on February 2, 2012. R. 405-6 at 104-105; Appendix B1 at 8.

Plaintiff received no treatment for kidney disease and did not see a nephrologist the entire time he was at IRCC. Appendix B3 at 8.

No labs were drawn from July 2012 to March 2013. Id.

In April 2013, Greby received laboratory results for Plaintiff indicating his kidney disease had progressed to a dangerous point. R. 405-8 at 138-139, 148-149. Greby did not inform Plaintiff that his kidney disease had progressed. R. 405-6 at 187-188. Greby contacted remotely a Wexford nephrologist, Dr. Rebecca Einwohner, who told her to admit Plaintiff into a hospital for a complete work-up. R. 405-8 at 139; R. 535-7 at 16, 43, 64-65, 151. Greby ignored that advice. Appendix B3 at 9. Plaintiff knew nothing about Greby's contact with Einwohner. R. 405-6 at 188.

---

[1] Page numbers cited throughout this brief are Record (R.) page numbers, not transcript or report page numbers.

There were no follow-up laboratory tests from April 2013—January 8, 2014. Appendix B3 at 12.

Plaintiff was asymptomatic at IRCC from January 17, 2012—mid-November 2013, when he suddenly felt extremely ill. R. 405-1 at ¶¶5, 6, 21; R. 405-6 at 99-100. Plaintiff's expert, Nephrologist Manpreet Samra, explained that kidney disease is a "silent disease," often with no symptoms until renal failure is imminent. Appendix B3 at 22, Opinion 7.

Plaintiff wrote three grievances, December 22, 2013, December 26, 2013 (emergency grievance), and January 8, 2014 because he believed he was not receiving the medical attention he needed. R. 405-1 at ¶¶26, 27; R. 405-6 at 96-97, 189-90; R. 495-11, 495-12, 495-13. In the grievances, Plaintiff "begg[ed] … to have [himself] fully checked out," stressing that "there is no way [his] body should be reacting this way." Appendix A2 at 5. Plaintiff's pleas "were dismissed as 'moot' and not an emergency, or ignored entirely." Id.

Plaintiff's grievances described symptoms of uremia, indicating an emergency situation. Appendix B3 at 29, Opinion 26. Plaintiff, however, did not know that kidney disease was causing his symptoms. R. 405-1 at ¶¶23, 25. He thought maybe he was having a bad reaction to a change in medicine. R. 405-6 at 104-105; R. 495-11, 495-12, 495-13.

Plaintiff's kidneys failed on January 16, 2014, and he was taken to Graham Hospital Emergency Room, where the doctors first diagnosed acute renal failure for the first time. Plaintiff was placed on emergent hemodialysis, a procedure with

risks. Appendix B3 at 35 (Opinion 44). On January 19, 2014, Plaintiff's entire left side became paralyzed and he suffered strokes and seizures, caused by the acute renal failure. R. 406-2[2] at 4, Opinions 1-3. On February 4, 2014, it was believed that Plaintiff might not recover from "a vegetative state" and no further medical assistance other than palliative care should be given. Appendix B5.

Plaintiff was comatose for several weeks, January 19, 2014—February 7, 2014. R. 406-2 at 2. He was then sent to hospitals for rehabilitation. Id. His physical and mental capacities were limited. Appendix A5 at 9.

### Nephrologist Manpreet Samra's expert report

Plaintiff retained Dr. Manpreet Samra, board-certified in Internal Medicine and Nephrology, and Medical Director for renal care at the VA Hospital. Appendix B4. Dr. Samra reviewed all of Plaintiff's medical records, issuing a 39-page report with 53 opinions. Appendix B3.

The report describes in detail the many opportunities from January 2012—January 2014 that Greby and the Health Care Unit (HCU) missed to properly treat Plaintiff's kidney disease. Id. The report repeatedly calls Greby's conduct aberrant and "a substantial departure from accepted standards of care." At one point, Samra wrote, "It is beyond comprehension that Greby showed such blatant disregard for the health of her patient and such incompetence by ignoring the dangerously abnormal lab test results of 1/9/2014." Id., at 33, Opinion 39.

---

[2]    Plaintiff retained Dr. Waimei Tai, a stroke neurologist, for an expert report on Plaintiff's brain damage caused by acute renal failure. R. 406-2.

The report also contains several opinions as to how the Warden's

indifference caused Plaintiff's injuries:

- Since the IRCC medical staff did not have the expertise nor training to treat kidney disease, the Warden should have arranged for Plaintiff to be transferred to a prison with a nephrology staff or referred to an off-site nephrologist. Id., at 26, Opinion 17. Samra described in detail what proper monitoring should have been and how the lack thereof was "a direct cause of swift progression to end stage renal failure." Id., at 26-27, Opinions 19, 20.

- Given dire symptoms Plaintiff described in his grievances, Gossett should have consulted with a doctor, and required a review of Plaintiff's medical chart, before determining that "an emergency is not substantiated." Id., at 29-30, Opinions 26, 27. "Mr. Ollison could have been rendered the proper care in time to avert the strokes and seizures and protect Mr. Ollison's kidneys from the permanent damage." Id.

- "It was a woefully insufficient response and a blatant disregard for the ill inmates' well-being'" for the Warden not to demand that a doctor come to the prison "for triage for inmates with persistent and serious medical problems given Dr. Greby's horrible attendance record." From 1/1/2014—1/16/2014, Greby, the only doctor at IRCC, was out more than 12 days, while Plaintiff was becoming critically ill, receiving virtually no medical attention. Id. at 34-35, Opinion 42. The subsequent strokes, seizures, and neurological damage could have been averted. Id. at 36-37, Opinions 43-46.

**Ralph Salke's expert report**

Ralf J. Salke, RN, BSN, CCHP-A, is a certified correctional health care

expert, working in correctional medicine for over 32 years. His training and

experience is in correctional medicine and the interface between the prison

administrative structure and the delivery of medical services through prison HCU's.

Appendix B2.

Salke is certified as a Correctional Health Care Provider (Advanced) through the National Commission on Correctional Healthcare (NCCHC). He is a Surveyor for NCCHC, evaluating prison health care systems for possible accreditation. Id. He belongs to several correctional health professional organizations and has held top leadership roles. Id.

Salke has had on-the-ground experience in prisons. He was Regional Manager 1988-98 for Corizen Health in Illinois, Missouri, and Kansas, reviewing "particular operational, administrative, clinical issues, meet[ing] with the warden, the assistant warden, others as indicated, develop[ing] reports." R. 495-4 at 34-35 He worked at IRCC for two years as Regional Manager. Id.

Salke reviewed the entire file, including the medical record, emails sent between Wexford and IDOC personnel, prison administrative directives, the Wexford/IDOC contract, and other documents. He wrote a detailed 106-page report, containing 134 opinions. Appendix B1. Fourteen pages of facts and seven pages of 35 opinions pertained specifically to Gossett. Id., at 39-52 (Facts), 84-90 (Opinions).

Salke stated: "It is my opinion, to a reasonable degree of certainty in the field of correctional health care, that the action or inaction on the part of Warden Gregory Gossett was a substantial deviation from the standard of care and a cause of Eric Ollison's injuries, and that he was personally involved in causing Mr. Ollison's injuries, either directly or through supervisory liability." Id. at 84. His report makes the following points:

- IDOC directives and IDOC/Wexford contract put the Warden in charge of all aspects of the administrative management of prison health services, including clinic care, off-site consultations, chronic care, offender access to care, specialty service referral, sick call, Quality Improvement Program, management of medical records, treatment protocols, control of medications and medical instruments, and the infirmary. Id., at 39-42 (Facts), 83-84 (Opinions 1-4).

- The Warden was the direct supervisor of Medical Director Greby in all matters except medical decisions. "The Warden knew about Dr. Greby's gross failures and incompetence as a Medical Director, and turned a blind eye to it. It was only a matter of time before her actions led to another death or serious injury." The attitude that "we are holding our breath that nothing else significant happens" was reckless. Id., at 42-43 (Facts), 85 (Opinions 7-9).

- Greby's excessive absenteeism left the facility with no doctor. "Physicians such as Dr. Greby, who was grossly medically incompetent and meanspirited, who was physically and verbally abusive to inmates, who was absent often and when she was there, refused to perform the basic functions of a Medical Director, practiced medicine on inmates for almost two years after she should have been terminated." Id., at 106. See also 10, 35, 68. Her absenteeism included a three-week period when Plaintiff's health was plummeting.

- Greby caused or was implicated in five patient deaths, two before she came to IRCC and three afterwards., Id. at 79, 83 (Opinion 30),106.

- "It was . . . dangerously irresponsible for the Warden to leave the position of Health Care Unit Administrator (HCUA) vacant during the military leave of Jonathan Sisson for most of a two-year period in 2012 and 2013." Id., at 43-45 (Facts), 86-87 (Opinions 10-19). Without the HCUA, there is no one managing and monitoring the performance and quality of medical services provided by the health care contractor. Id., Opinion 10, 15.

- "Warden Gossett knew about yet disregarded a substantial risk of harm in allowing the HCUA position to go unfilled. Without the HCUA, the Health Care Unit was a toxic work environment in which Dr. Greby physically and verbally abused inmates and berated members of the medical staff with little accountability." Id., Opinion 16. There was also no one making grievance recommendations. Id., Opinion 14.

12

- When HCUA Sisson was at IRCC for a short time in April 2013, he wrote a scathing report, saying "Greby thinks all inmates are liars and it is her duty to punish through medicine." Id., at p. 45.

- "The Warden was on notice that Dr. Greby's behavior was erratic and that she was harming patients." Id., at 45-48 (Facts), 87-88 (Opinions 20-23). "He had regular staff meetings every month with the two Assistant Wardens and the department heads, including DON Greenhagen, as well as *ad hoc* meetings, to talk about problems in the prison." Id., Opinion 20. Regional Manager Moore met with the Warden every time she came to IRCC, discussing problems with Greby. Id., at 47.

- Mr. Salke cited five e-mails in which Moore reported that the Warden was fully apprised of attempts to force Greby to resign or to terminate her. Id., at p. 44-45. One email stated: "The only reason we have tolerated Dr. Greby at IL River this long is because we had nobody to replace her. She's been given every kind of discipline imaginable and still a big problem and risk." Id., at 45. Salke cited eleven e-mails which reported that the Warden threatened to lock Greby out of the prison. Id., at 45-46.

- Gossett showed reckless disregard for inmate health by not making effective the Mandatory Quality Improvement Program. There was no mandatory monthly review of "critical incident cases including delayed diagnosis," like Plaintiff's case. Id., at 48-49 (Facts), 88-89 (Opinions 24-28)

- Given the serious problems Plaintiff described in his grievances, especially the emergency grievance, Gossett should have required the medical staff to review Plaintiff's chart. If the chart had been reviewed by a competent medical person, the grossly abnormal laboratory tests that Greby filed in Plaintiff's chart without taking action would have been found; medical care could have been expedited. Id., at 49-50 (Facts), 89-90 (Opinions 33-35)

- Gossett initiated urgent internal and external investigations of what happened to Plaintiff, saying "I have a very bad feeling about the quality of care Offenders are receiving at IRCC." Gossett admitted at deposition that Plaintiff's sudden emergency situation called for a mandatory investigation. Gossett said to his superior, "At the end of the day it is my responsibility as Warden." All urgent investigations,

however, were aborted without explanation. Id., at 51-52 (Facts), 90 (Opinions 33-35).

- Dozens of listed IRCC patients were sent to an outside nephrologist only for limited dialysis-related care or a specific test, not for monitoring and management by a nephrologist. Id. at 12-18.

## Procedural History of Claim

### Complaint

Plaintiff filed a complaint in the Northern District of Illinois on January 15, 2016, alleging an Eighth Amendment violation (deliberate indifference to Plaintiff's serious medical condition)[3] against:

- Wexford Health Sources, Inc. (settled/dismissed)

- Seven Stateville Defendants (settled/dismissed)

- Thirteen IRCC Wexford Defendants (settled/dismissed)

- Four IRCC IDOC Defendants (Warden Walter Nicholson, Warden Gregory Gossett, Corey Wise, and Robbie Johnson)[4]

R. 1.

The complaint alleges the medical staff and Wardens were deliberately indifferent to Plaintiff's serious medical condition, through their direct and indirect actions, i.e., that Nicholson, Gossett, and others knew or should have known Plaintiff was in serious need of medical care but were deliberately indifferent even though timely and appropriate care was feasible (R. 1 at ¶137); failed to provide

---

[3]  Other claims (II, III) against Wexford (respondeat superior, *Monell*) were dismissed by settlement. R. 526. Indemnification (IV) was dismissed by the court. Appendix A2.

[4]  Plaintiff is only proceeding against Nicholson and Gossett on appeal.

Plaintiff with the proper continuity of care his kidney disease required, and failed to provide him with necessary specialists (¶138); and ignored Plaintiff's persistent cries for help when it was clear or should have been clear that he was suffering from acute renal failure and was in distress (¶139); and that their acts of omission and commission proximately caused Plaintiff's temporary and permanent physical and emotional injuries (¶140).

The complaint also alleges specifically that Nicholson and Gossett were Wardens at IRCC (R. 1 at ¶27, 28); as Chief Administrative Officers they were responsible for the overall operation, policies, and management of IRCC, and the formulating of rules, regulations, and policies (¶29); they promulgated rules, regulations, policies, and procedures at IRCC for the provision of medical care, including the administration of medical services to inmates by medical care providers (¶¶30, 102); they promulgated and enforced rules, regulations, and policies for the effective and equitable resolution of inmate problems and grievances (¶31); they were in charge of Plaintiff's medical care and decisions, as a ward of the state (¶32); Gossett had actual notice of Plaintiff's medical distress through grievances, including an emergency grievance (¶¶94-100); in a cover-up attempt, Gossett declared two months after Plaintiff suffered renal failure and brain injury that Plaintiff's complaint was not an emergency (¶101); as supervisors, they were aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to Plaintiff (¶103); they had ample notice that Plaintiff

had a serious medical condition, to which they were deliberately indifferent (¶104); and all Defendants were jointly and severally liable.

## Dismissal of Nicholson

Defendant Nicholson moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim. R. 69-70. He argued that Plaintiff did not file his claim within two years of when Nicholson left IRCC, although the complaint did not allege when Nicholson left. R. 70 at 3-4. He argued that deliberate indifference to a serious medical need was a "continuing violation," and the claim accrued once Defendant no longer had the power to do something about Plaintiff's condition. Id. at 4-5. He further argued that "Plaintiff does not allege any actual knowledge of or involvement by Defendant Nicholson in Plaintiff's medical care." Id. at 6-8.

Plaintiff responded, asserting the discovery rule, i.e., that his claim did not accrue until he knew about his injury (acute renal failure) and who caused it, on January 16, 2014. R. 88, at 5-8. He also argued that indirect involvement as a supervisor who turned a blind eye to the prison's unconstitutional practice was personally responsibility. Id., at 8-12.

The court granted the motion to dismiss, ruling that although a plaintiff is not required to plead facts in the complaint to anticipate and defeat a statute of limitations defense, "when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, dismissal is appropriate." Appendix A2 at 8. The court stated, "Nicholson argues that the claims against him accrued when he stopped working at Illinois River sometime in 2012 (neither party provides

an exact date of Nicholson's departure, but that is not important because Ollison did not file the Complaint until January 2016)." Id., at 10. The claim accrued when Defendant "no longer had any control over the prisoner's medical care." Id., at 14.

The court held that Nicholson had no actual knowledge or personal involvement, such as a letter from, or a conversation with Plaintiff, about his lack of treatment. Id., at 15-16. Also, Plaintiff failed to "allege other instances of deliberate indifference . . . that would support the inference that [IRCC] personnel were systemically withholding medical care from prisoners." Id., at 16.

With the dismissal decision, the case was transferred to the Central District.[5] R. 143-144.

## Affirmative defenses barred

On June 4, 2019, IRCC IDOC Defendants moved for leave to file an answer to the complaint. R. 189. Plaintiff opposed, arguing Defendants were 1093 days late and Plaintiff would be unduly prejudiced. R. 190. Upon Rule 72 review of the magistrate judge decision (R. 192), the court held that Defendants were barred from asserting all affirmative defenses, except for failure to exhaust administrative remedies. Appendix A3.

## First summary judgment motion denied

Defendant Gossett moved for summary judgment for failure to exhaust administrative remedies. R. 382. The court denied the motion. Appendix A5. It

---

[5]   Court dismissed Stateville Defendants (not an issue on appeal), leaving only IRCC Defendants, thus the transfer.

ruled that "since Plaintiff did not know his specific medical condition until he was diagnosed at the hospital, he could not have filed a specific grievance until sometime after January 16, 2014." Id., at 8.

## Factual dispute about Gossett's employment dates

On July 25, 2019, Gossett swore to answers to interrogatories where he stated he left IDOC in 2015, having been Assistant Warden for two years and Warden for three years. R. 369-1 at ¶¶2, 3. This corresponds to Gossett being Assistant Warden from 2010-2012 and Warden from 2012-2015.

On August 22, 2019, Gossett submitted a 94-page response to Plaintiff's requests to produce, objecting at great length to providing any employment documents. R. 495-19 at ¶¶85-88.

On September 27, 2019, in his belated answer to the complaint, Gossett admitted that he "was employed as Warden at all other times relevant to the events in this complaint," after refusing to answer whether Nicholson was at IRCC in 2012. R. 223 at ¶¶27, 28.

On November 19, 2019, Gossett testified at deposition that he started working at IRCC in 1989 as a correctional lieutenant, then was "detailed away." He returned in 2011 as Assistant Warden and was promoted to Warden in July 2012. R. 495-14 at 17-18. He confirmed several times that he was Assistant Warden at IRCC in 2011, and Warden from 2012-2015. Id., at 36, 104, 107, 115. He said Walter Nicholson was Warden in 2011. Id. at 18-19.

In questioning Gossett, Plaintiff's counsel relied on Gossett's testimony that he was Warden the entire time Plaintiff was at IRCC, i.e., from January 2012—January 2014. See e.g., id. at 37, 77, 79, 80, 103-06, 113-14.

On June 23, 2020, out of the blue, near the end of discovery, Gossett served unsigned "supplemental" answers to interrogatories, significantly changing when he became Assistant Warden at IRCC, from 2011 to March 2013, and when he became Warden, from July 2012 to September 2013. R. 495-18.

Before Gossett's attempt to switch dates, numerous significant depositions pertaining to Gossett's role at IRCC had already taken place:

> Eric Ollison—11/21/2019
> Lisa Bishop, IDOC Medical Records—9/23/2019
> Kandis Critz, Nurse—9/23/2019
> Jennifer Easley, Nurse—3/13/2020
> Dr. Rebecca Einwohner—11/15/2019
> Dr. Arthur Funk, Rule 30(b)(6) witness—2/27/2020
> Dr. Carla Greby(2), Medical Director—1/9/2020, 1/10/2020
> Edna Greenhagen, Director of Nursing—9/25/2019
> David Hopkins, Nurse—3/13/2020
> Robbie Johnson, Grievance Officer—11/19/2019
> Francie Maurice, Nurse—3/13/2020
> Stacy Moore(2), Wexford Regional Manager—12/17/2019, 3/10/2020
> Crystal Stein, Nurse—12/17/2019
> Connie Sword, Physician Assistant—9/25/2019
> Corey Wise, Grievance Counselor—11/19/2019

No deponents contradicted Gossett's sworn statements that he was Warden in 2012-14. Many, even Regional Manager Moore, testified they "could not recall." Dr. Funk said he believed Gossett was Warden in 2011 and 2012. R. 495-25 at 32, 139-40. Dr. Roderick Matticks, Regional Medical Director, said he believed Gossett

was Warden when the HCUA was on military leave, from May-December 2013. R. 495-27 at 198-99.

On February 12, 2020, by court order, Plaintiff received from Wexford 700+ pages of email messages that incriminated the Warden, with Wexford personnel relating conversations with him, proving he knew that Greby's incompetent, erratic, and abusive performance presented a dangerous situation for inmates in need of medical care and that he was involved in attempts to fire her for more than a year prior to her firing. See R. 493-3—493-9 (in seven parts due to size). Most messages referred to Warden, or Assistant Warden, by title.

On April 1, 2020, the Magistrate Judge reviewing a motion and the emails expressed disbelief regarding Gossett:

> I don't buy it. I do not buy that given the information that we have related to the performance of Dr. Greby that I've seen in discovery, and then the late dumping of these emails that we discussed at the last hearing, I just find it hard to believe that the warden has no information regarding the performance of Dr. Greby and the matters that are related here. R. 315 (Audio) 4:40—5:09.

> I think it's pretty clear from the documents that have been submitted that the warden's position initially regarding lack of knowledge as it relates to Dr. Greby's performance, etc., is just not accurate. Id., at 3:49—4:11.

A second deposition of Gossett was held on July 16, 2020, regarding the newly disclosed email messages. Counsel objected 18 times, obstructing the questioning. R. 495-15. Plaintiff moved to compel Gossett's answers (R. 358), which was granted (R. 378). A third deposition was held.

On September 14, 2020, Plaintiff moved to modify the earlier order dismissing Nicholson from the case (Appendix A2) or, "because of his deception, barring Warden Gossett from disputing his sworn testimony" that Plaintiff had relied on throughout discovery. R. 369. The court denied the motion. Appendix A4. The court resolved the factual dispute by finding "Defendant Gossett took the [Warden] position in September of 2013." Id., at 25.

On October 14, 2020, Gossett stated as an "undisputed material fact" supporting his first motion for summary judgment that "at all times relevant to the Complaint, Defendant Gossett was Warden at Illinois River." R. 382 at 2, #3.

On July 6, 2022, the court addressed the "continued dispute concerning Warden's employment." Appendix A6 at 20-23. The court ruled that Gossett was "correcting his testimony" in his supplemental answers to interrogatories (id. at 21), and "explained he mistakenly provided the wrong dates" previously (id.). The court further ruled:

> Therefore, if Plaintiff intends to argue at summary judgment or at trial that Defendant Gossett worked at Illinois River Correctional Center prior to March of 2013, he must present evidence other than Warden Gossett's *mistaken, and now corrected*, testimony given during the first deposition. (Emphasis added).

Id., at 23.

### *Daubert* decision barring two experts

The court said it would not "address potential *Daubert* motions prior to Summary Judgment." 7/1/21 Order. It stated, "I think you can file your motions for

summary judgement, rely on the experts as they are now." R. 518 at 11. Gossett filed his summary judgment motion (R. 484, 485) and Plaintiff responded (R. 495), relying heavily on the reports of two of his six experts, Nephrologist Samra and Correctional Heath Care Expert Salke.

After filing the summary judgment motion, Gossett filed a *Daubert* motion to bar the Samra and Salke as experts. R. 503. Plaintiff responded in opposition. R. 510.

The court changed course and ruled on Defendant's *Daubert* motion first, granting the motion and barring Samra and Salke's extensive reports in their entirety. Appendix A6. It ruled that "while Dr. Samra and Salke each have specialized training and knowledge, there is no indication the expertise of these witnesses is needed to assist the jury 'to understand the evidence or determine a fact in issue.'" Id., at 20.

The court stated that prior to rendering the *Daubert* decision, it had "not thoroughly reviewed the arguments of the parties" in the summary judgment motion already filed. Id., at 23. Thus, it had not considered Plaintiff's detailed memorandum in response to the motion. See R. 495. Nevertheless, it struck Plaintiff's response to the motion, ordering Plaintiff to redraft his response without using any of the 134 expert opinions of Ralf Salke or 53 opinions of Dr. Manpreet Samra, or "the mistaken testimony given in Defendant Gossett's first deposition." Id., at 23.

The court acknowledged that Salke is "a certified correctional health care provider with extensive experience providing health care within a prison setting." Id., at 14. However, "[e]ven assuming the directives are relevant and admissible, it is unclear why an expert opinion is needed to decipher the written directives." Id. Also, "Expert Witness Salke has no expertise in the qualifications of prison administrators." Id., at 16.

The court ruled: "Salke also offers several opinions that 'The Warden had Supervisory Liability' which could cause confusion since the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under 42 USC §1983." Id. The court rejected outright Salke's opinion that it was critically important in a prison to keep the HCUA position filed, that Greby's performance was inadequate, that the Quality Improvement Program was ineffective, and that Gossett knew all this. Id., at 16-17.

The court stated that the fundamental questions in the case were specific, i.e., "whether the Warden had sufficient notice Plaintiff suffered from a serious medical condition and whether he had sufficient notice Plaintiff was not receiving adequate care for that condition." Id., at 17. The opinions that the Warden should have consulted with a medical person when he read the grievances and had actual notice of a serious problem were irrelevant because Gossett was "a lay person." Id., at 18. "Plaintiff may not use an expert to suggest Defendants were required to have additional medical knowledge or education, or to suggest grievance procedures based on the Expert's medical or healthcare expertise." Id., at 19.

The court ruled that a jury could understand the medical and prison administrative issues in the case without experts. Id., at 20.

## Settlement with Wexford Defendants

Plaintiff reached a settlement with Wexford and the IRCC Wexford Defendants for some of Plaintiff's damages. They were dismissed by order on March 3, 2022, pursuant to stipulation. R. 526.

## Second summary judgment motion granted

Defendant's motion for summary judgment, filed seven months after Defendant had received Salke's report, argues only that 1) Gossett dealt with Plaintiff's grievances properly (R. 485 at 16-22), and 2) the doctrine of *respondeat superior* does not apply in §1983 cases, and Gossett was not directly involved in Plaintiff's medical treatment (id. at 23-24).

Pursuant to court order, Plaintiff redrafted his original response (R. 495), without using Samra and Salke's expert reports. R. 535.

On December 20, 2022, the court granted Gossett summary judgment, dismissing the deliberate indifference claim against him. Appendix A7. Much of the decision was devoted to analyzing Plaintiff's three grievances. Id., at 8-23. The court ruled that a non-medical official may rely on the judgment of medical personnel. Id., at 15-16. It ruled that while Plaintiff knew he needed medical care, he did not know he was suffering from chronic kidney disease when he wrote his grievances. Id., at 8. The grievances did not give Gossett notice of Plaintiff's kidney disease. See, e.g., id. at 23.

The court held that since the legal theory of failure to intervene was not alleged in the complaint, Plaintiff could not assert it. Id., at 3. It also accepted Defendant's argument that Plaintiff's legal theory of supervisory liability was impermissibly based on "radically new factual allegations." Id., at 24, 26.

Expert reports being barred, the court concluded that Plaintiff "speculates" as to supervisory liability and wrongfully asks the court to hold non-medical Defendants to medical standards. Id., at 29-30.

## SUMMARY OF ARGUMENT

### Rule 12(b)(6) ruling

It was error to dismiss Warden Walter Nicholson from the case on a Rule 12(b)(6) motion, on statute of limitations grounds. Plaintiff Eric Ollison, an IRCC inmate, thought his kidney problem had been treated and he was cured. He was asymptomatic for almost two years, until he became seriously ill late November 2013. He learned that he had acute renal failure when he was taken to an emergency room on January 16, 2014. Plaintiff's Eighth Amendment claim regarding his medical condition accrued on January 16, 2014. A timely lawsuit was filed on January 15, 2016.

Nicholson allowed an incompetent, mean-spirited doctor, Carla Greby, run a dysfunctional prison HCU. While there were attempts to fire her and Nicholson threatened to "lock her out," nothing was done to remove her. She was allowed free reign to harm patients. Plaintiff had sub-standard medical care the entire time Nicholson was Warden, which contributed to his eventual injury. Nicholson retired on some unknown date while Plaintiff was at IRCC. However, his actions were a cause of Plaintiff's injury and he should not have been dismissed from the case.

The court also erred in ruling that because Plaintiff did not allege in his complaint that he wrote a letter or spoke to Nicholson, there was no personal involvement. It erred in ruling that a systemic claim would have required the naming of other people who were harmed in the HCU.

## *Daubert* decision

The court erred in dismissing all 134 opinions of Correctional Health Care expert Ralf Salke and all 53 opinions of Nephrologist Manpreet Samra, on the causation, nature, and extent of Plaintiff's injury, as not helpful to the jury. Plaintiff was left unable to prove even that he had a serious medical condition. The court misunderstood its role as gate-keeper.

The court erroneously narrowed the case to only the contents of the three grievances Plaintiff wrote during a 17-day period when his health was plummeting, when he had no idea why he was so ill because Greby and the HCU hid information from him.

The nephrologist and correctional health care expert should have been allowed to testify as to what happened medically when the non-medical administrator turned a blind eye to serious systemic problems.

It was not reasonable for the court to believe that a jury would be able to understand medical evidence about acute renal failure and brain damage or the Warden's role in the functioning of the HCU without expert testimiony.

## Decision barring use of Gossett's sworn statements

Gossett swore that he was Assistant Warden at IRCC in 2011 and was promoted to Warden in July 2012. Late in discovery, after dozens of intense depositions were taken, he submitted an unsigned supplemental answer to

interrogatories in which he tried to change his employment dates to put the blame on Nicholson, who was already dismissed from the case.

It was error for the court to bar Plaintiff from using Defendant's sworn statements either as admissions or for impeachment. The court usurped the jury's role by making a credibility decision that Defendant had made a "mistake" that he "corrected."

## Summary judgment decision

The dispute over Gossett's employment dates itself precluded summary judgment.

The court's incorrect *Daubert* decision tied Plaintiff's hands in thoroughly opposing Defendant's summary judgment motion.

Defendant waived argument that the legal theory of supervisory liability should be summarily denied by confusing it with *respondeat superior* and not properly developing the argument in his opening brief.

The court erred in accepting Gossett's false argument in his reply brief that Plaintiff was relying on "radically new fact issues" of supervisory liability, when the legal theory had been thoroughly litigated and Defendant vigorously participated in that litigation.

**ARGUMENT**

I. **Court Applied the Wrong Accrual Date in Rule 12(b)(6) Ruling Dismissing Warden Nicholson on Statute of Limitations Grounds and Erred in Determining There Was No Personal Involvement.**

    A. **Standard of review.**

Review of a dismissal of claims in the complaint for failure to state a cause of action pursuant to Rule 12(b)(6) is *de novo,* with the court accepting plaintiff's well-pleaded factual allegations as true and drawing all reasonable inferences in his favor. *Smykla v. Molinaroli*, 85 F.4th 1228, 1234 (7th Cir. 2023).

When opposing a Rule 12(b)(6) motion, and in appealing a dismissal, a party may elaborate on the factual allegations in the complaint, so long as the new elaborations are consistent with the pleadings. *Geinosky v. City of Chicago*, 675 F.3d 743, 745, fn 1 (7th Cir. 2012).

    B. **Complaint need not anticipate nor refute affirmative defenses like statute of limitations.**

The "plain language of Rule 8(c)(1)" and Rule 12(b) states that an affirmative defense must be raised in the answer, not by motion. *See Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022). "There is a real consequence to this structure: it means that a plaintiff's complaint need not anticipate or refute potential affirmative defenses." *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 640 (7th Cir. 2022). "Rarely will the face of the complaint so clearly prove the opponent's affirmative defense that immediate dismissal, prior to the filing of an answer, will be proper." *Id.*

29

Because a complaint need not anticipate the defense of statute of limitations, the complaint "should not be dismissed just because it does not confirm its own timeliness." *Milchtein v. Milwaukee County*, 42 F.4th 814, 822 (7th Cir. 2022). "[A] federal complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense." *Hollander v. Brown* 457 F.3d 688, 691 (7th Cir. 2006). Only if the defense is unambiguous and obvious from the complaint, *leaving no doubt*, should statute of limitations defense be a bar to the suit. *Luna Vanegas,* 46 F.4th at 640; *see Sanders v. St. Joseph County, Indiana*, 806 F. App'x 481,484–85 (7th Cir., 2020) ("The lack of clarity in Sanders's complaint regarding the date of his release does not warrant dismissal. A plaintiff is not required to plead around potential affirmative defenses, such as the statute of limitations, and so Rule 12(b)(6) is generally not the appropriate vehicle for raising untimeliness.").

The court held the complaint "reveal[ed] that relief is barred by the applicable statute of limitations." Appendix A2 at 8. To the contrary, given that all reasonable inferences were to be made in Plaintiff's favor, the court made factual leaps that were improper. Moreover, Defendant has the burden of pleading and proving the statute of limitations defense. *See Gunn v. Continental Casualty Co.*, 968 F.3d 802, 805 (7th Cir. 2020).

**C.** **Plaintiff's cause of action accrued no earlier than January 16, 2014, when he found out about his injury and learned who caused it.**

The discovery rule delays accrual of plaintiff's claim until he knows that he has been injured and that it was wrongfully caused. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012).

In order to determine the accrual date, the court must first identify the injury. *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). The injury in question here is the acute renal failure that occurred and was first diagnosed on January 16, 2014. It is also the subsequent seizures, strokes, and brain damage caused by renal failure, which did not occur until January 19, 2014.[6]

The court held that because Plaintiff alleged in his complaint that he told medical personnel at IRCC intake about his kidney disease, he "should have known that he was not getting adequate medical attention when he received no monitoring or treatment for his kidney condition." Appendix A2 at 11. However, it is not reasonable to expect an asymptomatic inmate who is not medically trained to know that he has a serious medical problem and what his treatment plan should be. Plaintiff told the IRCC medical personnel that he had had a "kidney problem." (id. at ¶63). However, Plaintiff's understanding was that his "kidney problem" was

---

[6] Statute of limitations was tolled at that point, because Plaintiff was in a coma, under a legal disability (*See Ross v. Stolberg*, 2018 WL 4760992, *6 (Ill.App. 1st 2018)). Moreover, Plaintiff had not exhausted his administrative remedies (which he was unable to do). *See Johnson v. Rivera*, 272 F.3d 519, 521–22 (7th Cir. 2001).

cured and nothing more needed to be done, as long as he monitored his diet and exercise. R. 405-1 at ¶14; R. 405-6 at 78, 80; Appendix A7 at 6 ("Plaintiff does not have any medical training, and after his last visit with the doctor on September 20, 2011, he believed his kidney problem 'was healed'"); id., at 8 ("while Plaintiff knew he needed medical care, he did not know he was suffering from chronic kidney disease when he wrote his grievances"); id., at 22 ("Plaintiff did not know he was suffering from symptoms related to his kidney disease when he submitted his second grievance").

Nothing in the complaint suggests or establishes that Plaintiff knew or should have known that his symptoms immediate before his acute renal failure were being caused by his kidneys. See R. 88 at 7. Moreover, nothing in the complaint suggests Plaintiff knew or should have known that he was not receiving adequate medical treatment due to Defendants' deliberate indifference. Id.

There was a significant power and information imbalance here. The medical staff *knew* from the laboratory reports that Plaintiff's disease was progressing, and they *knew* his serious diagnosis, but they did not tell Plaintiff and they did not do anything about it. He was asymptomatic at IRCC, until mid-November 2013, when he suddenly felt very ill. At that point, he wrote three grievances with pleas that "were dismissed as 'moot' and not an emergency, or ignored entirely." Appendix A2 at 5. Plaintiff did not know he had been denied adequate medical treatment and who had caused that denial until his kidneys actually failed on January 16, 2014. "[A]ny plaintiff who is blamelessly ignorant of the existence or cause of his injury

32

shall be accorded the benefits of the discovery rule." *Stoleson v. United States*, 629

F.2d 1265, 1269 (7th Cir. 1980).

This Court's decision in *Devbrow v. Kalu*, 705 F.3d 765 (7th Cir. 2013) is

directly on point. Devbrow entered prison knowing he was at an elevated risk for

prostate cancer and required a screening biopsy every two—four years. *Id.* at 766.

Although he told prison doctors about this need, he did not receive a biopsy until

seven years later. *Id.* The biopsy led to a diagnosis of prostate cancer; a follow-up

bone scan showed that the cancer had metastasized and was no longer operable. *Id.*

Plaintiff sued two years after the cancer diagnosis. *Id.* at 767. This Court held that

the claim accrued, at the earliest, when Devbrow received the diagnosis, and

possibly not until he learned it had metastasized. *Id.* at 769.

The court distinguished *Devbrow* by stating that Devbrow was "incarcerated

at the same facility," so Defendants "retained the power to do something about his

condition—all the way up to the accrual date." Appendix A2 at 13. The court

erroneously applied the continuing violation doctrine, which states that continuing

refusals to treat a prisoner's disease delays accrual until the last refusal, and *Heard*

*v. Sheahan*, 253 F.3d 316, 318, (7th Cir. 2001), which holds that the clock starts

when defendant no longer has any control over the prisoner's medical care. *Id* at

318. The court said,"[F]or Nicholson, this was when he left Illinois River sometime

in 2012."[7]

---

[7]    It is disputed when Nicholson left IRCC. All the complaint says is that "upon information and
belief," he was there as Warden in 2012. R. 1 at¶27.

*Heard,* however, is silent on the discovery rule. The court said Plaintiff had "all that he needed to bring the claim in 2012" against Nicholson. Appendix A2 at 14. However, it is illogical to require Plaintiff to file suit when his catastrophic injury had not yet occurred, and when he did not know that Nicholson was largely responsible for the inadequate medical care he did not know he was receiving, which substantially contributed to his eventual injury. *See Goodhand v. United States*, 40 F.3d 209, 212 (7th Cir. 1994) ("Until the plaintiff knows that he has been injured and by whom or by what, he has no reason to take steps to determine whether he might have a legal claim"). By the same token, it is not fair that there be no liability for Nicholson, whose indifference resulted in inmates who were in his care and control being forced to receive medical services from, and being injured by, a mean-spirited and incompetent doctor whose removal he could demanded.

Plaintiff's claim accrued no earlier than January 16, 2014. Plaintiff filed suit on January 15, 2016, within the two-year statute of limitations.

**D.     Court erred in ruling that the complaint, and additional facts presented, do not sufficiently allege supervisory liability for Nicholson.**

Under Rule 8(a)(2), a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief.". "[P]laintiff's complaint 'need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . Specific facts are not necessary." *Childress v. Walker*, 787 F.3d 433, 440–41 (7th Cir. 2015) (cleaned up). This rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of

34

a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (cleaned up).

This Court allows broad latitude to plaintiffs, in that "[a] complaint that invokes a recognized legal theory . . . and contains plausible allegations on the material issues . . . cannot be dismissed under Rule 12." *Richards*, 696 F.3d at 638. "Knowledge and intent, in particular, need not be covered in detail." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009).

To establish personal liability, the plaintiff must show that the relevant official "caused the constitutional deprivation at issue" or "acquiesced in some demonstrable way in the alleged constitutional violation." *Gonzalez v. McHenry County, Illinois*, 40 F.4th 824, 828 (7th Cir. 2022) (cleaned up)

Plaintiff's complaint alleges that: Nicholson (and others) knew or should have known Plaintiff was in serious need of medical care but were deliberately indifferent even though timely and appropriate care was feasible (R. 1 at ¶137); he failed to provide Plaintiff the proper continuity of care his kidney disease required, and failed to provide him with the necessary specialists (¶138); and his acts of omission and commission proximately caused Plaintiff's temporary and permanent physical and emotional injuries (¶140).

The complaint also alleges specifically that: Nicholson was the Warden at IRCC (R. 1 at ¶27); as Chief Administrative Officer he was responsible for the overall operation, policies, and management of IRCC, and the formulating of rules, regulations, and policies (¶29); he was responsible for the overall operation of IRCC,

and promulgated rules, regulations, policies, and procedures for the provision of medical care, including the administration of medical services to inmates by medical care providers (¶¶30, 102); he promulgated and enforced rules, regulations, and policies for the effective and equitable resolution of inmate problems and grievances (¶31); he was in charge of Plaintiff's medical care and decisions as a ward of the state (¶32); and as a supervisor, he was aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to Plaintiff (¶103).

The court ruled that the complaint was deficient because "Nicholson was not directly responsible for Ollison's care, and he himself was not personally aware of Ollison's medical condition." Appendix A2 at 15. The court took an improperly narrow view of personal liability, saying, "It would be one thing if Ollison had alleged . . . that he wrote letters to the Wardens, informing them of the lack of medical treatment, or that he had spoken with the Wardens about the problem." Id. Because Plaintiff did not allege that Nicholson "knew specifically of Ollison's kidney disease and inability to receive treatment," or allege that other prisoners had medical care withheld, to support an inference that the problem was systematic, the complaint was insufficient. Id., at 15-16.

Plaintiff did not have to write a letter or have personal contact with the Warden to have a valid complaint. A supervisor may be personally liable for harms resulting from systemic constitutional violations even if the official is unaware of a specific plaintiff's situation. *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir.

1996). Personal involvement does not mean direct involvement. *See Childress*, 787 F.3d at 439-40 ("[P]ersonal responsibility is not limited to those who participate in the offending act"). A claim for deliberate indifference arises where the prison administrator knows that prison conditions create a risk to an inmate and the administrator "instituted, condoned, or willfully turned a blind eye" to the prison's practice. *Id.* at 440. The court acknowledged Plaintiff's allegation that the Warden was aware of the practices that caused Plaintiff's injury, "facilitated and/or turned a blind eye to those practices," and "purposefully ignor[ed] [his] subordinates' misconduct." Appendix A2 at 15. See Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001). The court ruled, however, that this was not sufficient.

The court also erred in ruling that in order to allege a systemic problem, Plaintiff would have had to give examples in his complaint of other people who were effected as a result of the Warden turning a "blind eye" to Greby's incompetent and abusive behavior. There is no requirement, however, that the complaint relate other instances, as in a *Monell* claim. This Court has held that prison hospital administrators are in a position that "justifies the inference at this [complaint] stage of the proceeding that [they do] bear some responsibility for the alleged misconduct." *Antonelli*, 81 F.3d at 1428 (cleaned up); *see also Williams v. Prison Health Services, Inc.,* 167 F. App'x 555, 558 (7th Cir. 2006). It is enough that they failed to act in spite of their knowledge of the serious harm that could befall a person like Plaintiff. *See Sanville*, 266 F.3d at 737.

Finally, just because Nicholson left IRCC while Plaintiff was still there does not mean that Nicholson is not liable and the complaint must be dismissed. Nicholson tolerated Greby's incompetence and allowed her to harm inmates. Greby failed to treat Plaintiff's kidney disease from Day One. The fact that Nicholson did not insist that she be fired and did not "lock her out," as he threatened to do during his tenure, resulted in her remaining on the job, with more opportunity to harm Plaintiff. It would be unfair if Plaintiff cannot sue Nicholson for a medical injury he did not know about until January 16, 2014, when Nicholson's conduct was one of the causes of the injury. Nicholson's retirement schedule does not extinguish Plaintiff's constitutional rights.

Supervisory liability was sufficiently alleged, and the Eighth Amendment claim against Nicholson should not have been dismissed.

## II. Court Erred in its *Daubert* Decision, Barring All Opinions of Certified Correctional Health Care Expert Salke (134) and Nephrologist Samra (53) as Irrelevant and Not Helpful to the Jury.

### A. Standard of review

In its review of a decision to exclude expert testimony, this Court "first undertakes a *de novo* review of whether the district court properly followed the framework set forth in *Daubert*." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (cleaned up). If the district court properly understood its role, then the Court reviews its ultimate decision to exclude expert testimony for an abuse of discretion. *Id.*

Plaintiff submits that the court did not understand its role, requiring a *de novo* review. Furthermore, in its ultimate decision to bar experts Salke and Samra entirely from the case, the court abused its discretion.

### B.    Court did not properly understand its role in applying *Daubert* to the Salke and Samra reports.

Defendant did not identify expert opinions objected to, but in a broad sweep said all opinions were irrelevant. R. 503. This of itself was reason to deny the motion. The principle of party presentation requires the parties to frame the issues for decision. *See United States v. Sineneng-Smith*, 590 U.S. ___, 140 S. Ct. 1575, 1579 (2020) (cleaned up). The court instead wrongly barred Salke and Samra from testifying at all, about anything.

The court did not apply *Daubert* to the particular facts of Plantiff's case and it made erroneous assumptions regarding the scope of Plaintiff's case and the purpose of his experts. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 591 (1993) (gate-keeping inquiry must be tied to the particular facts). The *Daubert* factors do not comprise a rigid checklist, but rather factors to assess reliability depend on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 593; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

The court made strongly positive comments about Salke and Samra's background and experience, Salke with "extensive experience providing health care within a prison setting," and Samra with extensive experience diagnosing and

treating kidney disease. Appendix A6 at 5, 14. However, the court incorrectly

minimized and misinterpreted Salke and Samra's opinions, making these

assumptions:

- Plaintiff's case should be limited to the content and timing of the grievances and whether they gave Gossett specific actual notice of Plaintiff's kidney disease.

- A medical person is not competent to give opinions about a non-medical person's conduct, even to explain what happened medically as result of the non-medical person turning a blind eye.

- Jurors could understand the relationship between Warden and the HCU and issues of supervisory liability, and how it happened that Plaintiff suffered acute renal failure, all without expert experience and opinion.

An expert's testimony qualifies as relevant under Fed.R.Evid. 702 so long as

it assists the jury in determining *any fact at issue in the case. Stuhlmacher v. Home

Depot U.S.A., Inc.,* 774 F.3d 405, 409 (7th Cir. 2014). After improperly narrowing

Plaintiff's case and giving short shrift to supervisory liability, the court described

Salke and Samra's reports as "gratuitous expert opinions," having nothing of value

to offer the case. Appendix A6 at 20.

The court did not properly understand its role in applying *Daubert* to the

Salke and Samra reports.

**C.    Court erroneously limited inquiry of Gossett's personal
       involvement to only direct involvement and the 17-day period
       of the grievances.**

The court stated its task was to determine whether the expert opinions are

"helpful to the trier of fact in this case." Appendix A6 at 14, also 20. However, the

court misapprehended and minimized the scope of what Plaintiff was asking the jury to decide. The court said: "The fundamental questions before the jury in this case are whether the Warden had sufficient notice *Plaintiff* suffered from a serious medical condition and whether he had sufficient notice *Plaintiff* was not receiving adequate care for that condition" (emphasis added) (Id., at 17), concluding "no scientific or specialized knowledge is needed to determine whether notice was provided to a non-medical defendant. Id., at 12-13.

It was error to limit the inquiry of Gossett's personal involvement only to direct involvement and the 17-day period of the grievances. Over and above his indifferent approach to grievances, Gossett allowed the health care system at IRCC to deteriorate to the point that, whether Gossett had specific knowledge of Plaintiff's medical condition or not, he was deliberately indifferent and turned a blind eye to the inevitability that yet another inmate was going to be seriously injured and possibly die, as others had.

### Salke

The court focused almost exclusively on the grievances, thus framing Plaintiff's case incorrectly. The court agreed with Defendant's argument that Salke was "not qualified to offer an opinion concerning the grievance process or the Warden's role in that process." Appendix A6 at 18. However, Salke's function as an expert in this case was not to show deficiencies in the grievance procedure, nor to "suggest [more proper] grievance procedures," nor to show that Gossett violated the

Administrative Code by failing to follow the correct procedure, as the court suggested. Id. at 19.

The court did not address Plaintiff's broader claim supported by Salke's report (Appendix B1) that Gossett was responsible for failing to protect inmates like Plaintiff from a dangerously defective health care system at IRCC run by a Medical Director who, in the course of her career, had caused the deaths of five patients. Correctional health consultant opinions are critical to proving that the functioning of IRCC's HCU was not just sub-standard, but abominable, and that patients were recklessly placed in harm's way by Gossett's inaction.

### Samra

Samra's opinions are critical to proving that Plaintiff's total lack of kidney care at the HCU resulted in avoidable injury, total kidney failure as well as brain damage. Her opinions are critical to proving causation and damage.

Again, the court's erroneous perception was that Samra was trying to render opinions about the quality of the grievance system. It criticized Samra for not reviewing IDOC policies for medical care (id., at 7), not knowing "the specific requirements of the grievance system" (id., at 8), and not being "competent to give an opinion on whether the IDOC Defendants followed the administrative process." (id.). The court said: "Plaintiff is asking this Court to allow his medical expert to testify concerning the requirements of the emergency grievance review procedure." Id., at 10. That is incorrect.

Samra's opinions pertained to how Plaintiff's kidney disease silently progressed over two years to acute renal failure because of no treatment and care from a nephrologist, because of no kidney clinic, and because Gossett did not insist on a triage doctor for critically ill patients when Greby was inexcusably absent. The timing of Greby's final absence proved catastrophic for Plaintiff, resulting in emergent hemodialysis, in turn causing strokes, seizures, and brain injury.

Causation and the extent of injury are critical elements for an Eighth Amendment claim. Despite this, the court barred Samra from testifying.

**D.      Court erroneously held that a medical person is not competent to give opinions relevant to a non-medical person's conduct, even to explain what happened medically as result of the non-medical person turning a blind eye.**

**Salke**

Salke is an expert on the interface between the prison administrative structure and the delivery of medical services through prison HCU's. His opinions pertain to what Gossett knew directly or circumstantially about the risk of injury created by the independent contractor in the HCU.

The court held: "Plaintiff may not use an expert to suggest [IDOC] Defendants were required to have additional medical knowledge." Appendix A6 at 19. However, Plaintiff never argued that. Plaintiff's point was that Gossett did not have to be medically trained to know there were medical consequences to his failure to supervise Greby and the HCU. It is not uncommon for supervisors in an organization not to have the expertise of the people they supervise. That does not

mean that Gossett could "turn a blind eye" to the medical incompetence and cruelty shown by Greby, and her absenteeism.

The court notes with disapproval that Salke had "no experience running a prison." Id., at 15. However, Mr. Salke has worked with wardens, evaluated prison health care systems for accreditation, worked for a contractor providing health care services to prisons, and advised prisons on the creation of clinics and programs. He is fully qualified to give the opinions in his report.

### Samra

The court wrote (Appendix A6 at 5): "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony," citing *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Plaintiff agrees. However, the court then held: "Plaintiff seeks to use his medical expert to impart medical knowledge to the Defendant who . . . is not medically trained." Appendix A6 at 10. That is incorrect. Plaintiff never argued that Gossett should have been a doctor.

Samra's opinions are that the Warden ran the HCU very poorly, and there were medical consequences to Plaintiff from not being treated for kidney disease, not having his alarming laboratory tests acted upon, not having his grievances taken seriously, and not having a triage doctor tending to him in Greby's absence. Her opinions were valid and relevant.

**E.** **Court erroneously held that jurors themselves, without the aid of expert experience and opinion, could understand how prisons function and what caused Plaintiff's acute renal failure and brain injury.**

### Salke

The court erred holding that jurors can understand the prison health care system and supervisory liability without expert testimony.

The court was dismissive of all Salke's opinions about supervisory liability, (Appendix B1 at 84-90), stating that they "could cause confusion since the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under 42 USC §1983." Appendix A6 at 16. However, it was the court that was confused. Supervisory liability (a form of personal liability on federal claims—*see Childress*, 787 F.3d at 439-40) is not the same as *respondeat superior* (vicarious liability for employers on state claims—*see Moy v. County of Cook*, 159 Ill.2d 519, 523-24 (1994)). Supervisory liability is a valid form of personal liability in §1983 cases.

The court further held that Salke could not testify about IDOC administrative directives (Appendix A6 at 14-15), even though they showed Gossett knew he had supervisory responsibilities with regard to the HCU. The court said a jury could decipher the directives on its own. Id.

By barring Salke totally, the court denied jurors proof of Gossett's inadequate reaction to instances of Greby harming patients (Sisson comment: "Greby thinks all inmates are liars and it is her duty to punish through medicine"); the importance of the HCUA position and how leaving it vacant for most of 2013—2014, was reckless;

45

the options available to the Warden to stop the harm to patients and the toxic environment at the HCU, including locking Greby out, contacting the IDOC in Springfield, demanding that Wexford follow through on its threats to fire Greby before something "egregious" happens; and, in general, how a prison administration controls the independent contractor who charges IDOC billions of dollars to provide health care services.

The court equated these opinions with "legal conclusions" (Appendix A6 at 16-17), and concluded: "[N]o scientific or specialized knowledge is needed to determine whether notice was provided to a nonmedical defendant." Id., at 17.

An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining *any fact at issue in the case. Stuhlmacher,* 774 F.3d at 409. It was error for the court to bar all Salke's 134 opinions.

### Samra

The bar on all Samra's opinions left Plaintiff unable to prove essential elements of his deliberate indifference claim and unable to prove causation and damage, i.e., that:

- Plaintiff had a serious medical condition.

- Because of a total lack of kidney care and treatment, Plaintiff's stable kidney disease worsened into acute renal failure and caused brain damage.

- No monitoring and treatment by a nephrologist had a deleterious effect on Plaintiff's health.

- Kidney disease is a "silent killer" that gives no warning.

- Because Greby refused to come to work in early January 2014, when Plaintiff's condition was critical, and Gossett did nothing, Plaintiff had to undergo emergency procedures and suffered brain damage.

- If Plaintiff's grievances had been promptly acted, Plaintiff would have avoided some of the worst effects of renal failure and strokes and seizures.

It was error for the court to bar all Samra's opinions.

## III. Court Erred in Ruling That Gossett's Sworn Testimony That He Arrived at IRCC in 2011 and Was Promoted to Warden in July 2012 Was Simply a "Mistake" That Plaintiff Could Not Use Against Him.

The dispute of fact as to Gossett's employment dates at IRCC itself precludes summary judgment. *See Marnocha v. St. Vincent Hosp. & Health Care Center, Inc.*, 986 F.3d 711, 718 (7th Cir. 2021); Rule 56(a). The court's obligation at summary judgment is to refrain from making credibility determinations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"); *Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017).

The court's Rule 12(b)(6) decision stated "neither party provides an exact date of Nicholson's departure." The court ruled the exact date was not important, however, because any date would be outside the statute of limitations. Appendix A2 at 10.

For eleven months, from July 25, 2019—June 23, 2020, throughout almost all of discovery, Gossett's sworn testimony in answers to interrogatories and at

deposition was that he was an Assistant Warden at IRCC in 2011, and was promoted to Warden in July 2012. R. 369-1 at ¶¶2, 3; R. 495-14 at 17-18, 36, 104, 107, 115. In his belated answer to the complaint, Gossett admitted that he "was employed as Warden at all other times relevant to the events in this complaint," presumably meaning the entire time Plaintiff was at IRCC, 2012-2014. See R. 223 at ¶¶27, 28. In his response to requests to produce, Gossett refused to release any information at all from his employment file. R. 495-19 at ¶¶85-88.

On June 23, 2020, out of the blue, near the end of discovery, after dozens of important depositions had been taken, Gossett served unsigned "supplemental" answers to interrogatories, attempting to significantly change the date he became Assistant Warden at IRCC, from 2011 to March 2013, and the date he became Warden from July 2012 to September 2013, to shift blame for some of the Warden inaction to Nicholson, his predecessor. See R. 495-18.

On September 14, 2020, Plaintiff moved to bar Gossett from disputing his sworn testimony that Plaintiff had relied on throughout discovery. R. 369. The court denied the motion, making a finding of fact that "Defendant Gossett took the [Warden] position in September of 2013." Appendix A4 at 25.

On October 14, 2020, Gossett flipped again, stating as an "undisputed material fact" in his first motion for summary judgment that "at all times relevant to the Complaint, Defendant Gossett was Warden at Illinois River." R. 382 at 2, #3. "All times relevant to the Complaint" means the entire time Plaintiff was at IRCC, 2012-2014.

48

On July 6, 2022, the court addressed the "continued dispute concerning Warden's employment." and ruled that Gossett was "correcting his testimony" in his supplemental answers to interrogatories, and had adequately "explained he mistakenly provided the wrong dates" previously. Appendix A6 at 21. The court barred Plaintiff from using the 2011 arrival date and July 2012 promotion date at summary judgment or trial, even to impeach Gossett. Id. at 23.

It was error for the Court to decide as a matter of law what is truth and what is not truth, what is a mistake and what is not a mistake. Factual issues and credibility issues are for the jury. *See Anderson, supra.* It would be reasonable for the jury to conclude that Gossett worked on the dates sworn to in his answers to interrogatories, deposition, and belated answer to the complaint, not the ones in his unsigned supplement submitted at the end of discovery.

Plaintiff should have been allowed to use Gossett's prior statements against him as admissions in Plaintiff's response to the summary judgment motion, and as impeachment at trial. As an analogy, while an amended complaint which seeks to "correct" the facts supersedes the original complaint, the original complaint may still be used as party admissions. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 640 (7th Cir. 2004); *188 LLC v. Trinity Industries, Inc.,* 300 F.3d 730, 736 (7th Cir. 2002). A party's prior statements, especially when sworn to, are grist for cross-examination.

**IV.    Decision Granting Defendant Gossett Summary Judgment Was Error.**

**A.    Standard of review**.

Review of a summary judgment decision is *de novo. Jackson v. Sheriff of Winnebago County, Illinois,* 74 F.4th 496, 500 (7th Cir. 2023). Summary judgment is appropriate only when there is no dispute of material fact, and the moving party is entitled to judgment as a matter of law. *Id.* at 502; Rule 56(a). Plaintiff as the nonmoving party receives "the benefit of conflicting evidence and reasonable inferences." *Id.*

**B.    Court's erroneous *Daubert* ruling weakened Plaintiff's ability to oppose the summary judgment motion.**

The court had ruled that it "will not address potential *Daubert* motions prior to Summary Judgment." 7/1/21 Order; see R. 518 (7/1/21 transcript) at 11-12 ("you can file your motions for summary judgment, rely on the experts as they are now"). Defendant filed his motion for summary judgment first (R. 484), followed by his *Daubert* motion (R. 503). Plaintiff filed a detailed response, setting forth proof of his theories of direct and supervisory liability, supported by the Salke and Samra reports. R. 495.

The court, however, switched its order of review, making its *Daubert* rulings ahead of its summary judgment decision. It informed the parties that it "has not thoroughly reviewed the arguments of the parties" for the summary judgment motion, in which Plaintiff had heavily relied on expert reports. Appendix A6 at 23. Nevertheless, it struck Plaintiff's response (R. 495) and ruled he would have to re-

draft the response without expert reports and without the use of Gossett's admissions that he arrived at IRCC in 2011 and became Warden in July 2012, which the court described as "the mistaken testimony." Appendix A6 at 23.

The Court erred in rendering a decision that expert reports from Salke and Samra are not relevant to the motion for summary judgment without fully considering plaintiff's multiple theories of liability and how the experts support those theories. Plaintiff's hands were tied in proving supervisory liability without the expert reports, especially because Plaintiff himself did not know how medical decisions were made and was kept in the dark about his own grossly abnormal laboratory reports, and Gossett categorically denied in discovery that he knew anything about any problems with Greby and the toxic HCU environment.

Importantly, some of the proof of supervisory liability is circumstantial and the inference needs to be explained by an expert. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

In addition, the court noted Plaintiff had used the words "failed to intervene" when referring to Gossett's actions. It held that Plaintiff "ha[d] not previously alleged a separate claim based on a failure to intervene," summarily ruling it would not consider that legal theory. Appendix A7 at 3. This was error. The federal rules do not require a plaintiff to allege legal theories or even facts corresponding to each element of a claim. *Sargeant v. Barfield*, 87 F.4th 358, 361 (7th Cir. 2023).

**C.   Defendant waived arguments about supervisory liability by not making them in his motion.**

Defendant argued in his motion for summary judgment that 1) a prison official does not act with deliberate indifference if he reasonably relied on the judgment of medical personnel (R. 485 at 14-15), 2) the three grievances did not give Gossett actual notice of Plaintiff's lack of medical care (id., at 16-19), 3) Gossett did not personally participate in Plaintiff's inadequate medical care (id., at 19-22), and 4) *respondeat superior* and negligent hiring allegations were not allowed in a §1983 claim. (Id., at 23-24).

Plaintiff argued extensively in response: "Because defendants do not address plaintiff's claim of supervisory liability in their motion for summary judgment, they waive the issue." R. 535 at 91, full argument at 91-108.

In Defendant's *reply*, he argued that Plaintiff was attempting to "radically change the factual basis of his claim after the discovery period has ended," thus "preclud[ing] Defendants from conducting any discovery into radically new factual basis of his claim." R. 547 at 160-162. Defendant did not elaborate on what it was learning for the first time in Plaintiff's response, nor what discovery he was denied.

The court adopted Defendant's reply argument, holding that Plaintiff "cannot present new factual allegations in support of his supervisory liability claim in his summary judgment response." Appendix A7 at 26. "Defendants correctly note Plaintiff's complaint made no mention of the Health Care Administrator's tenure, Dr. Greby's absenteeism, Wexford's consideration of terminating Dr. Greby's

52

employment, an alleged cover up, or Defendant Gossett's knowledge of any specific decencies [sic] in the provision of medical care." Id., at 25.

This ruling was error. A complaint does not need detailed factual allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It was not mandatory that the specific allegations the court found missing from the complaint be alleged. Moreover, this is not a Rule 12(b)(6) or 12(c) motion, but a summary judgment motion. The court is to consider all "materials in the record," including pleadings, depositions, interrogatory answers, affidavits or declarations, documents, electronically stored information, admissions, and other material to determine if the moving party is entitled to judgment as a matter of law. Rule 56(c)(1)(A).

Defendant was caught short by not briefing the supervisory liability issue in his opening brief. Arguments raised for the first time in a reply brief should be deemed waived. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012).

### D. Court erred in accepting Defendant's false argument in his reply that Plaintiff was relying on "radically new factual allegations."

It has been clear throughout this litigation that supervisory liability, the derivative legal theory, was being pursued.  In the complaint (¶¶28—32, 94—104, 136—141), Plaintiff clearly alleges that Gossett did not provide Plaintiff with continuity of kidney care, did not provide him with needed specialists, and ignored Plaintiff's persistent cries for help, including in his grievances. Also, Gossett was responsible for providing his wards medical care, was in charge of the medical care

providers, and consented to or approved of the deficient and harmful practices he knew about that ultimately led to Plaintiff's injuries.

Supervisory liability was repeatedly mentioned at court appearances, in documents, and at deposition, e.g.:

> 2/12/20—Disclosure of 700+ pages of emails that clearly implicated the Warden. R. 493-3—493-9.
>
> 2/18/20— Motion to compel hearing where Plaintiff argued: "Now we get—these email pages, that indicate that the warden and the assistant warden, and the healthcare administrator were all in the loop all along that there was a severe problem, a serious problem with Dr. Greby." R. 285 (Audio) at 1:00:54—1:01:18.
>
> 2/18/20—Order that IDOC had to produce Gossett emails.
>
> 3/9/20—Motion to compel disclosure of IDOC emails relevant to Warden's supervisory liability, which were being wrongfully withheld, to show the extent of Gossett's involvement and knowledge. R. 304
>
> 3/10/20—Regional Manager Moore deposition, in which she testified about her emails regarding communications about Greby to the Warden and Assistant Warden. R. 495-26.
>
> 3/24/20—Motion to compel documents regarding IDOC initial rejection of Greby employment application, internal and external investigations of Plaintiff's treatment and of Greby's conduct initiated by Gossett, results of HCUA Sisson's review of Plaintiff's medical file and that of an inmate who died after questionable care. R. 311-1 at 5-6.
>
> 26(a)(1) disclosures giving notice of witnesses for supervisory liability as they were identified through discovery:
>
> > • Fourth Supplemental—3/20/20
> > HCUA Jonathan Sisson
> > Regional Manager Stacy Moore

- Sixth Supplemental—4/13/20
    - Assistant Warden (AW) Christine Brannon
    - AW Stephanie Dorethy

- Seventh Supplemental—5/13/20. Appendix B6
    - Warden Walter Nicholson
    - AW Rhonda Morgan
    - AW Leonta Jackson
    - IDOC Deputy Director Glen Austin
    - IDOC Investigations Commander Randy Plunk
    - IDOC Investigator Larry Sims
    - IDOC Investigator Michael Hood

4/1/20—Hearing where Magistrate Judge stated: "I don't buy it—that the warden has no information regarding the performance of Dr. Greby and the matters that are related here." R. 315 (Audio), at 4:40—5:09. "I think it's pretty clear from the documents that have been submitted that the warden's position initially regarding lack of knowledge as it relates to Dr. Greby's performance, etc., is just not accurate." Id., at 3:49—4:11.

9/14/20—Plaintiff's motion to reverse dismissal of Nicholson and bar Gossett from changing employment dates, detailing legal theory of supervisory liability R. 369.

10/29/20—Samra report disclosed.

2/1/21—Salke report disclosed.

3/26/21—Samra deposition.

4/21/21—Salke deposition, 10 AM—7 PM (R. 457 at 2, re length).

4/27/21—Plaintiff's response to motion for clarification—stating that expert Salke had been retained for Plaintiff's "direct and indirect supervisory liability claim against Warden Gregory Gossett." R. 457 at 1-2, Salke report attached.

6/11/21—19-page detailed demand letter written for 8/23/21 court conference, four pages giving detailed disclosure of supervisory liability legal theory.

The legal theory of supervisory liability was heavily litigated. When Defendant claimed in his reply on October 31, 2022, that Plaintiff was attempting to "radically change the factual basis of his claim after the discovery period has ended," thus "preclud[ing] Defendants from conducting any discovery into radically new factual basis of his claim" (R. 547 at 160-162), he was grossly inaccurate. There is no way the facts in Plaintiff's response were "new" to Defendant or to the court. If nothing else, Salke's expert report submitted on February 1, 2021, made it crystal clear that supervisory liability was part of Plaintiff's claim for deliberate indifference.

The court, nevertheless, adopted Defendant's reply argument, holding that Plaintiff "cannot present new factual allegations in support of his supervisor liability claim in his summary judgment response and therefore the Court will not consider these arguments." Appendix A7 at 26.

The court cited *Shanahan v. City of Chicago*, 82 F.3d 776 (7th Cir. 1996), in support of a blanket prohibition that "plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Id.* at 24. However, *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489 (7th Cir. 2023) abrogated the *Shanahan* line of cases, holding that Rules 8, 15, and 56 do not contain a blanket prohibition, and that it would be "odd" to insist on it, given that Rule 15(b) permits amendments of complaints even during trial. *Id.*

Plaintiff's position here is that there is *one claim* alleged in his complaint—the Eighth Amendment deliberate indifference to Plaintiff's serious

medical needs. Supervisory liability for the Warden is a *legal theory* presented in the complaint for proving deliberate indifference. Even if the court were to decide that supervisory liability was not adequately presented in the complaint, new legal theories are always permissible, even at the summary judgment stage. *Id.*

Finally, Defendant describes no prejudice to him because of "radically new facts." Nor could he, since counsel actively participated in grilling Salke and in all the heavy litigation on this issue.

The court said even if it were to consider the supervisory liability legal theory, Plaintiff set forth insufficient evidence "demonstrating Defendant Gossett had knowledge of any specific issues within either the healthcare unit or Dr. Greby, nor that the Defendant knew the Plaintiff faced a substantial risk of harm." Appendix A7 at 27-28. By barring Salke and Samra, and by making a ruling as a matter of law that Gossett did not arrive at IRCC until March 2013, the court tied Plaintiff's hands in presenting the proof that was there.

**E.** **The grievances gave Gossett actual knowledge, but Plaintiff's case was broader than the content of the grievances and their timing.**

There is no evidence that Gossett ever investigated the emergency grievance nor consulted with competent medical personnel on any of the three grievances. Given Plaintiff's pleas in the grievances Gossett or his designate assistant reviewed, Gossett should have consulted with medical personnel and someone, at some point, should have looked at Plaintiff's chart. *See Thomas v. Wexford Health Sources, Inc., et al.,* 414 F.Supp.3d 1154, 1163 (N.D. Ill. 2019) (denying summary judgment to

57

warden); *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 991-992 (N.D.Ill. 2012). The Warden cannot have it both ways, cloaking himself in feigned ignorance because he is not a doctor, but then making decisions with serious medical consequences as if he were. Moreover, Gossett had good reason to know that Greby was failing to treat or inadequately treating inmates. *See Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018).

The court focused on analyzing the grievances and whether there was compliance with Administrative Directives rather than whether the Constitution was complied with. Appendix A7 at 16-23. This was error.

For the reasons set forth above, the court's granting of summary judgment to Gossett should be vacated

# CONCLUSION

Plaintiff asks the Court to reverse the final judgment (Appendix A1) by reversing the following:

- Dismissal of Defendant Walter Nicholson (Appendix A2),

- Granting of summary judgment to Defendant Gregory Gossett (Appendix A7),

- Orders allowing Gossett to change his dates of employment (Appendix A4, A6), and

- Order barring opinions of Plaintiff's experts, Ralf Salke and Manpreet Samra (Appendix A6).

Respectfully submitted,

Dated: January 4, 2024                /s/ Irene K. Dymkar
                                     Irene K. Dymkar

Attorney for Plaintiff-Appellant:
Irene K. Dymkar
53 W. Jackson, Suite 733
Chicago, Illinois 60604
(312) 345-0123

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

      1)    This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B), because it contains 13,994 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

      2)    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using WordPerfect 2021, in 12-point Century Schoolbook font.


Dated: January 4, 2024                /s/ Irene K. Dymkar
                                      Irene K. Dymkar


Attorney for Plaintiff-Appellant:
Irene K. Dymkar
53 W. Jackson, Suite 733
Chicago, Illinois 60604
(312) 345-0123

# CIRCUIT RULE 31(e)(1) CERTIFICATION

I, Irene K. Dymkar, attorney for plaintiff-appellant, Eric Ollison, hereby certify that on January 4, 2024, I filed electronically, pursuant to Circuit Rule 31(e), appellant's brief in non-scanned PDF format, except for appendix materials not available in non-scanned PDF format.

Dated: January 4, 2024                    /s/ Irene K. Dymkar
                                                    Irene K. Dymkar


Attorney for Plaintiff-Appellant:
Irene K. Dymkar
53 W. Jackson, Suite 733
Chicago, Illinois 60604
(312) 345-0123

**PROOF OF SERVICE**

I, Irene K. Dymkar, attorney for plaintiff-appellant, Eric Ollison, certify that I electronically filed the foregoing Appellant's Brief with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service was made through the CM/ECF system.

Dated: January 4, 2024                     _____/s/ Irene K. Dymkar_____
                                                           Irene K. Dymkar

Attorney for Plaintiff-Appellant:
Irene K. Dymkar
53 W. Jackson, Suite 733
Chicago, Illinois 60604
(312) 345-0123

## CIRCUIT COURT RULE 30(d) STATEMENT REGARDING APPENDIX

I, Irene K. Dymkar, attorney for plaintiff-appellant, hereby certify that all of the materials required by Circuit Court Rule 30(a),(b) are included in the Short Appendix.

Dated: January 4, 2024                    /s/ Irene K. Dymkar
                                              Irene K. Dymkar

Attorney for Plaintiff-Appellant:
Irene K. Dymkar
53 W. Jackson, Suite 733
Chicago, Illinois 60604
(312) 345-0123

No. 23-1125

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Eric Ollison,
Plaintiff-Appellant,

v.

Gregory Gossett et al.,
Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois, Peoria Division
Case No. 17-cv-01077-JES-JEH
The Honorable James E. Shadid

CIRCUIT RULE 30(a) APPENDIX
OF PLAINTIFF-APPELLANT, ERIC OLLISON

Irene K. Dymkar
Attorney for the
Plaintiff-Appellant,
Eric Ollison

Irene K. Dymkar
Law Offices of Irene K. Dymkar
53 West Jackson, Suite 733
Chicago, IL 60604
(312) 345-0123

# Circuit Rule 30(a) Appendix

## Index

Second Amended Judgment in favor of Defendants and against
Plaintiff, entered January 17, 2023, R. 555 . . . . . . . . . . . . . . . . . . . . . .  Appendix A1

Memorandum Opinion and Order dismissing Stateville Defendants,
Defendant Walter Nicholson, and Count Four of Complaint,
entered November 29, 2016, R. 133 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Appendix A2

Order by District Judge James E. Shadid affirming Order barring
Gregory Gossett, Robbie Johnson, and Corey Wise from raising all
affirmative defenses, except for failure to exhaust administrative
remedies, entered September 13, 2019, R. 212 . . . . . . . . . . . . . . . . . . .  Appendix A3

Order by District Judge James E. Shadid denying Plaintiff's motion
for Order modifying Order of November 29, 2016, which dismissed
Warden Nicholson from this action or, in the alternative, because
of his deception, barring Warden Gossett from disputing his sworn
testimony that he arrived at Illinois River Correctional Center
in 2011 and was Warden in 2012, entered January 29, 2021, R. 434 . .  Appendix A4

Summary Judgment Order denying Defendants' motions for
summary judgment on the issue of exhaustion of administrative
remedies, entered April 20, 2021, R. 453 . . . . . . . . . . . . . . . . . . . . . . .  Appendix A5

Order granting Defendants Gregory Gossett, Corey Wise, and
Robbie Johnson's motion to bar Plaintiff's expert witnesses, entered
July 6, 2022, R. 533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Appendix A6

Summary Judgment Order granting Defendants Gregory Gossett,
Corey Wise, and Robbie Johnson's motion for summary judgment,
entered December 20, 2022, R. 549 . . . . . . . . . . . . . . . . . . . . . . . . . . .  Appendix A7

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| ERIC OLLISON, | ) |
| *Plaintiff* | ) |
| v. | ) |
| WEXFORD HEALTH SOURCES INC., et al., | ) |
| *Defendants* | ) |

Civil Action No.   17-1077

## SECOND AMENDED JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐  the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____

☑  other:  that Plaintiff, Eric Ollison's, action against Defendants Hardy, Schwartz, Mays, Funk, Nurse Morris, Mahone, Annette Taller, special representative of Steven Taller, and Nicholson was dismissed on 11/29/2016 pursuant to Memorandum Opinion and Order entered in the Northern District of Illinois, case no. 16 C 00662; Plaintiff's action against Defendants, Unknown Medical Personnel and Unknown Employees of the Illinois Department of Corrections, was dismissed pursuant to Order entered 9/13/2019; Plaintiff's action against Defendants Greby, Wexford Health Sources Inc, Easley, Barker, Critz, Peltier, Law, Greenhagen, Einwohner, Maurice, Sword, Reynolds, Bishop, and Hopkins, was dismissed on 3/3/2022 pursuant to Stipulation of the parties; and Plaintiff's action against Defendants Gossett, Wise, and Johnson was dismissed pursuant to Summary Judgment Order entered 12/20/2022. Plaintiff shall recover nothing from the dismissed Defendants.

This action was *(check one)*:

☐  tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐  tried by Judge _____ without a jury and the above decision was reached.

☐  decided by Judge _____ on a motion for

.

Date:   1/17/2023

*CLERK OF COURT*

_____  s/ Shig Yasunaga

*Signature of Clerk or Deputy Clerk*

**Appendix A1**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ERIC OLLISON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 00662 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| WEXFORD HEALTH SOURCES, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Eric Ollison brought this Section 1983 lawsuit[1] against a slew of correctional and medical personnel[2] at two Illinois Department of Corrections (IDOC) prisons. R. 1, Compl.[3] He claims that, while incarcerated, the Defendants ignored his chronic kidney disease, causing him to suffer acute renal failure in January 2014. *Id.* Several of the Defendants filed motions to dismiss part of the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. R. 38, Hardy's Mot. to Dismiss; R. 62, Stateville Wexford Defs.' Mot. to Dismiss; R. 69, Nicholson's

---

[1]This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

[2]Ollison filed this complaint against the following individuals at Stateville Northern Reception and Classification Center: Warden Marcus Hardy; Dr. Arthur Funk; Dr. Sylvia Mahone, Mary Diane Schwarz; Dr. Steven Taller (deceased); Sarah L. Mays; and Donna Morris (collectively, the "Stateville Defendants"). Ollison also brought claims against the following individuals at Illinois River Correctional Center: Warden Walter Nicholson (2012); Warden Greg Gossett; Dr. Carla B. Greby; Dr. Rebecca S. Einwohner; Lisa Bishop; Connie Sword; Edna L. Greenhagen; Shirley Law; Christine Peltier; C. Darcy Reynolds; Kandis Critz; David Hopkins; Karena Barker; M. Francie Maurice; Jennifer Easley; Corey Wise; and Robbie Johnson (collectively, the "Illinois River Defendants"). Wexford Health Sources, Inc., which contracts with IDOC to provide medical care at IDOC prisons and employs the individual medical personnel defendants, is also a party to this suit.

[3]Citations to the record are "R." followed by the docket entry number and, where applicable, a page or paragraph number.

**Appendix A2**

Mot. to Dismiss; R. 48, IDOC Ill. River Defs.' Mot. to Dismiss, Sever and Transfer; R. 93, Gossett's Suppl. Mot. to Dismiss. The Illinois River Defendants also moved to transfer the entire case to the Central District of Illinois (where Illinois River is located), or alternatively to sever the claims against the Illinois River Defendants and transfer those to the Central District, R. 61, Wexford Defs.' Mot. to Transfer; R. 78, Einwohner, Sword, and Maurice's Suppl. Mot. to Transfer; R. 87, Reynolds's Suppl. Mot. to Transfer. For the reasons discussed below, the Court grants the motions to dismiss (rendering the motions to sever moot), leaving only the claims against certain Illinois River Defendants intact. The Court also grants the motions to transfer this lawsuit to the Central District of Illinois.

## I. Background

For the purposes of this Opinion, the facts alleged in the Complaint are accepted as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). At all times relevant to the Complaint, Ollison was a prisoner in IDOC custody. Compl. ¶ 6. Ollison's claims arise out of his treatment—or rather, the lack thereof—at two of the facilities where he was incarcerated, Stateville Northern Reception and Classification Center (located in the Northern District of Illinois) and Illinois River Correctional Center (located in the Central District of Illinois). *Id.* Ollison was imprisoned at Stateville for a short period from December 2011 to January 2012, when he was transferred to Illinois River. *Id.* ¶¶ 50, 55.

**Appendix A2**

Ollison had already been diagnosed with Stage III chronic kidney disease when he arrived at Stateville. Compl. ¶ 48. He also suffered from proteinuria, nephrotic syndrome, hyperlipidemia, and hypertension. *Id.* Before Stateville, Ollison had been detained at the Kankakee County Detention Center, where he received adequate medical treatment, including frequent laboratory work-ups. *Id.* ¶¶ 47, 49. Ollison took medication to regulate his various conditions—including the kidney disease—and had regular appointments with a nephrologist to monitor his status. *Id.* ¶ 49.

Ollison's medical care deteriorated upon his arrival at Stateville. At intake, he was interviewed by Defendant Sarah Mays, a registered nurse, about his medical history, and given a physical examination by Dr. Steven Taller and Mary Schwarz, a physician's assistant. Compl. ¶ 50. Although Ollison told Mays, Taller, and Schwarz about his chronic kidney disease and other medical conditions, none of them noted that information in Ollison's medical chart. *Id.* ¶ 51. Nor did Stateville's medical personnel independently discover Ollison's kidney disease, even though laboratory tests performed by Dr. Taller yielded abnormal results suggestive of the disease. *Id.* ¶ 53. For these reasons, and because no one obtained Ollison's medical records from Kankakee, the kidney disease was omitted from Ollison's charts and he did not receive the care that he needed. *Id.* ¶ 54.

On January 16, 2012, Ollison was transferred to Illinois River. Compl. ¶ 55. His transfer screening report—completed at Stateville—did not note that Ollison had a kidney disease. *Id.* When Ollison underwent an intake reception screening at

3

**Appendix A2**

Illinois River, the medical personnel there recorded that he had "no significant history"—despite Ollison informing them of his kidney problem—and that his "problem list was updated," yet the list did not note the kidney disease or any of Ollison's other conditions. *Id.* ¶¶ 62-63. Ollison's kidney disease remained unrecorded by Illinois River personnel over the next several months, despite several abnormal laboratory results that should have revealed it. *Id.* ¶¶ 66-69. After July 2012, no laboratory tests were performed on Ollison until March 2013—at which time they came back with seriously abnormal readings, including a high level of urine protein. *Id.* ¶¶ 70-71. It was only at this point that Ollison's prison doctor referred him to a nephrologist. *Id.* ¶¶ 72-73.

The nephrologist saw Ollison in March and April 2013, and ordered various tests. Compl. ¶¶ 74-79. But neither the nephrologist nor Ollison's primary care physician developed a comprehensive treatment plan to control the disease. *Id.* ¶¶ 79-80. What's more, Ollison's appointments with the nephrologist were discontinued after April 2013. *Id.* ¶ 81. In July 2013, Illinois River received Ollison's medical records from Kankakee County Detention Center; the records traced the history of Ollison's kidney disease. *Id.* ¶ 84. But even after receiving these records, the Illinois River medical staff still did not take affirmative actions to monitor or manage his condition. *Id.* ¶ 85.

In November 2013, Ollison began to feel unwell. He complained of sluggishness, dry mouth, chills, shortness of breath, and a salty taste in his mouth that refused to go away. Compl. ¶ 87. He began vomiting regularly for weeks on

end, and his face and legs started to swell. *Id.* He went days without urinating. *Id.* Although he informed the medical staff many times about these symptoms—which were classic signs of renal failure—Ollison received no treatment for his kidneys. *Id.* ¶¶ 86, 88-89. Indeed, the medical staff failed to order so much as a laboratory test, much less refer Ollison to a nephrologist. *Id.* ¶¶ 90-91. All they did was take Ollison's blood pressure and treat him for acid indigestion and heartburn. *Id.* ¶ 93.

Ollison filed three grievances complaining of his lack of treatment, two in December 2013 and one in January 2014. Compl. ¶ 94. In the grievances, Ollison "begg[ed] … to have [himself] fully checked out," stressing that "there is no way [his] body should be reacting this way." *Id.* ¶ 95. But his complaints were dismissed as "moot" and not an emergency, or ignored entirely. *Id.* ¶¶ 96, 98, 100-01.

On December 30, 2013, after repeatedly vomiting throughout the day, Ollison collapsed on the floor of his cell and began writhing in pain and shivering and shaking uncontrollably. Compl. ¶¶ 105-07. His cellmate hit the emergency button, calling a corrections officer over. *Id.* ¶ 106. The corrections officer sent for a nurse, but when she arrived she merely gave Ollison Ibuprofen and Maalox. *Id.* ¶ 108. Over the next two weeks, Ollison saw a number of physician's assistants, nurses, and doctors at Illinois River, but all of them dismissed his complaints, and no laboratory tests were performed until January 16, 2014. *Id.* ¶¶ 109-114. Those tests were reported to the nephrologist, who recommended that Ollison be sent to the hospital immediately. *Id.* ¶ 116.

5

**Appendix A2**

Ollison was admitted to the emergency room at Graham Hospital and diagnosed with acute renal failure. Compl. ¶ 117. Due to the severity of Ollison's condition, he was transferred from Graham to the larger St. Francis Medical Center in Peoria, Illinois. *Id.* ¶ 119. There, Ollison began hemodialysis. *Id.* ¶ 120. But by that point, his condition was so serious that it soon led to complications. He developed paralysis on his left side, and began having seizures. *Id.* ¶ 121. He suffered acute respiratory failure. *Id.* Eventually, he went into a coma. *Id.* ¶ 126.

Because Ollison was a prisoner and ward of the state, the power to make medical decisions on his behalf was vested in Greg Gossett, the Warden at Illinois River. Compl. ¶ 124. Gossett did not inform Ollison's family of his hospitalization, and they only learned of it after a family member called the prison to ask about Ollison's whereabouts. *Id.* ¶ 125. After Ollison's family discovered what had happened to him, they also learned that a do-not-resuscitate order had been instituted for Ollison—against their wishes—and were advised that "the plug should be pulled." *Id.* ¶ 127.

In February, however, Ollison began to recover and was finally discharged from the hospital in April 2014. Compl. ¶¶ 128-29. Although his condition has improved, Ollison has not made a full recovery and will likely suffer permanent injury, including the loss of full functionality in his limbs and the loss of some mental functions. *Id.* ¶ 130. On January 15, 2016—nearly two years after he was admitted to Graham Hospital with acute renal failure—Ollison filed suit against the Defendants under Section 1983, claiming that their deliberate indifference to

**Appendix A2**

his kidney disease caused him injury and violated his Eighth Amendment right to be free from cruel and unusual punishment.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly,* 550 U.S. 544, 555 (2007). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002)).

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

**Appendix A2**

With regard to the statute of limitations, an argument that a complaint was filed too late is actually an affirmative defense. So, instead of applying Rule 12(b)(6), the proper way to analyze a dismissal motion on that ground is as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Like Rule 12(b)(6) motions, however, the allegations must be taken as true, and the Court must be sensitive to the potential need for discovery. Although a plaintiff is not required to plead facts in the complaint to anticipate and defeat a statute of limitations defense, when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, dismissal is appropriate. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010) ("[I]f it is plain from the complaint that the [statute of limitations] defense is indeed a bar to the suit dismissal is proper without further pleading.") (citations omitted).

### III. Analysis

The many Defendants in this case have filed an array of motions to dismiss, sever, or transfer some or all of Ollison's claims. The motions boil down to five issues: (1) whether Ollison's claims against the Stateville Defendants and Nicholson, for alleged misconduct in 2011 and 2012, are barred by the statute of limitations; (2) whether the Complaint adequately alleges the personal involvement of Hardy, Nicholson, and Funk, who had supervisory roles; (3) whether the claims

**Appendix A2**

against the Illinois River Defendants should be severed from the claims against the Stateville Defendants for improper joinder; (4) whether all or part of Ollison's claims should be transferred to the Central District of Illinois; and (5) whether Count Four of the Complaint, which Ollison characterizes as a "Supplemental State Claim for Indemnification by State of Illinois," is barred by sovereign immunity. Each of these issues is addressed in turn.

### A. Statute of Limitations

The Stateville Defendants and Nicholson, the Warden of Illinois River in 2012, argue that Ollison's claims against them are time-barred and therefore must be dismissed. *See* R. 39, Hardy's Br. at 3-5; Stateville Wexford Defs.' Mot to Dismiss ¶¶ 12-18; R. 70, Nicholson's Br. at 3-5. State law supplies the statute of limitations for Section 1983 claims. *Heard v. Sheahan*, 253 F.3d 316, 317 (7th Cir. 2001). Federal courts apply the statute of limitation for the tort most closely analogous to the Section 1983 claim asserted, which, for deliberate-indifference claims premised on lack of medical treatment, is medical malpractice. *Devbrow v. Kalu*, 704 F.3d 765, 768 (7th Cir. 2013). In Illinois, medical malpractice claims must be brought within two years of accrual. *Ray v. Maher*, 662 F.3d 770, 773 (7th Cir. 2011) (citing 725 ILCS 5/13-202). So Ollison's claims against the Stateville Defendants and Nicholson may only proceed if they accrued on or after January 15, 2014.

But when did the claim accrue? Ordinarily, a claim accrues when all the elements of the claim have occurred so that the plaintiff can file suit and obtain

relief. *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182 (2014). When a claim is premised on continual *inaction*, however, the limitations clock does not start until the inaction ends or when the inaction is no longer a proper basis for the claim. More specifically, for a deliberate-indifference claim based on denial of medical care, the Seventh Circuit has held that the limitations clock starts to tick either when the defendant no longer refuses to treat the inmate's condition or when the defendant no longer has the power to do anything about the condition (say, if the inmate leaves the prison). *Heard*, 253 F.3d at 318. The Stateville Defendants contend that Ollison's claim against them therefore accrued when he was transferred to Illinois River on January 16, 2012, because the Stateville Defendants no longer could provide medical care to Ollison. Stateville Wexford Defs.' Mot. to Dismiss ¶ 12; Hardy's Br. at 3. Nicholson argues that the claims against *him* accrued when he stopped working at Illinois River sometime in 2012 (neither party provides an exact date of Nicholson's departure, but that is not important because Ollison did not file the Complaint until January 2016). Nicholson's Br. at 3, 5. That is, the clock began running on each respective defendant when he or she no longer "had the power to do something about [Ollison's] condition." *See Heard*, 253 F.3d at 318. So any alleged wrongs from 2011 or 2012 cannot be raised in a complaint filed in 2016.

But Ollison maintains that the Complaint is timely because his claim only accrued when he knew "his injury and its cause," *Devbrow*, 705 F.3d at 768, and that occurred on January 16, 2014, when he was admitted to Graham Hospital for acute renal failure. R. 88, Pl.'s Resp. Br. at 7. Although he had experienced ill-

10

symptoms before that date, Ollison argues that he had no way of knowing that those symptoms were caused by the lack of treatment for his kidney disease. *Id.* And because he was unaware of that causality, Ollison did not know that he was not receiving adequate medical treatment or that any of the Defendants were deliberately indifferent to a serious medical need until he was hospitalized. *Id.*

But Ollison's own Complaint contradicts his argument. In it, Ollison states that he told medical personnel about his kidney disease when he first arrived at Stateville, so he himself recognized that the condition needed medical care. *See* Compl. ¶ 51. He again reported the kidney disease during his intake screening at Illinois River. *Id.* ¶ 63. So Ollison should have known that he was not getting adequate medical attention when he received, as he himself alleges, no monitoring or treatment for his kidney condition—especially given the contrast between the indifference of the staff at Stateville and Illinois River and the regular, proactive care Ollison received at the Kankakee County Detention Center. In the Complaint, Ollison acknowledges that he had been diagnosed with kidney disease while at Kankakee and received "consistent and competent medical care[] from a primary care physician and from a nephrologist" there. *Id.* ¶¶ 47-48. This care included "frequent laboratory work-ups," monthly or bi-monthly meetings with a nephrologist, and medications to manage the disease. *Id.* ¶ 49.

So Ollison knew he had a serious medical condition when he arrived at Stateville. Compl. at 9. And he knew, from his time at Kankakee, that the condition required medical treatment. Thus, when Ollison received far inferior treatment—

**Appendix A2**

indeed, *no* treatment—at Stateville and Illinois River, he knew all the facts that comprised a claim for deliberate indifference. *See Devbrow*, 705 F.3d at 769 ("[A] prisoner may obtain nominal damages for an Eighth Amendment deliberate-indifference violation in the absence of a compensable physical injury; actual damages are not an element of the claim." (citing *Cotts v. Osafo*, 692 F.3d 564, 569 (7th Cir. 2012))).

It is worth noting an argument that Ollison could have presented (but did not). Specifically, Ollison could have tried arguing that because "accrual rules are applied to the substance of the claim before the court, and *this* deliberate-indifference claim seeks to redress for a concrete physical injury [that is, acute renal failure], not probabilistic future harm or an abstract injury for which nominal damages are available as a remedy," the claim accrued on the date when he learned of the acute renal failure on January 16, 2014. *Devbrow*, 705 F.3d at 769. This argument would have been best supported by *Devbrow*. In that case, the inmate entered prison knowing that he was at an elevated risk for prostate cancer, and required a screening biopsy within two to four years. 705 F.3d at 766. Although he told the prison doctors about this need, he did not receive a biopsy until seven years later. *Id*. The biopsy led to a diagnosis of prostate cancer, and a follow-up bone scan showed that the cancer had metastasized and was no longer operable. *Id*. The inmate sued for deliberate indifference two years after he was diagnosed with cancer, *id*. at 767, and the Seventh Circuit held that the claim accrued, at the earliest, when the plaintiff received the cancer diagnosis (and possibly not until he

12

**Appendix A2**

learned it had metastasized)—*not* when the prison doctors finally referred him for a biopsy and "the deliberate indifference ceased," *id.* at 769. The Seventh Circuit reasoned that, although the plaintiff *could* have brought a deliberate-indifference claim when he was referred for the biopsy—and before he had a compensable physical injury in the form of the cancer diagnosis—that was not the claim he had brought. *Id.* Because the plaintiff was seeking actual damages for cancer, rather than nominal damages for the violation alone, and he did not know about the cancer until it was diagnosed, the date of the diagnosis was the appropriate accrual date. *Id.*

But *Devbrow* is distinguishable from the case at hand. At all times before his diagnosis, the inmate in *Devbrow* was incarcerated at the same facility. So the defendants retained the "power to do something about his condition," *see Heard*, 253 F.3d at 318—and, by extension, remained exposed to liability for failure to exercise that power—all the way up to the accrual date. Indeed, *Devbrow* acknowledged that a continuing deliberate-indifference constitutional violation terminates once a prisoner leaves the jail. *Devbrow*, 705 F.3d at 770 (discussing *Heard*, 253 F.3d at 320). This is consistent with other Seventh Circuit authority. *See Heard*, 253 F.3d at 318; *Blakenship v. Obaisi*, 443 F. App'x 205, 208 (7th Cir. 2011) (unpublished order) (dismissing claims against a prison doctor whose treatment of the plaintiff ceased more than two years before the claim was filed when the plaintiff was transferred to a different facility).

13

**Appendix A2**

Hence, although continuing refusals to treat a prisoner's disease may delay the start of the limitations clock, the clock *does* start when the defendants in question no longer have any control over the prisoner's medical care. *See Heard*, 253 F.3d at 318. For the Stateville Defendants, this was when Ollison left the facility in January 2012, and for Nicholson, this was when he left Illinois River sometime in 2012. As explained above, based on Ollison's own allegations in the Complaint, Ollison had all that he needed to bring the claim in 2012 against the Stateville Defendants and Nicholson, and they no longer had the responsibility to treat him after his transfer to Illinois River (and, for Nicholson, after he left the warden job at that prison). Because Ollison did not file the Complaint until January 2016, around four years afterwards, his claims against the Stateville Defendants and Nicholson are dismissed as untimely.

## B. Personal Involvement of Funk, Hardy, and Nicholson

For the sake of completeness, the Court will discuss the argument, pressed by the supervisory defendants, that the Complaint fails to adequately allege their personal involvement. Specifically, Nicholson and two of the Stateville Defendants, Funk and Hardy, were supervisory personnel who did not have any direct contact with Ollison. Compl. ¶¶ 15-18, 20-22, 27, 29-32. They argue that, because they were not directly responsible for any of the acts or omissions giving rise to Ollison's claim, they cannot be found liable for deliberate indifference. *See* Hardy's Br. at 5-8; Stateville Wexford Defs.' Mot. to Dismiss ¶¶ 19-22; Nicholson's Br. at 6-9.

14

**Appendix A2**

Because there is no *respondeat superior* liability under Section 1983, a plaintiff must demonstrate (and at the dismissal-motion stage, allege) that each defendant was personally involved with the alleged constitutional violation. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). But a supervisor may be liable for the violations of his or her subordinates if the supervisor approved of, or knew of but turned a blind eye to, the subordinates' misconduct. *Id.* Additionally, a senior official may be personally liable for harms resulting from systemic constitutional violations, even if the official is unaware of a specific plaintiff's situation. *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996)

The Complaint does not allege facts that impute either form of personal liability against the three Defendants. As wardens, Hardy and Nicholson were not directly responsible for Ollison's care, and Ollison does not claim that either was personally aware of Ollison's medical condition. Ollison argues that they are nevertheless liable because they were "aware of the practices that cause[d] Ollison injury" and "facilitated and/or turned a blind eye to those practices." Pl.'s Resp. Br. at 11. Furthermore, Ollison alleges that Hardy and Nicholson "purposefully ignor[ed] their subordinates' misconduct." *Id.* But these are "mere conclusory statements" that simply recite the elements of supervisory liability, and thus are insufficient to support a plausible claim. *See Iqbal*, 556 U.S. at 663. It would be one thing if Ollison had alleged (as some prisoners do) that he wrote letters to the Wardens, informing them of the lack of medical treatment, or that he had spoken with the Wardens about the problem. But Ollison has provided no factual

15

**Appendix A2**

allegations that suggest Hardy and Nicholson knew specifically of Ollison's kidney disease and inability to receive treatment. Nor does he allege other instances of deliberate indifference at either facility that would support the inference that Stateville or Illinois Rivers personnel were *systemically* withholding medical care from prisoners.

Ollison's claim against Funk fails for similar reasons. Funk was the Medical Director at Stateville, in charge of promulgating the rules and procedures governing medical care at the facility. Compl. ¶¶ 21-22. Ollison argues that Funk was "directly responsible" for patient care, because he "had the obligation to ensure that the intake information and records were complete and accurate" but did not do so in Ollison's case. Pl.'s Resp. Br. at 9. But Funk did not conduct Ollison's intake screening—in fact, he was not even present at the intake. *See* Compl. ¶¶ 50-51. And Ollison does not allege that Funk had reason to believe that the personnel who *did* conduct the intake committed any misconduct, or that there were systemic problems with the accuracy of patient records that led to constitutional violations. So, with no plausible allegations of personal liability, the claims against Funk, Hardy and Nicholson would have failed even if the claims had been timely filed.

### C. Motion to Sever Illinois River Claims

Next, the Court turns to the motions to sever the claims against the Illinois River Defendants from those against the Stateville Defendants. Because all claims against the Stateville Defendants are dismissed as untimely, *see* Section III.A, only

16

**Appendix A2**

the Illinois River claims remain, making it unnecessary to rule on the motions to sever. Again, however, for the sake of completeness, had the Stateville claims survived, the Court would have kept the two sets of claims in one complaint and the motions to sever would have been denied.

Federal Rule of Civil Procedure 20 permits joinder of defendants when a right to relief against them arises out of the "same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). In prisoner-rights cases, "severance is not mandatory simply because a complaint names officials from more than one prison as defendants." *Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1018 (N.D. Ill. 2015). Although Ollison was transferred from Stateville to Illinois River, his injury—the failure to provide medical care for his kidney disease—was "discre[te] and continuous." *See Young v. Obaisi*, 2015 WL 8013437, at *5 (N.D. Ill. Dec. 7, 2015). This injury forms a "common thread tying together [Ollison's] allegations against several distinct groups of defendants" at two correctional facilities. *See Ruiz*, 144 F. Supp. 3d at 1018 (quotation marks and citation omitted). And no doubt the claims against both the Stateville Defendants and Illinois River Defendants would share common questions of fact concerning Ollison's medical history and the need for medical treatment. Thus, had the Stateville claims been filed within the

17

**Appendix A2**

proper time period, the Stateville and Illinois River claims would have been properly joined.[4]

### D. Motion to Transfer

The Defendants argue that any surviving claims should be transferred to the Central District of Illinois, where Illinois River is located. A district court may transfer any civil action filed in a proper venue to "any other district or division where it might have been brought."[5] 28 U.S.C. § 1404(a). In deciding whether to do so, the court must consider the convenience of the parties and witnesses, and the interest of justice. With the Stateville Defendants' claims dismissed, transfer to the Central District is the better course.

On convenience, the Court must consider the "availability of and access to witnesses, [] each party's access to and distance from the resources in each forum[,] … the location of material events[,] and the relative ease of access to sources of proof." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (internal citations omitted). Here, most of these factors point to

---

[4]Alternatively—if formalistically—Ollison's claims would have been properly joined because (1) he is suing Wexford for its employees' alleged misconduct at both Stateville and Illinois River; (2) Federal Rule of Civil Procedure 18(a) "allows all of plaintiff's claims against Wexford to be brought in one case, regardless of whether Wexford's alleged constitutional deprivations at the [two] correctional centers each constituted its own[] separate transaction or occurrence"; and (3) Ollison's claims against the individual Stateville Defendants arise out of the same transaction or occurrence as his Stateville-related claims against Wexford (likewise his Illinois River-related claims against Wexford and the Illinois River Defendants), permitting joinder of those under Federal Rule of Civil Procedure 20(a). *See Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1017 (N.D. Ill. 2015).

[5]Ollison does not dispute that this action could have been brought in the Central District of Illinois. R. 76, Pl.'s Second Resp. Br. at 6.

the Central District. The remaining individual defendants all work at Illinois River. The remaining claims all arise out of conduct at Illinois River. The primary non-party witnesses—the medical personnel who treated Ollison for his acute renal failure—work at hospitals located in the Central District. That is a crucial point, because the convenience of non-parties deserves special emphasis beyond the litigants themselves. Ollison's medical records are probably located in the Central District; at the very least, the hospital records where Ollison was treated following his renal failure will be in that District (to be sure, because records can be easily transmitted, this point is not nearly as important as the convenience of non-party *witnesses*).

Ollison argues that transferring the case would greatly inconvenience him, because he requires dialysis and regular medical treatment in Chicago. R. 76, Pl.'s Second Resp. Br. at 7. This is an important point, but there are a dozen or so Illinois River Defendants to weigh on the other side. Also, Ollison has not described the dialysis or medical treatment with any specificity, such as the regularity and frequency of the treatments, how long they take, or whether there is something unique about the specific facility in the Northern District. Overall, the convenience factor supports transfer.

As for the "interest of justice" element, this factor relates to the "efficient administration of the court system," and requires courts to look at "docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective

19

**Appendix A2**

desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Research Automation*, 626 F.3d at 978 (internal citations omitted). Neither side presents compelling arguments weighing in either direction. Because both venue options are located in Illinois, there is little reason for either district to have more familiarity with the relevant law. The Defendants argue that judges in the Central District may have more knowledge of the policies and procedures of Illinois River, R. 49, IDOC Ill. River Defs.' Br. at 9; Wexford Defs.' Mot. to Transfer at 10, but those policies and procedures are unlikely to be so complex as to weigh heavily in favor of transfer. And neither side presents data suggesting that either venue would provide a speedier trial. So the interest of justice element is neutral.

The overriding factor in the transfer analysis, then, is the convenience of the parties and non-parties. For the reasons discussed, the convenience factor weighs heavily in favor of the Central District, so the motions to transfer are granted.

**Appendix A2**

## E. Indemnification Claim Against the State of Illinois

Finally, the Court addresses the motion to dismiss Count Four of the Complaint, which Ollison captions the "Supplemental State Claim for Indemnification by State of Illinois." Compl. at 29. In it, Ollison asserts that, "[s]hould any employee and/or agent of the State of Illinois be found liable to plaintiff … then the State of Illinois must indemnify such judgment for" damages and attorneys' costs and fees. *Id.* ¶ 166.

It is unclear if by this allegation Ollison means to join the State of Illinois as a party to this action. Although the Complaint's caption does not include Illinois, the text of the Complaint names the State of Illinois as an "indemnification party." Compl. ¶ 44. But it is long-settled that the Eleventh Amendment bars federal courts from exercising jurisdiction over "actions against a state brought by her own citizens," unless the state consents to suit. *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992) (citations omitted). The fact that a state chooses to indemnify its employees for damages does not constitute consent. *Mann v. Vogel*, 2010 WL 5395631, at *2 (C.D. Ill. Dec. 23, 2010) (citations omitted). So, to the extent that Ollison brings a claim directly against the State of Illinois, that claim is dismissed.

But Ollison contends that Count Four should not be dismissed because it "is not brought to relieve the individual defendants of any liability or force the state of Illinois to take any particular action," but merely to provide a "relevant background" to Ollison's claims against Defendants Wise and Johnson (both IDOC

**Appendix A2**

employees) in their individual capacities.[6] Pl.'s Second Resp. Br. at 14. It is unclear exactly what Ollison means by this. But assuming that Ollison intends Count Four to designate the State of Illinois as indemnitors to Wise and Johnson, the count still must be dismissed, since it is a "mere legal conclusion" that "does not … purport to make a substantive claim," *see Wright v. Carter,* 2015 WL 4978688, at *6 (N.D. Ill. Aug. 20, 2015), and, in any event, a federal court cannot enter a money judgment requiring the State of Illinois to indemnify its employees. The motion to dismiss Count Four is granted.

## IV. Conclusion

For the reasons discussed, the motions to dismiss the claims against the Stateville Defendants, R. 38, R. 62, and against Nicholson, R. 69, and the motion to dismiss Count Four, R. 48, are granted. The motions to sever the claims against the Stateville Defendants and Illinois River Defendants, R. 48, R. 61, are denied as moot in light of the dismissal of the Stateville Defendants. The motions to transfer

---

[6]There is some uncertainty as to whether Ollison intends to sue Wise and Johnson in their individual or official capacities. The Complaint states that "[t]hey are being sued in their individual/personal capacity." Compl. ¶ 43. But Ollison's Second Response Brief argues that Count Four should not be dismissed because "the Eleventh Amendment does not bar claims against employees of the state sued in their official capacities." Pl.'s Second Resp. Br. at 14. Because the latter statement is clearly wrong (except in suits for injunctive relief, which this is not), *see Scott v. O'Grady,* 975 F.2d at 369, and because Ollison's argument makes no sense otherwise, the Court will assume that Ollison made a typographical error in his Second Response Brief and meant to say that the Eleventh Amendment does not bar claims against state employees in their *individual* capacities.

**Appendix A2**

the remaining claims to the Central District of Illinois, R. 48, R. 61, are granted. The status hearing of December 7, 2016 is vacated.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 29, 2016

23

**Appendix A2**

E-FILED
Friday, 13 September, 2019  01:02:12 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC OLLISON, | ) | |
|    Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 17-1077 |
| | ) | |
| WEXFORD HEALTH SOURCES, et.al., | ) | |
|    Defendants | ) | |

ORDER

This cause is before the Court for consideration of various motions including Defendants' objection to Magistrate Judge Jonathan Hawley's July 3, 2019 order granting in part and denying in part Defendants' Motion for Leave to File an Answer Instanter. *See* July 3, 2019 Order, [195].  In addition, Plaintiff has filed a Motion for an Order of Default against Defendants Rebecca Einwohner, Connie Sword, Shirley Law, Catherine Reynolds, and M. Francie Maurice [194]; and Defendants have filed a Motion for Leave to File an Answer Instanter concerning the same Defendants. [197].

I.  BACKGROUND

Plaintiff filed his complaint on January 15, 2016 in the Northern District of Illinois alleging 26 named Defendants and an unknown number of Doe Defendants violated his constitutional rights at Stateville Correctional Center and Illinois River Correctional Center. [1]. The docket demonstrates extensive and ongoing efforts to identify and serve Defendants.

Defendants filed motions to dismiss and/or sever Plaintiff's claims. [38, 48, 61, 62, 69, 78, 87, 92].  Defendant Wexford Health Sources also filed an answer to the

**Appendix A3**

complaint on March 1, 2016, and eight other Defendants filed a timely answer on April 8, 2016. [12, 60]**.**

On November 29, 2016, the Court granted in part and denied in part the motions to dismiss. *See* November 29, 2016 order.  The Court dismissed all Stateville Correctional Center Defendants; Defendants Nicholson, Funk, and Hardy; and a state law claim for indemnification. *See* November 29, 2016 order.

Plaintiff's surviving claims alleges 17 Defendants including Wexford Health Sources, Gregory Gossett, Lisa Bishop, Rebecca Einwohner, Edna Greenhagen, Shirley Law, Christine Peliter, Catherine Reynolds, Kandis Critz, David Hopkins, Karena Barker, M. Francie Maurice, Jennifer Easley, Corey Wise, Robbie Johnson, Carla Greby, and Connie Sword violated his constitutional rights.  Specifically, Plaintiff claims the Defendants were deliberately indifferent to his chronic kidney disease causing him to suffer acute renal failure in January of 2014. [1].

Since the surviving claim was limited to Illinois River Correctional Center, the Court also ordered the case transferred to the Central District of Illinois for proper venue. *See* November 29, 2016 Order, [133].  However, the case was not ultimately transferred to the Central District until February 15, 2017 after the consideration of various, additional motions. [144].

Unfortunately, the docket did not initially indicate which Defendants were dismissed, nor was Plaintiff directed to file an amended complaint clarifying the surviving claims and Defendants.  Therefore, the case entered the Central District with what appeared to be 26 pending Defendants.

2

**Appendix A3**

While actively litigating the case, some of the surviving Defendants failed to file an answer to the complaint.  On June 4, 2019, Defendants Gossett, Johnson, and Wise brought the omission to the Court's attention with a Motion For Leave to File Instanter. [189]. Plaintiff opposed the motion. [190].

Judge Hawley noted Defendants initially had either 21 days after the service of the complaint or 14 days after the Court ruled on the motion to dismiss to file their answers to the complaint. *See* July 3, 2019 Order, p. 2; *see also* Fed.R.Civ.P. 12(a). However, Federal Rule of Civil Procedure 6(b) provides a "court may, for good cause, extend the time…if the party failed to act because of excusable neglect." Fed.R.Civ.P. 6(b)(1)(B).  Excusable neglect is determined by considering:  1) the danger of prejudice to the non-movant, 2) the length of delay and its impact of the judicial proceedings, 3) the reason for the delay, and 4) the movant's good faith. *See* July 3, 2019 Order p. 2-3; *citing Pioneer Investment Services, Co. v. Brunswick Associates, Ltd*., 507 U.S. 380, 395 (1993).

Judge Hawley found the delay in filing an answer was not unduly prejudicial and had little impact on the proceedings since the parties had continued litigating the case as though all answers had been filed.  In addition, while the delay was extensive, it appeared to be an inadvertent mistake which the Defendants brought to the Court's attention.

However, Judge Hawley found allowing the Defendants to include a list of affirmative defenses was another matter.  Adding affirmative defenses nearly three years after the inception of the lawsuit could not only impact the judicial proceedings,

Appendix A3

but also prejudice the Plaintiff.  Since denying Defendants motion to file an answer in its entirety would have been extremely prejudicial to Defendants, Judge Hawley instead allowed Defendants to file an answer 2 ½ years late, but did not permit Defendants to raise any affirmative defenses.  Defendants have now filed an objection to the order. [195].

Further complicating the issue, there are five other Defendants who still have not filed an answer to the complaint.  Therefore, Plaintiff has filed a Motion for a Default Order against Defendants Einwohner, Sword, Law, Reynolds, and Maurice. [194].  Defendants have filed a response to the motion as well as a Motion for Leave to File an Answer Instanter. [196, 197].

## II. OBJECTION TO MAGISTRATE'S ORDER

### A. LEGAL STANDARD

A party may object to a magistrate judge's non-dispositive order within fourteen days of service. *See* Fed.R.Civ.P. 72(a); CDIL LR 72.2(A).  "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a).  "The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made." *See Weeks v. Samsung Heavy Industries Co., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997).

### B. ANAYLSIS

Defendants object to the portion of Judge Hawley's order which prohibits Defendants from raising affirmative defenses.  While Defendants' motion refers to any

4

**Appendix A3**

affirmative defense, their argument focuses on the defense of exhaustion of administrative remedies. (Def. Mot., [195]).

Defendants acknowledge Federal Rule of Civil Procedure 8(c) requires a defendant to list any affirmative defenses in a responsive pleading in order "to avoid surprise and undue prejudice to the plaintiff by providing her notice and the opportunity to demonstrate why the defense should not prevail." *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir.1997); *see also Reed v. Columbia St. Mary's Hospital*, 915 F.3d 473, 478 (7th Cir. 2019).   However, Rule 8(c) does not specify a consequence for a litigants failure to include an affirmative defense in an answer and the Seventh Circuit has held a "district court may (although it need not) permit an untimely affirmative defense, provided the plaintiff does not suffer prejudice from the delay." *Global Technology & Trading, Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 731 (7th Cir.  2015).

The cases cited by Defendants pertain to Defendants who did file an answer, but failed to include or update the list of affirmative defenses.  Nonetheless, Defendants argue Judge Hawley's decision concerning the affirmative defense of exhaustion of administrative remedies was based on inaccurate information.  The Judge specifically found the "only identifiable prejudice to the Plaintiff would be in him having to Respond to the Defendants' Affirmative Defenses at such a late stage in the case when no discovery has been done on those issues." July 3, 2019 Order, p. 3.

Defendants argue Plaintiff not only knew about the affirmative defense of exhaustion of administrative remedies in 2016, but also the parties addressed the issue in discovery.  First, nine defendants did file timely answers to the complaint on March

5

**Appendix A3**

1, 2016 and April 8, 2016, and both answers identified exhaustion as an affirmative defense. (Answer, [12], p. 42-43); (Answer, [60], p. 42-43).   Therefore, Defendants Wexford, Barker, Bishop, Critz, Easley, Greby, Greenhagen, Hopkins, and Pelliter are not currently precluded from raising this affirmative defense.

Second, Defense counsel's First Set of Interrogatories dated March 13, 2018 asked Plaintiff to identify each grievance filed at his facility or with the Administrative Review Board "regarding the allegations of the complaint."  (Def. Mot, Ex. 1, p. 3, Int. #6).  Plaintiff responded by pointing Defendants to documents previously provided and noting the dates of three, relevant grievances. (Def. Mot, Ex. 1, p. 3, Int. #6).

Third, Plaintiff filed a motion to voluntarily dismiss this lawsuit without prejudice on February 12, 2019. (Plain. Mot, [164]).[1]  Plaintiff's motion argued allowing the dismissal would not prejudice Defendant's ability to assert any absolute defenses with the exception of exhaustion of administrative remedies. (Plain Mot., [164], p. 8).  Plaintiff then explained in detail why the defense was "inapplicable" because exhaustion was "not available" to Plaintiff.  (Plain Mot., [164], p. 8).  Plaintiff's motion also included attached grievances as exhibits. (Plain Mot., [164], Ex. A).

Finally, in a subsequent hearing with Judge Hawley, the judge noted how little discovery the parties had actually completed since the lawsuit was initially filed in the Northern District on January 15, 2016.   The Judge then entered a discovery plan calling for all discovery to be completed by May 8, 2020. *See* May 29, 2019 Minute Entry.

---

[1] Since Plaintiff was no longer incarcerated, Plaintiff planned to refile his complaint without the limitations and requirements of the Prison Litigation Reform Act (PLRA).

**Appendix A3**

Given all these factors, Defendants argue Plaintiff was well aware of the Defendants plan to raise exhaustion of administrative remedies as an affirmative defense and there is no discernable prejudice in allowing Defendants to proceed with this defense even three years into the litigation.

Plaintiff's response argues in detail that Judge Hawley should not have allowed Defendants Gossett, Johnson, and Wise to file a late answer because Defendants did not meet their burden under Rule 6.  However, Plaintiff chose not to file an object to the magistrate's order, nor ask the Court for additional time to file an objection.  "Rule 72(a) is unambiguous and unequivocal: 'A party may not assign as error a defect in the order not timely objected to.'" *Collier v. Caraway*, 2017 WL 1077650, at *2 (S.D.Ind. March 22, 2017), *quoting* Fed. R. Civ. P. 72(a); *see also Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chicago*, 543 Fed.Appx. 591, 594-95 (7th Cir. 2013) ("By not filing timely objections, litigants typically waive their right to challenge on appeal the issues decided in a magistrate judge recommendation" or decision.); *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538 (7th Cir.1986)(failure to file objections within the specified time period waives the right to appeal a magistrate's order).  Furthermore, while Plaintiff continues to argue allowing a late answer is extremely prejudicial to Plaintiff, the record simply does not support his contention.

Defendants limited their objection to the issue of whether Defendants should be able to proceed with the affirmative defense of exhaustion of administrative remedies. In response to this specific objection, Plaintiff again bewilderingly argues he "assumed exhaustion was not being asserted by defendants as an affirmative defense." (Plain.

7

**Appendix A3**

Resp. [203], p. 7).  Plaintiff wholly ignores the repeated, specific references to this defense cited in Defendants' objection.

Plaintiff also argues allowing the Defendants to raise this defense nearly three years into the litigation is "grossly unfair" to Plaintiff who could face additional time and expense addressing the issue including a possible hearing pursuant to *Pavey v Conley*, 544 F.3d 739, 742 (7th Cir. 2008). (Plain. Resp., [203], p. 6).  In addition, Plaintiff says he faces prejudice because the PLRA bars an inmate from proceeding with his case if the inmate failed to exhaust his administrative remedies before filing his lawsuit. *See* 42 U.S.C.§1997e(a).

The Seventh Circuit has explained "the expense of conducting a suit does not count as prejudice." *Global Technology & Trading, Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 732 (7th Cir. 2015).  Prejudice instead " is a reduction in the plaintiff's ability to meet the defense on the merits—if, say, a witness has died, or documents have been destroyed, during the time between when the defense should have been raised and when it was actually raised." *Id.*   Therefore, prejudice is not based on whether or not a defendant's affirmative defense will ultimately succeed, but rather on whether or not the Plaintiff has been allowed an adequate opportunity to garner a respond. *See Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005)(Defendant allowed to raise exhaustion for the first time at summary judgment finding Plaintiff "was not prejudiced; he was aware of the exhaustion issue even when he filed his complaint, and he confronted the defense in responding to the motion for summary judgment."); *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005)("where the plaintiff has an opportunity to respond to a late affirmative

**Appendix A3**

defense, he cannot establish prejudice merely by showing that the case has progressed significantly since the defendants answered his complaint).

While Judge Hawley found Plaintiff could face potential prejudice defending against a last-minute affirmative defense, the parties did not present a complete and accurate record for the Judge's consideration. Exhaustion has long been an issue in this case as evidenced by the two answers filed in 2016; previous discovery; relevant documents in Plaintiff's possession; and Plaintiff's previous argument concerning exhaustion in his Motion to Voluntarily Dismiss. Therefore, the Court finds based on the incomplete record presented to Judge Hawley, there was clear error in preventing the Defendants from raising the affirmative defense of exhaustion of administrative remedies.

For clarification of the record, the Court must address two further issues. While the Defendants refer to other affirmative defenses in their objection, Defendants have not adequately demonstrated barring other affirmative defenses was a clear error. Therefore, Defendants Gossett, Johnson, and Wise may *only* assert the affirmative defense of exhaustion of administrative remedies. No other affirmative defenses may be raised at this late juncture in the litigation.

In addition, the Court notes Plaintiff's response again raises his dissatisfaction with the Court's decision to deny his motion to voluntarily dismiss his lawsuit. Plaintiff notes the Court found Plaintiff had not demonstrated an adequate reason for the delay in filing the motion and it was prejudicial to Defendants. Plaintiff says the same standard should apply to Defendants' motion for leave to file an answer instanter.

Again, Plaintiff chose not to file an objection to Judge Hawley's order and the Court considers different factors when determining whether to allow a motion to voluntarily dismiss versus a motion for leave to file a late answer instanter. For instance, Plaintiff requested extensions of time to complete discovery despite Judge Hawley's admonitions concerning the importance of abiding by the deadlines. [157, 160]. Ultimately, Judge Hawley refused to allow Plaintiff's requests for nearly a one year extension of the discovery deadline. *See* September 4, 2018 Minute Entry. Five months later, Plaintiff filed the motion to voluntarily dismiss his lawsuit. [164].

The Court set Plaintiff's motion to dismiss for a hearing and allowed each side to present arguments. The Court addressed each of the factors necessary in determining whether to grant a motion to voluntarily dismiss including: "defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant." *Pace v. S. Express Co.*, 409 F.2d 331, 334 (7th Cir. 1969). After consideration each of the parties' arguments, the Court ultimately denied Plaintiff's motion noting Plaintiff failed to explain why he waited three years after his release from custody to file his motion to dismiss while still continuing to litigate his claims. In addition, the dismissal would prejudice Defendants given the time and expense Defendants indicated they had already invested. *See* May 2, 2019 Minute Entry. While discovery has not progressed in this case, Defendants had already expended resources filing and responding to numerous motions and obtaining an expert witness. Furthermore,

10

**Appendix A3**

Plaintiff did not express an interest in allowing the dismissal while paying the costs of litigation.

## III. MOTION FOR AN ORDER OF DEFAULT
## AND MOTION TO FILE ANSWER INSTANTER

Plaintiff asks the Court for an order of default against Defendants Eihwohner, Sword, Law, Reynolds and Maurice and a hearing to determine damages. [194]. Plaintiff argues a "default order is mandatory" based on the Defendants complete failure to file an answer in this case for three years. (Plain. Mot, [194], p. 4). Defendants oppose the motion and ask instead for leave to file an answer instanter. (Def. Mot., [197]).

Federal Rule of Civil Procedure 55 authorizes the entry of default judgment against a party who "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a), (b)(2). However, "the term 'otherwise defend' is broader than filing an answer or motion under Rule 12(b)." *Mir v. State Farm Mutual Automobile Insurance Company*, 2019 WL 1237143, at *1 (C.D.Ill. March 18, 2019). It also refers to appearing and challenging matters such as service, venue, or sufficiency of pleadings. *Id.*; *see also* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2682 (4th ed. 2019). "This broad interpretation … reflects the strong policy in favor of deciding matters on the merits rather than by default." *Mir,* 2019 WL 1237143, at *1; *citing Sun v. Board of Trustees of the University of Illinoi*s, 473 F.3d 799, 811 (7th Cir. 2007).

For instance, in *Cannon v. Washingto*n, 321 Fed.Appx. 501 (7th Cir. 2009), the district court granted a motion for summary judgment on the issue of exhaustion. The

**Appendix A3**

Seventh Circuit reversed and remanded, a scheduling order was entered, and discovery began before Defendants realized they had not filed an answer.  The Seventh Circuit held "[e]ven in the absence of a responsive pleading, (the defendants) had not failed to 'otherwise defend' the suit." *Cannon,* 321 Fed.Appx. at 503.

The Court further notes the Seventh Circuit has recognized default judgments are a harsh sanction which "are not favored." *Isby v. Clark,* 100 F.3d 502, 504 (7th Cir. 1996). Consequently, "a district court may conclude in its discretion that a party's conduct was 'hardly admirable' but still not the sort of 'egregious conduct' that would warrant entering a default." *Shaw v. Illinois Dept. of Corrections,* 2009 WL 1904398, at *1 (C.D.Ill June 29, 2009); *quoting In re Hall,* 304 F.3d 743, 748–49 (7th Cir.2002).

Although Plaintiff is correct Defendants Eihwohner, Sword, Law, Reynolds and Maurice failed to file an answer for three years, the Defendants have actively litigated this case through changes in counsel and venue.   While the lapse in filing an answer is extensive, the Defendants did "otherwise defend" in response to Plaintiff's complaint. *See* Fed.R.Civ.P. 55(a).

Furthermore, the three year time period unfortunately does not adequately reflect the litigation efforts in this case.  The first year was largely devoted to identifying and serving Defendants and, as repeatedly noted, limited discovery has been completed.

Plaintiff continues to argue allowing another tardy answer will result in extreme prejudice to Plaintiff, and Defendants have simply not demonstrated good cause and excusable neglect for the delay.  However, the Seventh Circuit has clearly held a district

12

**Appendix A3**

court's discretion to allow a late answer "is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer, but extends to some cases in which the delay is caused by inadvertence, mistake, or carelessness." *Lewis v. School Dist. #70*, 523 F.3d 730, 740 (7th Cir. 2008)(internal citation omitted).  The determination of "excusable neglect" is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer*, 507 U.S. at 395. As previously noted, the Court considers the danger of prejudice, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant had acted in good faith. *Id.*  Ultimately, "[p]arsing the inexcusable from the excusable is a matter of discretion." *Elliot v. Mission Trust Services, LLC*, 104 F.Supp.3d 931, 939 (N.D.Ill. May 18, 2015); *citing In re Canopy Financial, Inc.*, 708 F.3d 934, 936 (7th Cir.2013).

Defendants' inadvertent error in failing to file an answer for three years is not a compelling excuse.  The Court is more persuaded by the fact that the parties continued to litigate the case as though all answers had been filed.  In addition, there is no evidence of bad faith by the Defendants.  Therefore, allowing the late answer will have little, if any, impact on the judicial proceedings, and little, if any, prejudicial impact on Plaintiff. *See i.e. Favorite v. Sakovski*, 2019 WL 3857877, at *2 (N.D.Ill. Aug 16, 2019)(allowing late answer even though defendants fail to provide a good reason for delay, because minimal impact on proceeding, no reason to believe prejudice to plaintiff or bad faith on part of defendant).

**Appendix A3**

Therefore, the Motion for a Default Order is denied. [194].  Defendants Eihwohner, Sword, Law, Reynolds and Maurice's Motion for Leave to File an Answer Instanter is granted in part and denied in part. [197],  Defendants may file an answer, but may only raise the affirmative defense of exhaustion of administrative remedies at this late juncture.

## IV. REMAINING DEFENDANTS AND SCHEDULING

The docket in this case still identifies "unknown medical personnel" and "unknown employees of the Illinois Department of Corrections."  However, there has been no effort since the case was transferred to the Central District on February 15, 2017 to identify or serve any other Defendants.

In addition, the caption to Defendants' recent motions lists Doe Defendants and previously dismissed Defendants. [197].

Therefore, for final clarification of the record, the Court finds Plaintiff's Eighth Amendment individual and official capacity claims are  alleged against the following 17 Defendants: Wexford Health Sources, Gregory Gossett, Lisa Bishop, Rebecca Einwohner, Edna Greenhagen, Shirley Law, Christine Peliter, Catherine Reynolds, Kandis Critz, David Hopkins, Karena Barker, M. Francie Maurice, Jennifer Easley, Corey Wise, Robbie Johnson, Carla Greby, and Connie Sword. If either party disagrees, they MUST file a motion to clarify within 14 days of this order.

Finally, typically the Seventh Circuit prefers for the parties to address the issue of exhaustion of administrative remedies prior to discovery on the merits. *See Pavey*, 544

14

**Appendix A3**

F.3d at 742.  The matter is referred to Judge Hawley for consideration of a separate dispositive motion deadline on this issue.

IT IS THEREFORE ORDERED:

1) The Defendants' objection to Magistrate Judge Jonathan Hawley's July 3, 2019 order is overruled in part and sustained in part. [195]. Defendants will be allowed to raise the affirmative defense of exhaustion of administrative remedies, but will not be allowed to raise any other affirmative defense at this late juncture in the litigation.

2) Plaintiff's Motion for a Default Order is denied. [194].

3) Defendants Rebecca Einwohner, Connie Sword, Shirley Law, Catherine Reynolds, and M. Francie Maurice's Motion for Leave to File an Answer Instanter is granted in part and denied in part.  [197]. Defendants may file an answer, but may only raise the affirmative defense of exhaustion of administrative remedies.

4) Defendants Rebecca Einwohner, Connie Sword, Shirley Law, Catherine Reynolds, and M. Francie Maurice as well as Defendants Defendants Gossett, Johnson, and Wise must refile their answers within seven days in compliance with this order.

5) The Clerk of the Court is directed to dismiss Defendants "Unknown Medical Personnel" and "Unknown Employees of the Illinois Department of Corrections" for clarification of the record.  The Court has identified the 17 surviving Defendants in this order. If either party believes there is an error in identification

15

**Appendix A3**

of the surviving Defendants, they MUST file a motion to clarify within 14 days of this order or this case will continue with the 17 identified Defendants.

6) This matter is referred to Magistrate Judge Hawley for further scheduling and consideration of a dispositive motion deadline on the issue of exhaustion.

ENTERED this 13th day of September, 2019.


s/ James E. Shadid
_____
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE

**Appendix A3**

E-FILED
Friday, 29 January, 2021 10:27:28 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC OLLISON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 17-1077 |
| | ) | |
| WEXFORD HEALTH SOURCES, et.al., | ) | |
| Defendants | ) | |

CASE MANAGEMENT ORDER

This cause is before the Court for consideration of various pending motions including Plaintiff's Motion to Modify the November 29, 2016 Court Order, (Plain. Mot., [369]); various motions to strike, (Plain. Mot., [370]); (Def. Mot., 373]); (Plain. Mot., 389]); (Def. Mot., [416]); (Plain. Mot., [423]); and a motion to allow consolidated briefing, [390].

I.  BACKGROUND

Plaintiff and his counsel originally filed a complaint in the Northern District of Illinois on January 15, 2016 alleging Defendants at both Stateville Correctional Center and Illinois River Correctional Center (IRCC) violated Plaintiff's constitutional rights. [1].  The Court dismissed all Stateville Defendants, and the case was transferred to the Central District of Illinois on February 15, 2017. (Order, [144]).

Plaintiff's surviving claims allege 18 correctional and medical staff members were deliberately indifferent to Plaintiff's chronic kidney disease causing him to suffer acute renal failure in January of 2014. (Comp., [1]).

The docket reflects a troubling display of acrimony between the parties and extensive delays in resolving this litigation. On March 31, 2017, Magistrate Judge

**Appendix A4**

Jonathan Hawley entered his 14-page Standing Order informing the parties of the Court's rules and expectations of the parties during discovery. [148]. Judge Hawley adopted the parties' own Discovery Plan on April 24, 2017 setting the close of all discovery on November 30, 2018; a dispositive motion deadline on December 31, 2018; and a June 3, 2019 Trial Date. *See* April 24, 2017 Text Order.

Since that time, the parties have filed 94 separate motions.  Twenty- three motions requested additional time. *See* (Doc # 157, 160, 169, 201, 211, 227, 238, 251, 252, 279, 280, 309, 310, 332, 364, 377, 380, 381, 385, 404, 414, 415, 425).  Twenty-five motions addressed discovery disputes between the parties. *See* (Doc # 166, 167, 173, 175, 193, 205, 213, 215, 222, 253, 265, 291, 300, 307, 311, 316, 327, 335, 337, 344, 358, 361, 362, 370, 396).  Consequently, Judge Hawley has held 22 separate hearings in this case. *See* September 4, 2018 Minute Entry; February 14, 2019 Minute Entry; April 2, 2019 Minute Entry; May 29, 2019 Minute Entry; March 29, 2019 Minute Entry; September 13, 2019 Minute Entry; September 19, 2019 Minute Entry; September 23, 2019 Minute Entry; October 4, 2019 Minute Entry; October 16, 2019 Minute Entry; December 20, 2019 Minute Entry; January 7, 2020 Minute Entry; February 18, 2020 Minute Entry; March 5, 2020 Minute Entry; March 9, 2020 Minute Entry; April 1, 2020 Minute Entry; May 6, 2020 Minute Entry; July 13, 2020 Minute Entry; July 23, 2020 Minute Entry; September 25, 2020 Minute Entry; October 2, 2020 Minute Entry; December 16, 2020 Minute Entry.

Yet another hearing is scheduled for February 5, 2021 to address the latest discovery dispute. *See* January 6, 2021 Text Order.

**Appendix A4**

During these hearings, Judge Hawley repeatedly advised the parties they must abide by discovery deadlines.  Judge Hawley's Standing Order also specifically admonished the parties "'[a]ny discovery disputes raised with the Court after the expiration of the relevant discovery deadline shall be deemed waived by the Court…" Standing Order, [148] p. 5.

On September 1, 2020, this Court granted Plaintiff's Motion to Strike untimely disclosed discovery and granted Medical Defendants' Motion for Sanctions "to the extent that the Plaintiff will not be allowed to submit documents at dispositive motion or trial which were obtained after the close of fact discovery." September 1, 2020 Text Order.

> The Magistrate Judge informed the parties that fact discovery was limited to oral discovery on December 20, 2019, and he has repeatedly admonished the parties since that time that written discovery is over. *See* December 20, 2019, Minute Entry; February 18, 2020, Minute Entry; March 19, 2020, Text Order; May 6, 2020, Minute Entry. Therefore, the Court will not accept any written discovery obtained by any party after the close of fact discovery. This case has been pending for more than 4 1/2 years and the parties have been given ample opportunity to litigate their claims. September 1, 2020 Text Order.

Deadlines in this case were recently extended again. *See* January 7, 2021 Text Order. Currently, all remaining oral discovery must be completed on or before April 30, 2021; the dispositive motion deadline is set for June 1, 2021; a final pretrial conference is scheduled for October 1, 2021; and a jury trial is set for November 1, 2021. *See* January 7, 2021 Text Order. However, Plaintiff's counsel has filed an unopposed motion to extend the trial date to March of 2022. (Plain. Mot., [425]).

## II. PLAINTIFF'S MOTION TO RECONSIDER

**Appendix A4**

Plaintiff has filed a Motion for Order Modifying Order of November 28, 2016,
Which Dismissed Warden Nicholson From This Action Or, In the Alternative, Because
of His Deception, Barring Warden Gossett from Disputing his Sworn Testimony That he
Arrived at Illinois River Correctional Center in 2011 and Was Warden in 2011. (Plain.
Mot., [369]).

The November 28, 2016 Order entered by Northern District of Illinois Judge
Edmond E. Chang dismissed all claims against Stateville Correctional Center
Defendants and IRCC Warden Nicholson finding, in part, the claims were barred by the
statute of limitations period. *See* November 28, 2016 Order, p. 9-14.

The Court notes Plaintiff's claims are subject to a two-year statute of limitations
period. *See Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006).  In addition, Plaintiff's
claims accrued when he had reason to know of the injury which formed the basis of this
action. *See Woidtke v. St. Clair County, Illinois*, 335 F.3d 558, 562 (7th Cir. 2003); *Sellars v.
Perry,* 80 F.3d 243, 245 (7th Cir.1996).  More specifically, "[d]eliberate indifference to a
serious medical need is a continuing violation that accrues when the defendant has
notice of the untreated condition, and typically ends only when treatment is provided
or the inmate is released." *Ruiz v. Williams,* 144 F.Supp.3d 1007, 1012 (N.D.Ill., Nov. 17,
2015)(internal citation omitted).

However, even when an injury is ongoing, "[l]iability is defendant-specific."
*Heard v. Elyea*, 525 Fed.Appx. 510, 512 (7th Cir. 2013). Therefore, a claim against an
individual defendant "accrues immediately when that person loses the ability to do
something about [the plaintiff's] condition" *Id.* (internal quotation omitted).

**Appendix A4**

In this case, the Court found Plaintiff's claim accrued when Defendant Nicholson left IRCC sometime in 2012.  Since Plaintiff did not file his complaint until January of 2016, his complaint was untimely. (Plain. Mot., [369]).

Plaintiff argues when the Court dismissed Defendant Nicholson, it "admitted that it was not clear from the complaint when Nicholson worked at Illinois River" since neither side provided a clear departure date. (Plain. Mot., [369], p. 2).  However, on June 23, 2020, Defendant Warden Gossett for the first time stated he came to IRCC as an Assistant Warden in March of 2013 and "became Warden in September 2013 (not July 2012)." (Plain. Mot., [369], p. 3).  Plaintiff argues he was "unduly prejudiced" when he previously relied on "defendant's representations" concerning the Warden's work history. (Plain. Mot., [369], p. 3).

Furthermore, Plaintiff argues the Court should have considered Defendant's motion pursuant to Federal Rule of Civil Procedure 12 (c), rather than 12(b)(6) since the motion concerned an affirmative defense.   Plaintiff argues "[f]ailure to follow this procedure deprived plaintiff of notice of the affirmative defense and opportunity to contest it." (Plain. Mot., [369], p. 7).

Plaintiff's disingenuous motion misrepresents the record before this Court.   The November 29, 2016 order noted Defendant Nicholson's motion addressed more than one issue. "With regard to the statute of limitations…the proper way to analyze a dismissal motion on that ground is as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c)." November 29, 2016 Order, p. 8, *citing Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012.

**Appendix A4**

Although a plaintiff is not required to plead facts in the complaint to anticipate and defeat a statute of limitations defense, when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, dismissal is appropriate. November 29, 2016 Order, p. 8.

Furthermore, Defendants' motion to dismiss argued "[p]ursuant to Plaintiff's allegations, the statute of limitations against Defendant Nicholson accrued, at the very latest, *in 2013*, because he was no longer Warden at Illinois River, and was not responsible for any oversight of Plaintiff's confinement." (Def. Memo, [70], p. 5) (emphasis added).   Judge Chang acknowledged "neither party provides an exact date of Nicholson's departure, *but that is not important because (plaintiff) did not file the Complaint until January 2016*." November 29, 2016 Order, p. 13 (emphasis added).

Plaintiff has provided no evidence concerning when Defendant Warden Nicholson left IRCC.  Plaintiff instead asks the Court to assume there was no interim Warden before Defendant Gossett took the position in September of 2013.  Even if the Court assumes Defendant Nicholson did not leave IRCC until 2013, Plaintiff has not presented new evidence. As Judge Chang noted, filing a complaint in January of 2016 was outside the required two-year statute of limitations period.

Plaintiff next contends the appropriate accrual date for his claims is January of 2014 because Plaintiff had no way of knowing he was not receiving adequate medical treatment until he was hospitalized at this time for renal failure.  Plaintiff refers to the Seventh Circuit opinion in *Devbrow v. Kalu* which held an inmate's claim did not accrue until he received his cancer diagnosis. *Devbrov,* 705 F.3d 765, 768 (7th Cir. 2013) ("statute of limitations starts to run when the plaintiff discovers his injury and its cause.").

**Appendix A4**

However, Judge Chang thoroughly considered the *Devbrov* case and found Plaintiff's "own Complaint contradicts his argument." November 29, 2016 Order, p. 11.

> Ollison knew he had a serious medical condition when he arrived at Stateville. And he knew, from his time at Kankakee, that the condition required medical treatment. Thus, when Ollison received far inferior treatment—indeed, no treatment—at Stateville and Illinois River, he knew all the facts that comprised a claim for deliberate indifference. November 29, 2016 Order, p. 11-12.

The Court also considered additional arguments in favor of a later accrual date which Plaintiff failed to address in his response to the motion to dismiss. *See* November 29, 2016 Order, p. 12-14.

In the end, the Court found the *Devbrow* case was clearly distinguishable from the case at bar because the plaintiff in *Devbrow* was incarcerated at the same facility and the defendants still had the "power to do something about his condition." November 29, 2016 Order, p. 13 (internal citation omitted). Once Defendant Nicholson was no longer employed at IRCC, he no longer had any control over Plaintiff's medical care. *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 518 (7th Cir. 2019)( "[t]he date of the defendant's departure thus marks the last possible time when the claim might have accrued."); *Heard v. Elyea*, 525 Fed. Appx. 510, 511-512 (7th Cir. June 3, 2013)( cause of action against medical director accrued when the director retired and was no longer in a position to help or harm the inmate);*Haywood v. Feinerman*, 2020 WL 3618463, at *2 (S.D.Ill. July 2, 2020)("Simply put, if a defendant leaves his or her employment at the correctional facility where a plaintiff is incarcerated, the statute of limitations begins to run."); *Harris v. Larson*, 2016 WL 5118640, at *2, FN 2 (S.D.Ill. Sept 21, 2016)(plaintiff's

**Appendix A4**

claim did not accrue on the last day of actual treatment, but on the last possible date defendant "could have" provided care.).

Plaintiff also argues Judge Chang incorrectly found Plaintiff had failed to allege any "plausible allegations of personal liability" against Defendant Nicholson. November 28, 2016 Order, p. 16.  Plaintiff's argument is moot since any claim against Defendant Nicholson is barred by the statute of limitations period and Plaintiff has presented no basis for reconsidering this ruling at this late stage of the litigation.

The Court also notes Judge Chang delayed transferring this case to the Central District in order to allow Plaintiff time to file a motion to reconsider his order. (Plain. Mot., [134]); December 2, 2016 Minute Entry).  The Court denied Plaintiff's motion, finding his "arguments essentially recycle the same arguments previously advanced by Plaintiff in the first round of briefing." *See* February 14, 2017 Minute Entry.[1]

Now, approximately a year after the close of written discovery and four years after Judge Chang's order dismissing Defendant Nicholson, Plaintiff has once again filed a motion to reconsider.  Plaintiff's motion blatantly misrepresents the record, provides no new and relevant information, and once again rehashes the same arguments previously considered and rejected.  The frivolous motion is denied. (Plain. Mot., [369].  Defendants' Motion to Strike and Motion for an Extension of Time to File a Response are denied as moot. (Def. Mot., [373, 377]).

---

[1] Plaintiff's motion to reconsider focused on the dismissal of the Stateville Defendants, but also addressed the basis of Plaintiff's claims against Defendant Nicholson. (Plain. Mot.,[139], p. 11).

**Appendix A4**

### III. DISCOVERY MOTION

Plaintiff has filed a Motion to Strike Witnesses and Compel Documents (Plain. Mot., [370]).  First, Plaintiff asks the Court to strike Defendant Wexford Health Source's Witness, Nicolas Little.  Plaintiff says Defendant Wexford first disclosed Witness Little in an August 27, 2020 supplemental disclosure pursuant to Federal Rule of Civil Procedure 26.  Plaintiff does not point to any legal basis for this motion, but notes on September 1, 2020, the Court granted Plaintiff's motion to strike untimely discovery disclosures. *See* September 1, 2020 Text Order.  As previously noted, the Court granted the motion noting written, fact discovery closed on December 20, 2019. *See* September 1, 2020 Text Order. Plaintiff argues the Court should again prevent the untimely disclosure of a new witness.

Defendants argue they supplemented their witness list only after Plaintiff questioned a witness about matters which were outside the witness' knowledge and expertise and outside the prior agreement of the parties. *See* Fed.R.Civ.P. 30(b)(6).

Defendants initially objected to Plaintiff's request for Wexford to produce a Rule 30(b)(6) witness to interpret Wexford's medical services contract with the Illinois Department of Corrections (IDOC).  Defendants noting the contract was approximately 300 pages and included a wide variety of topics. However, Defendant Wexford did identify Witness Dr. Roderick Matticks to address medical, clinical issues.

Defendants further claim in February of 2020, the Plaintiff agreed "our focus in questioning should (be) limited, e.g., to issues such as clinical services, oversight,

**Appendix A4**

responsibility, accountability, and recordkeeping." (Def. Resp., [376], p. 3). While Defendants include this direct quote in their response, they do not indicate the source of the quote. Furthermore, the only attached exhibit is not relevant to this statement. (Def. Resp., [376],Ex. A).

After review of the complete record in this case, the Defendants are quoting a February 7, 2020 letter from Plaintiff's counsel concerning which topics would be addressed during Witness Dr. Matticks' deposition. (Def. Mot., [343], Ex. C). Plaintiff's counsel also stated she intended to "question regarding Utilization Management and cost-cutting measures and not use the term 'profit margin.'" (Def. Mot., [343], Ex. C). Wexford's "utilization management program balances clinical needs with cost containment."[2] This balance between clinical needs and costs is a frequent subject in litigation involving Wexford and IDOC prisoners. *See i.e. Mamon v. Doe,* 2019 WL 570610, at *2 (S.D.Ill. Feb. 11, 2019)( alleging Wexford's Utilization Management Team had a policy of denying medical care to reduce costs).

Apparently, the February 7, 2020 letter did not result in a sufficient agreement between the parties, because the Medical Defendants later filed a Motion for Protective Order asking the Court to order Plaintiff to identify which section of the Wexford/ IDOC contract would be the focus of the deposition. (Def. Mot., [343]). During the hearing on the motion, Defendants claim Judge Hawley "offered Plaintiff the option of deposing a separate representative of Wexford on financial issues, stating while Dr.

---

[2] See Wexford Health Sources Incorporated, Services; Wexford Health Sources: Comprehensive Utilization Management, (last visited January 26, 2021).

**Appendix A4**

Matticks could read up, Judge Hawley questioned whether Plaintiff 'was really going to get the information he was looking for if this person is not familiar with it." (Def. Resp., [376], p. 3).  Defendants further maintain the Plaintiff rejected this offer, then proceeded to question the witness about financial matters during the deposition.

The Court has reviewed the audio recording of the July 23, 2020 hearing on the Motion for a Protective Order in its entirety. (Audio File, [351]). Defendants have quoted a question Judge Hawley asked of Plaintiff's counseling while gathering information before ruling on Defendants' motion.  The Judge did not offer Plaintiff's counsel an option of depositing a second witness.  The Defendants have misrepresented the record.

The Court noted Plaintiff's counsel had provided a list of topics with her notice of deposition and she had agreed to some limitations in the February 7, 2020 letter.  In keeping with the history of this case, the parties seemed to disagree about this agreement. Defense counsel stated he had repeatedly informed Plaintiff the designated witness was able to answer questions concerning the clinical aspects of the contract, but not financial issues. Plaintiff's counsel stated she had always indicated her intention to ask Wexford's expert witness questions concerning both clinical and financial aspects of the contract.

Judge Hawley found the issues Plaintiff intended to address during the deposition were all appropriate and relevant for a Rule 30(b)(6) witness.  In addition, while acknowledging it could be a challenge for a witness to be versed in several areas, Judge Hawley stated this was also not unusual for a Rule 30(b)(6) witness.

**Appendix A4**

Consequently, Defendants' Motion for Protective Order was denied, but the Court granted Defendants' oral motion for additional time to adequately prepare the witness. *See* July 23, 2020 Minute Entry.

Defendants now argue Plaintiff's questions went beyond the agreement of the parties in the February 7, 2020 letter.  In support of this claim, Defendants have provided a four-page portion of the deposition transcript which begins with the witness stating he is not prepared to answer questions "with regard to financing at this level." (Def. Resp., [376], Ex. A). Defendant has failed to provide the question which elicited this answer.  Plaintiff then asks a question concerning when Wexford would be responsible for payment of services instead of the State of Illinois. (Def. Resp., [376], Ex. A, p. 1).  In other words, at what point is Wexford responsible for hospital services which exceed the "hospital utilization threshold?" (Def. Resp., [376], Ex. A, p. 4).

While there appears to be a disagreement as to the limitations imposed by the February 7, 2020 letter, Plaintiff's counsel repeatedly stated during the hearing on the Motion for a Protective Order that she planned to ask financial questions.  Defendants' counsel was given additional time to prepare his witness.  In addition, the question provided concerned a portion of the contract which has been a frequent issue in Wexford cases before this Court and could hardly have been a surprise.  If this were the extent of the record, the Court would grant Plaintiff's motion and consider whether sanctions were appropriate for misrepresentation of the record.

However, Defendants claim Witness Nick Little was "disclosed at Plaintiff's invitation." (Def. Resp., [376], p. 8).  Two days after the deposition, Defense counsel

**Appendix A4**

maintains they received an email from Plaintiff's counsel noting Witness Dr. Matticks was unable to answer many of the proposed questions concerning finances.

> If you want to produce another witness who can answer financial questions with something other than "I don't know," we can discuss this. Otherwise, we will assume you are comfortable with Wexford not knowing why it does certain things, and the answers will stand. (Def. Resp., [376], p. 4).[3]

Defense counsel claims he responded on August 25, 2020, stating he believed the questions were not reasonably related to the topics agreed upon, and therefore the witness' answers would not be binding for Wexford. (Def. Resp., [376], p. 4).

Plaintiff's counsel replied the same day.

> We assume from your email that you do not want to produce another witness to talk about issues about which Matticks was uninformed. We assume you are comfortable with Wexford not knowing why it does certain things, and the answers will stand. (Def. Resp., [376], p. 4).[4]

Defense counsel then replied:

> Are you proposing we produce a witness to discuss (1) hospital utilization threshold in 3.1.2 of the Contract; and (2) reimbursement for staffing deficiencies under the Contract; and (3) why Dr. Greby was hired provisionally and paid about $50,000 less to be the acting medical director than what was budgeted? I see you threw in 'Etc' to your list of finance topics you claim Matticks was unprepared for, which is not acceptable. Please clarify if this is what you are proposing. (Def. Resp., [376], p. 5).

Defense maintains he did not receive a response and therefore supplemented their witness list two days later.

---

[3] Once again Defense counsel provide a direct quote without providing a copy of the email or other source of the quote.

[4] Defense counsel has again provided a quotation without attaching a copy of the email which is the source of this quotation.

Plaintiff's counsel fails to include any of these email exchanges, and in fact, makes no mention of any prior discussion concerning an additional witness. Instead, Plaintiff's counsel has attached a copy of an email she sent to Defense counsel on August 27, 2020 stating her objection "to the addition of any new witnesses who are Wexford employees. They have been clearly under your control the entire time." (Plain. Mot., Ex. D, p. 1). Plaintiff's counsel has included the response she then received from Defense counsel on August 31, 2020.

> Your August 21, 2020 email indicated you were interested in another witness regarding finances, specifically the hospital utilization threshold. I asked for clarification of your position in my August 25th email. I have not heard back. The only witness disclosed who had not previously been identified was Nick Little on contract finances. This disclosure is prompted by your August 21 email. (Plain. Mot., Ex. D, p. 2).

The final email is from Plaintiff's counsel dated September 8, 2020. Counsel states she does not understand Defendants' response and claims he does not have the right to add a new witness after the close of written, fact discovery. (Plain. Mot., Ex. D, p. 2).

It is difficult to understand why Wexford's Rule 30(b)(6) witness would not be prepared to answer questions concerning the hospital utilization threshold after the hearing before Judge Hawley. However, other questions concerning the specific salary of Dr. Greby are perhaps inappropriate for this witness. It is also difficult to comprehend why Plaintiff's counsel would omit information concerning emails which specifically address, and seemingly invite, the possibility of another witness, then file a motion to strike the witness.

**Appendix A4**

The Court is alarmed at each counsel's misrepresentation of the record in this case. Nonetheless, the Court will grant Plaintiff's motion to strike Witness Little. (Plain. Mot., [370]). Plaintiff has not requested sanctions based on the witness's lack of preparedness at the deposition, nor does it appear sanctions are appropriate given the record. *See Black Horse Lane Assoc., L.P. v. Dow Chemical Corp.*, 228 F.3d 275, 303-304 (3rd Cir. 2000)(monetary sanctions for lack of preparedness of Rule 30(b)(6) witness and sanction precluding party from introducing evidence contrary to witness deposition); *Lincoln Diagnostics, Inc. v. Panatrex, Inc.*, 2009 WL 395793, at *7–8 (C.D.Ill. Feb. 18, 2009) ("purpose behind Rule 30(b)(6) undoubtedly is frustrated in the situation in which a corporate party produces a witness who is unable and/or unwilling to provide the necessary factual information on the entity's behalf.").

Second, Plaintiff asks the Court to compel Wexford to produce the Human Resources File and unredacted version of the "Credentialing File" for Defendant Dr. Greby. (Plain. Mot., [370], p. 2). Plaintiff says in June of 2019, they previously requested the entire personnel file of Dr. Greby, all records involving the hiring of the doctor, and any records resulting in discipline. However, during the deposition of Rule 30(b)(6) Witness Dr. Matticks, the doctor referred to a Human Resources file and a "credentialing file." (Plain. Mot., [370], p. 3). Plaintiff says neither were previously disclosed during discovery.

On August 27, 2020, Wexford then provided a heavily redacted version of the credentialing file, but the Defendant has yet to produce the Human Resources file. When Counsel requested information concerning the redactions, Defendants stated it

contained "National Practioner Databank documents, which are confidential by law."

(Plain. Mot., [370], p. 4). Plaintiff's counsel notes a few pages of the National

Practitioner Databank (NPDB) were previously provided as an attachment to an email.

Therefore, counsel argues any objection to these documents are waived.

Defendants first note the Human Resources file is the same thing as the

Personnel file previously disclosed. Plaintiff's counsel was aware of this fact since she

directly asked about any distinction during the deposition.

> Q:   You had made mention of an HR file. Is that different from a
>       personnel file?
> A:   No. It would be considered one and the same.
> Q:   You just referred to it as a file in HR? That's a personnel file?
> A:   Correct. (Def. Resp., [376], Ex. A, p. 3-4).

At best, Plaintiff has again failed to present an accurate record. If Plaintiff's

counsel believed Dr. Matticks' answer was untruthful, she should have provided the

transcript and her reason for questioning the accuracy of the response. Since Plaintiff's

counsel failed to mention this exchange and failed to provide any evidence to rebut the

deposition response, her motion for a copy of the Human Resources file is denied as

frivolous.

Defendants agree they provided Plaintiff with a redacted copy of the

credentialing file. Defendants fail to explain why this file was not produced prior to

August of 2020. Plaintiff has provided a copy of an email from Defendants apologizing

for the oversight and noting it was provided as soon as it came to their attention during

the deposition of Witness Dr. Matticks. (Plan. Mot., [370], Ex. D).

**Appendix A4**

Defendants again claim the redactions include printouts from the NPDB which Wexford acquired during the hiring process and are considered confidential pursuant to 45 C.F.R. §60.20. Defendants admit several pages were inadvertently produced, but maintain this has no impact on the statute's requirements. Plaintiff has not presented any argument for disclosure of the NPDB documents, nor any argument the inadvertent disclosure serves as a waiver of 45 C.F.R. §60.20. The motion for an unredacted version of the credentialing file is denied.

Finally, Plaintiff asks the Court to compel Wexford to provide the "correct" corporate organizational charts. (Plan. Mot., [370], p. 4). Plaintiff requested organizational charts in June of 2019. Wexford responded with three different, "confusing" versions of the chart from different time periods. (Plan. Mot., [370], p. 5). During the deposition of the Rule 30(b)(6) witness, Dr. Matticks provided testimony which Plaintiff claims further confused which chart was from the appropriate time period. Therefore, Plaintiff asks the Court to order Wexford to provide correct organizational charts for the corporation, for Illinois, and for IRCC from 2012 to 2014.[5]

Defendants did provide charts for the appropriate timetable but admit some did not identify the correct individuals for each position. Defendants have now acquired and provided another senior management chart for 2012. The Court further notes

---

[5] Plaintiff's counsel has provided a copy of her September 8, 2020 email requesting this information within two days. (Plan. Mot., [370], Ex. D, p. 3). Defense counsel responded on September 10, 2020 noting he was out of the office for depositions, but he did intend to respond to Plaintiff's email. Plaintiff submitted this motion on September 14, 2020.

Appendix A4

Plaintiff admits he found the charts confusing when they were first provided in 2019, but fails to explain why he did not address the issue for more than a year and after the close of fact discovery. The motion for additional corporate organizational charts is denied.

Plaintiff's discovery motion is therefore granted in part and denied in part. (Plain. Mot., [370]).  The Court will grant Plaintiff's motion to strike Witness Little, but will deny Plaintiff's motion to compel additional discovery.

### IV. MOTIONS FOR SUMMARY JUDGMENT

Defendants have each filed Motions for Summary Judgment on the issue of exhaustion of administrative remedies. (Def. Mot., [382, 383, 384].  Typically, the Court expects dispositive motion pleadings, particularly pleadings limited to one issue, to include a motion, response, and reply. *See* CDIL-LR 7.1(D).  Occasionally, the Court allows the respondent to file a sur-reply if warranted.

In this case, the dispositive motions have spawned a confused array of responses, replies, and motions.  For instance, rather than simply file a response noting objections, Plaintiff filed a motion to strike various exhibits attached to the Defendants' dispositive motions. (Plain. Mot., [389]).

Plaintiff also filed a Motion to Consolidate asking for leave to file "one set of additional facts to apply to all defendants, and one memorandum of law and argument to respond to the motions of all defendants…" (Plaint. Mot., [390], p. 1-2).  Defendants have each responded to this motion.  One claims Plaintiff has misrepresented their

**Appendix A4**

communications, but all argue Plaintiff's proposal invites confusion. (Def. Resp., [398,

401, 402]).  It is hard to quibble with Defendants' concern.

Plaintiff has now filed nine different documents in response to the pending

dispositive motions including:

> 1) A response to all summary judgment motions which includes 43 pages of
> additional facts. (Plain. Resp., [403]).  The facts include various sections entitled
> "a chronology of prison and hospital stays," "positions and titles of defendants,"
> "plaintiff's health upon arrival at Illinois River," "increasingly abnormal lab
> results and failure to act," "symptoms of illness start mid-November
> 2013,""harmful medications administered," "diary entries made," "begging to be
> checked out," "Plaintiff taken to emergency room," and "information plaintiff
> did not have for grievances about IDOC and the Warden." (Plain. Resp., [403]).
> (not argument section).

> 2) An index of Plaintiff's exhibits in support of his additional facts.  This
> document lists 22 exhibits but includes exhibits for the first 11.  The document is
> 1234 pages long. (Plain. Resp., [405]).

> 3) An index of Plaintiff's exhibits in support of his additional facts.   This
> document lists the same 22 exhibits but includes exhibits for the second half.  It is
> 105 pages long. (Plain. Resp., [406]).

> 4) A Motion for Leave to File an Exhibit under seal in support of Plaintiff's
> additional facts. (Plain. Mot., [399]).  Plaintiff claims the various emails are
> relevant to his response.

> 5) Plaintiff's response to the IDOC Defendants' Statement of Undisputed Facts.
> (Plain. Resp., [407]).

> 6) An index of Plaintiff's exhibits in support of his additional facts.  The
> document lists 22 exhibits, but no exhibits are attached.

> 7)  Plaintiff's response to Defendant Greby's statement of undisputed facts.
> (Plaint. Resp., [410]).

> 8) Plaintiff's response to the Medical Defendants' statement of undisputed facts.
> (Plain. Resp., [411]).

Plaintiff's 51-page consolidated argument is attached to his Motion for Leave to

**Appendix A4**

File an Oversized Brief. (Plain. Mot., [409]).

In response to these documents, Defendants have filed a joint motion to strike portions of a declaration attached to Plaintiff's response, (Def. Mot., [416]); and two replies to Plaintiff's response. ((Def. Reply, [419, 420]). Finally, Plaintiff has filed another motion to strike portions of the IDOC's reply to her response. (Plain. Mot., [423]).

The Court will allow Plaintiff's motion to file a consolidated argument and motion for leave to file exhibits under seal. (Plaint. Mot., [390, 399]).

### V. MOTIONS TO STRIKE

Plaintiff asks the Court to strike several exhibits submitted in support of Defendants' Motions for Summary Judgment. (Plain. Mot., [389]).  Plaintiff's motion relies on the Court's September 1, 2020 Order granting Plaintiff's motion to strike untimely disclosed witness and documents. *See* September 1, 2020 Text Order. However, the September 1, 2020 Order was entered in response to both Plaintiff's motion and the Medical Defendants motion for sanctions due to Plaintiff's untimely discovery disclosures. (Plain. Mot., [327]); (Def. Mot., [347]).  A review of each motion is relevant to the current issues before the Court.

Plaintiff's prior Motion to Strike argued the IDOC Defendants had filed Supplemental Rule 26 disclosure on May 20, 2020 which provided the names of three new witnesses including Health Care Administrator Susan Griffin, Administrative Review Board Member Dave White, and Correctional Counselor Dan Wilson. (Plaint. Mot., [327]).  The IDOC Defendants' initial disclosures did include general reference to potential witnesses in each of these positions.  However, Plaintiff argued the names

**Appendix A4**

were within the control of IDOC, but no effort was made to disclose the names until after the close of written discovery.

In addition, Plaintiff argued the IDOC Defendants' had disclosed three new documents in their supplemental disclosures.  The parties later agreed two of the documents were previously disclosed, so Plaintiff limited her motion to one document. (Plaint. Mot., [327], Ex. C, Bates #1297); (Plain. Supp., [344]).

Both the IDOC Defendants' response to Plaintiff's motion and the Medical Defendants' motion for sanctions noted the irony in Plaintiff's Motion to Strike. (Def. Mot., [347]); (Def. Resp., [345]).  After repeated extensions of time, Magistrate Judge Hawley clearly stated on December 20, 2019, "fact discovery is extended as to ORAL discovery only. There will be no further extensions of written discovery." December 20, 2019 Minute Entry (emphasis in original).

Nonetheless, the Defendants received Plaintiff's fifth, six, seventh, and eighth supplemental Rule 26 disclosures including new documents and witnesses from March 20, 2020 through May 19, 2020. [6] (Def. Resp., [345]).  The Medical Defendants argued the Plaintiff was not simply providing supplemental disclosures, but Plaintiff was instead violating the Court's orders and continuing to engage in written discovery.

The Court agreed and found the IDOC Defendants had not explained the failure to timely disclose information within their control from the inception of this lawsuit. Therefore, on September 1, 2020, the Court granted both the Medical Defendants'

---

[6] The IDOC Defendants provided their supplemental disclosure on May 20, 2020, one day after Plaintiff's eighth supplemental disclosure.

motion for sanctions and Plaintiff's motion to strike the three witnesses and the "one untimely disclosed document (Bates #1297)." September 1, 2020 Text Order.  The IDOC Defendants would not be allowed to use the three witnesses: Griffin, White, and Wilson; and Plaintiff would "not be allowed to submit documents at dispositive motion or trial which were obtained after the close of fact discovery." September 1, 2020 Text Order.

The Court once again admonished the parties they had been allowed ample opportunity in 4 and ½ years to participate in discovery, and any discovery was clearly limited to oral discovery on December 20, 2019.  Therefore, the Court would "not accept any written discovery obtained by any party" after this date. September 1, 2020 Text Order.

Plaintiff's current motion asks the Court to strike various exhibits attached to the pending motions for summary judgment. (Plain. Mot., [389]).   First, Plaintiff says the Defendants have included a declaration from ARB Chairperson White who was stricken on September 1, 2020.

The Court has reviewed White's declaration, and it appears the Defendants intended White as a record-keeping witness to authenticate a document. (Def. Mot., 382], Ex. 10).  Defendants argue the witness was timely disclosed since the initial discovery disclosures referred to an unnamed ARB Chairperson.  That ship has sailed. The IDOC Defendants did not provide an explanation for their failure to timely disclose a specific name, nor did Defendants file a motion to reconsider. (Def. Resp., [345]).

**Appendix A4**

Nonetheless, while the Court struck the three untimely witness disclosures, none of the parties will be barred from adding record-keeping witnesses for the sole purpose of authenticating and explaining a business record. Many documents are involved in this case and it is difficult for any party to determine at this juncture whether there will a stipulation to some or all documents. The witness would only be allowed to provide information concerning whether a document met the criteria for a business record and the contents of those records.

It is difficult to understand why Defendants would choose to use the specific witness which was mentioned in the September 1, 2020 Order, particularly when Defendants admit other witnesses could provide this basic information. (Def. Resp., [393], p. 3). However, rather than delay this case further simply to add a record-keeping witness, the Court will not bar this affidavit. The motion to strike the affidavit from Defendant White is denied. Defendants are admonished in the future, they may not use this witness, even to authenticate a document.

Second, Plaintiff asks the Court to strike Counselor Corey Wise's declaration and the Cumulative Counseling Summary. Plaintiff claims the document contains inadmissible hearsay and attempts to admit statements from a witness who was previously stricken. These arguments are more appropriately made in a response to a motion for summary judgement. Therefore, the Court will not strike the document in its entirety, but will instead consider the arguments of the parties in addressing the dispositive motion.

**Appendix A4**

Third, Plaintiff asks the Court to strike the IGRV document as unintelligible without proper foundation. Again, this is an argument which should be made in response to a summary judgment motion.

Finally, Plaintiff asks the Court to strike any facts which rely on each of these exhibits. As with any summary judgment motion, the Court will only find a fact is undisputed if it is supported by admissible evidence in the record. Plaintiff's motion to strike is denied. (Plain. Mot., [389]).

The Defendants have filed a joint motion to Strike a portion of Plaintiff's declaration which is an exhibit in support of Plaintiffs' response to the dispositive motion. (Def. Mot., [416]). Defendants argue Plaintiff's declaration relies on inadmissible evidence, lacks foundation, contradicts his depositions testimony, etc. (Def. Mot., [416]). Plaintiff has also filed an additional motion to strike a portion of the IDOC Defendants' reply to her additional statement of facts which rely on Defendant Gossett. (Plain. Mot., [423]). Plaintiff alleges the Defendant is attempting to change his previous discovery responses.

Again, the Court finds the arguments are more appropriately made in a response or a reply. The motions to strike are denied, but the Court will consider the arguments of the parties in addressing the summary judgement motion. (Def. Mot., [416]); (Plain. Mot., [423]).

## CONCLUSION

This case has now been pending for more than five years. The litigants deserve resolution. A review of the record clearly demonstrates the Magistrate Judge Hawley

**Appendix A4**

has allowed the parties more than ample opportunity to conduct meaningful discovery to fairly litigate their claims.  In addition, this Court will not tolerate additional, unnecessary delays; frivolous motions; or intentionally incomplete representations of the record from any party.

"Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 1990, *quoting* Fed.R.Civ.P. 11; *see also Hahn v. Walsh*, 762 F.3d 617, 632 (7th Cir. 2014). The Supreme Court has stated the "central purpose" of Rule 11 "is to deter baseless filings in district court and … streamline the administration and procedure of the federal courts." *Cooter,* 496 U.S. at 393; *Hahn,* 762 F.3d at 632; *Littler v. Martinez*, 2020 WL 42776, at *33 (S.D.Ind. Jan. 3, 2020).  If any party continues to ignore the repeated admonitions of this Court, sanctions shall be imposed.

IT IS THEREFORE ORDERED:

1) Plaintiff's Motion for Order Modifying Order of November 28, 2016 is denied. (Plain. Mot., [369]).

2) Defendants' Motion to Strike and Motion for an Extension of Time to File a Response are denied as moot. (Def. Mot., [373, 377]).

3) Plaintiff's Motion to Strike Witnesses and Compel Documents is granted in part and denied in part. (Plain. Mot., [370]).  The Court strikes Medical

**Appendix A4**

Defendants' new Rule 30(b)(6) Witness Little for late disclosure.  The Court denies Plaintiff's motion to compel additional discovery documents.

4) Plaintiff's motion allowing him to file a consolidated argument and motion for leave to file exhibits under seal are granted. (Plaint. Mot., [390, 399]). The documents remain under seal.

5)  The parties' motions to strike various exhibits attached to the dispositive motions are all denied. (Plain. Mot., [389]); (Def. Mot., [416]); (Plain. Mot, [423]). The Court will consider the affidavit of Witness White for the purposes stated. The Court will consider all other argument when considering the relevance and admissibility of exhibits at summary judgment.

ENTERED this 29th day of January, 2021.


s/ James E. Shadid
_____
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE


**Appendix A4**

E-FILED
Tuesday, 20 April, 2021  03:10:26 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC OLLISON, | ) | |
|    Plaintiff, | ) | |
| | ) | |
|    vs. | ) | No. 17-1077 |
| | ) | |
| WEXFORD HEALTH SOURCES, et.al., | ) | |
|    Defendants | ) | |

SUMMARY JUDGMENT AND CASE MANAGEMENT ORDER

Plaintiff alleges 18 Illinois River Correctional Center Defendants were deliberately indifferent to Plaintiff's chronic kidney disease causing him to suffer acute renal failure in January of 2014. (Comp., [1]).  Defendants have now filed three motions for summary judgment on the issue of exhaustion of administrative remedies. [382, 383, 384].

I. BACKGROUND AND CASE HISTORY

The Court has previously noted the pending "dispositive motions have spawned a confused array of responses, replies, and motions." January 29, 2021 Case Management Order, p.  For instance, Plaintiff has filed nine different responsive documents including:

> 1) A response consisting of 43 pages of additional facts. (Plain. Resp., [403]).  The facts are divided into sections which are not obviously related to exhaustion, including: "a chronology of prison and hospital stays," "positions and titles of defendants," "plaintiff's health upon arrival at Illinois River," "increasingly abnormal lab results and failure to act," "symptoms of illness start mid-November 2013,""harmful medications administered," "diary entries made," "begging to be checked out," "Plaintiff taken to emergency room," and "information plaintiff did not have for grievances about IDOC and the Warden." (Plain. Resp., [403]).

1

**Appendix A5**

2) An index of Plaintiff's exhibits in support of his additional facts.  This document lists 22 exhibits but only includes exhibits for the first 11.  The document is 1,234 pages long. (Plain. Resp., [405]).

3) A second index of Plaintiff's exhibits in support of his additional facts.   This document lists the same 22 exhibits but includes documents for the second half of the listed exhibits.  It is 105 pages long. (Plain. Resp., [406]).

4) A document filed under seal in support of Plaintiff's additional facts. (Plain. Mot., [400]).

5) Plaintiff's response to the Illinois Department of Corrections (IDOC) Defendants' Statement of Undisputed Facts. (Plain. Resp., [407]).

6) An index of Plaintiff's exhibits in support of his additional facts.  The document lists 22 exhibits, but one exhibit is attached. (Plain. Resp., [408]).

7) Plaintiff's response to Defendant Greby's statement of undisputed facts. (Plaint. Resp., [410]).

8) Plaintiff's response to the Medical Defendants' statement of undisputed facts. (Plain. Resp., [411]).

9) A Motion for Leave to File an Oversized Consolidated Argument, which was granted by the Court. Plaintiff's consolidated argument is attached. (Plain. Resp., [409]).

In addition, the parties have filed separate motions to strike exhibits attached to the dispositive motions and responses. (Plain. Mot., [389, 423]);(Def. Mot., [416]).

Plaintiff's filings also include a history of the various rulings in this case which he finds inappropriate, including orders entered as far back as 2016 in the Northern District of Illinois. *See i.e.* (Plain. Resp., [407], p. 1-4).  A more accurate depiction of the case history is found in two case management orders and the various text orders entered in this case. *See* September 13, 2019 Order; January 29, 2021 Case Management Order.   As noted, the "docket reflects a troubling display of acrimony between the

**Appendix A5**

parties and extensive delays in resolving this litigation." January 29, 2021 Case Management Order, p. 1.

Since Magistrate Judge Jonathan Hawley entered his Standing Order informing the parties of the Court's rules and expectations, the parties have filed approximately 100 separate motions including 24 motions requested additional time; (Doc # 157, 160, 169, 201, 211, 227, 238, 251, 252, 279, 280, 309, 310, 332, 364, 377, 380, 381, 385, 404, 414, 415, 425, 427); and 27 motions addressing discovery disputes between the parties. (Doc # 166, 167, 173, 175, 193, 205, 213, 215, 222, 253, 265, 291, 300, 307, 311, 316, 327, 335, 337, 344, 358, 361, 362, 370, 396, 421, 451).

Consequently, Magistrate Judge Hawley has held 23 separate hearings in this case. *See* September 4, 2018 Minute Entry; February 14, 2019 Minute Entry; April 2, 2019 Minute Entry; May 29, 2019 Minute Entry; March 29, 2019 Minute Entry; September 13, 2019 Minute Entry; September 19, 2019 Minute Entry; September 23, 2019 Minute Entry; October 4, 2019 Minute Entry; October 16, 2019 Minute Entry; December 20, 2019 Minute Entry; January 7, 2020 Minute Entry; February 18, 2020 Minute Entry; March 5, 2020 Minute Entry; March 9, 2020 Minute Entry; April 1, 2020 Minute Entry; May 6, 2020 Minute Entry; July 13, 2020 Minute Entry; July 23, 2020 Minute Entry; September 25, 2020 Minute Entry; October 2, 2020 Minute Entry; December 16, 2020 Minute Entry; February 5, 2021 Minute Entry).

And once again, there is an upcoming hearing scheduled to discuss the latest discovery dispute. *See* April 15, 2021 Text Order.

## II. PLAINTIFF'S RULE 56(d) OBJECTION

3

**Appendix A5**

Plaintiff's consolidated memorandum of law argues he is "unduly prejudiced by the Court allowing defendants' motion to file their (summary judgment) motion regarding exhaustion of administrative remedies almost *five years* after the case was filed, after fact discovery has been completed, and after plaintiff has retained, paid for, and obtained and is obtaining expert reports from six experts." (Plain. Resp., [409], p. 3)(emphasis in original).

Plaintiff and Defendants have both contributed to the extensive delays in this litigation.  For instance, some Defendants were very late in filing their answers to the complaint.  The Court has addressed this issue finding Defendants demonstrated excusable neglect and specifically finding allowing the answer and affirmative defense of exhaustion would have "little, if any, prejudicial impact on Plaintiff." September 13, 2019 Order, p. 13.

Plaintiff's comments are deceiving given the record in this case.  While this litigation has been pending for some time, the time frame does not reflect Plaintiff's effort to litigate the claims.  On May 29, 2019, Magistrate Judge Hawley held a hearing to discuss the status of discovery.  The parties stated they had exchanged initial, Rule 26 disclosures, but Plaintiff admitted he had not responded to any of Defendants written discovery requests, and Plaintiff had not yet sent *any* written requests to the Defendants. *See* May 29, 2019 Minute Entry; (Audio File 188).[1]  Consequently, no

---

[1] A fact that was not clearly articulated to this Court during a previous hearing. *See* May 2, 2019 Minute Entry; (Transcript, [424], p. 8).

**Appendix A5**

depositions were completed. Three and a half years into this litigation, Magistrate Judge Hawley accurately stated: "We are starting literally from scratch." (Audio File 188).

Plaintiff next argues while the Court has allowed too long of a delay in addressing exhaustion, the Court is forcing Plaintiff to respond too quickly to the pending motions for summary judgment. Each response to the Defendants statement of facts includes a section labeled "Rule 56(d) objection." (Plain. Resp., [407], p. 4; [410], p. 4; [411], p. 4). This rule allows the Court to delay or defer consideration of a summary judgement motion if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed.R. Civ. P. 56(d).

Plaintiff claims he cannot present "essential" facts because "certain facts and evidence are not available to him." (Plain. Resp., [407], p. 4; [410], p. 4; [411], p. 4). Plaintiff first points to a text order in which the Court granted Plaintiff's motion for additional time to respond to the pending dispositive motions, but also advised Plaintiff he must file a response regardless of other pending motions or discovery issues. *See* November 9, 2020 Text Order. The admonition was intended to prevent further, unnecessary delays.

For instance, the Court admonished the parties on September 13, 2019 that exhaustion of administrative remedies should be addressed. However, when the Magistrate Judge attempted to set a dispositive motion deadline, the Plaintiff continued to state additional discovery was needed. *See* September 13, 2019 Order, p. 14-15; (Audio File, [216]). The discovery disputes continued and one year later, the parties still

5

had not agreed on a deadline.  Therefore, this Court set an October 14, 2020 deadline for motions for summary judgment on the issue of exhaustion only.

More important, the Plaintiff has pointed to only one specific motion which was pending at the time Plaintiff was directed to file his response, Plaintiff's "Motion for an Order Modifying Order of November 28, 2016 Which Dismissed Warden Nicholson From this Action Or, in the Alternative, Because of his Deception, Barring Warden Gossett from Disputing his Sworn Testimony That he Arrived at Illinois River Correctional Center in 2011 and Was Warden in 2011." (Plain. Mot., [369]).

The Court has since considered the motion finding "Plaintiff's motion blatantly misrepresents the record, provides no new and relevant information, and once again rehashes the same arguments previously considered and rejected. The frivolous motion is denied." January 29, 2021 Case Management Order, p. 8: *see also* February 14, 2017 Minute Entry.

Plaintiff next argues he has not yet deposed Defendant Warden Gossett. However, Plaintiff admits it would be the THIRD deposition of the Warden.  In addition, the only relevant questions Plaintiff anticipated in this deposition pertained to an email in which Plaintiff claims the Warden "admitted he was to blame for not doing more to prevent the (Plaintiff's) injuries." (Plain. Resp., [411], p. 5).  First, the issue is wholly unrelated to exhaustion.  Second, Plaintiff has now deposed the Warden and he has not filed an addendum to his response pointing to new, relevant information.

Finally, Plaintiff says the parties have agreed to a "late submission" of a report from Plaintiff's "correctional medical procedures expert." (Plain. Resp., [411], p. 5).

6

**Appendix A5**

Plaintiff maintains the expert will render opinions concerning the deliberate indifference of the Defendants as well as "nonaction in response to Plaintiff's grievances." (Plain. Resp., [411], p. 5).  It is unclear how a "medical procedures" expert is qualified to discuss the grievance procedure.  Nonetheless, Plaintiff has not explained how this information is specifically relevant to the issue of exhaustion.  Furthermore, it appears Plaintiff now has the expert's report, but he has not filed an addendum with new, relevant information.

Plaintiff has known exhaustion of administrative remedies was an issue in this case at least as far back as March 1, 2016. (Answer, [12], p. 42-43); *see also* September 13, 2019 Order, p. 5-6 (noting repeated references to exhaustion).  After more than four years of discovery, Plaintiff has not demonstrated he "cannot present facts essential" to opposing the pending summary judgment motions. Fed.R. Civ. P. 56(d).

### III. SUMMARY JUDGMENT BRIEFING

The Court has reviewed the various documents relevant to the issue of exhaustion of administrative remedies. [382, 383, 384, 389, 394, 395, 400, 403, 405, 406, 407, 408, 409, 410, 411, 416, 419, 420, 423, 428, 431]. The contentious, convoluted, and confusing briefing makes consideration of the single issue of exhaustion difficult.  The Court could strike the multitude of documents filed and direct the parties to file more appropriate briefing in keeping with the local rules. *See* CDIL-LR. 7.1(D).

However, it is clear Plaintiff was incarcerated at Illinois River Correctional Center from January 17, 2012 until January 16, 2014 when he was taken to the emergency room at an outside hospital. Plaintiff remained hospitalized from January

**Appendix A5**

16, 2014 until February 25, 2014 when he was transferred to RML Specialty Hospital in Hinsdale, Illinois.  Plaintiff was later moved to University of Illinois Hospital and Health Sciences System in Chicago, Illinois to "obtain physical therapy and occupational therapy to work on mobility and self-care issues." (Def. Mot., 384, p. 4, UMF # 15).

Plaintiff was discharged on April 4, 2014 and he was transferred to Graham Correctional Center where he remained for six months.  On October 17, 2014, Plaintiff was transferred to the Federal Bureau of Prisons.

Plaintiff was diagnosed with acute renal failure and suffered multiple strokes and lapsed into a coma.  Plaintiff alleges he suffered permanent brain damage, but the parties dispute Plaintiff's injuries, an issue which goes to the merits of this case.

Plaintiff did clearly file and submit two grievances prior to his hospitalization which specifically complain about problems after a change in his medication. (Plain. Resp., [209], p. 7- 14).  However, Plaintiff also lists a variety of symptoms and begs for medical care. (Plain. Resp., [209], p. 8). Arguably, the two grievances put medical defendants on notice of the fact that Plaintiff's medical condition was deteriorating, and he needed medical care.

However, before Plaintiff received a response, he was taken to the emergency room.  In addition, since Plaintiff did not know his specific medical condition until he was diagnosed at the hospital, he could not have filed a specific grievance until sometime after January 16, 2014.

**Appendix A5**

Therefore, the only real issue before this Court is whether the administrative remedy process was available to Plaintiff to either appeal his initial grievances or file new, specific grievances addressing the alleged lack of care resulting in his hospital stay.

"If administrative remedies are not 'available' to an inmate, then an inmate cannot be required to exhaust." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006); *see also Lintz v. Willoughby,* 2021 WL 1124703, at *3 (S.D.Ind. March 24, 2021).  The grievance process can be "unavailable" to an inmate if he is physically or mentally incapable of participating. *See Jones v. Nelson*, 729 F. App'x 467, 469 (7th Cir. 2018); *Hurst v. Hantke*, 634 F.3d 409, 411–12 (7th Cir. 2011); *Richmond v. Dart*, 2012 WL 6138751, at *3 (N.D.Ill. Dec. 11, 2012).

It is somewhat doubtful Defendants could demonstrate Plaintiff was capable of participating in the grievance process during the remainder of the time he was in IDOC custody and the Court is reluctant to consider issues which are relevant to the merits of this case.

Given the state of the record, the Court will not grant summary judgment on the issue of exhaustion of administrative remedies.  The motions are therefore denied. [382, 383, 284].

## IV.  SUMMARY JUDGMENT ON THE MERITS

The Court will not accept confused and convoluted briefing in any dispositive motion, response, or reply concerning the merits of this case.   The parties MUST abide by the following instructions:

9

**Appendix A5**

1)  The parties must review and follow the local rule regarding motions for summary judgment. *See* CDIL-LR 7.1(D).  In other words, the **only** briefing required is a motion for summary judgment, a response, and, if necessary, a reply.  The Court will not accept multiple, additional, contentious filings or motions.  In other words, a response to the summary judgment motion must include the response to Defendants' statement of facts as well as any new, alleged facts, and the argument. *See* CDIL-LR 7.1(D)(2).

2) The Court will not accept consolidated filings.  In other words, Plaintiff must file a separate response to each motion for summary judgment.  The ONLY exception is if Plaintiff chooses to file one, consolidated, exhibit list which he may then refer to in each response.  For clarification, Plaintiff must either: a) file one, consolidated exhibit list with exhibits relevant to all responses attached; or b) file a separate exhibit list with documents and attach the relevant exhibits to each summary judgment response.

3) If one party believes the other is relying on inadmissible evidence, this issue should be addressed in either the response, or the reply with specific citation to caselaw in support of the argument.

4) The Plaintiff MUST NOT review previous history or rulings in the response to the motion for summary judgment.  The response MUST be limited to the specific issues in the motion for summary judgment, not past rulings.  Plaintiff may file an appeal of past rulings at the appropriate time.

5) Facts MUST BE limited to the issues before the Court.  For example:

#12. Mr. Ollison was eligible to be sent to a halfway home in October 2015,

10

**Appendix A5**

but the homes were filled to capacity because there had been a federal policy change allowing for more non-violent prisoners to be released to halfway homes, causing an overflow at the halfway homes, resulting in Mr. Ollison's delay in release. Exhibit 1. (Plain. Resp., [403], p. 3).

This fact is clearly not relevant to whether Plaintiff exhausted all available administrative remedies, nor is this fact relevant to whether Defendants were deliberately indifferent to a serious medical condition.

These are the same requirements all litigants are expected to follow in briefing before this Court. **If either party fails to follow these directions, the Court will strike the briefing and allow seven days to comply with the Court's order**.

IT IS THEREFORE ORDERED:

1) Due to the briefing as presented, the motions for summary judgment on exhaustion are denied. [382, 383, 384].

2) The parties MUST abide by the specific directions provided in this order in any motion for summary judgment on the merits, the response, or the reply. The Court will strike any brief which fails to follow the explicit directions and allow seven days to file a brief in compliance with this order.

3)   The parties are reminded the dispositive motion deadline is June 1, 2021. *See* January 7, 2021 Text Order.  The pretrial conference is scheduled for February 3, 2022 at 1:30 p.m. in Courtroom A in the United States Federal Courthouse in Peoria, Illinois.  The jury trial is scheduled for March 7, 2022 at 9:00 a.m. *See* February 5, 2021 Minute Entry.

**Appendix A5**

Entered this 20th  day of April, 2021.


                    s/ James E. Shadid
        _____
                JAMES E. SHADID
            UNITED STATES DISTRICT JUDGE

**Appendix A5**

E-FILED
Wednesday, 06 July, 2022  02:45:05 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC OLLISON, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-1077 |
| | ) | |
| WEXFORD HEALTH SOURCES, et.al., | ) | |
|     Defendants | ) | |

ORDER

This cause is before the Court for consideration of Defendants Gregory Gossett, Corey Wise, and Robbie Johnson's Motion to Bar Plaintiff's Expert Witnesses. [503].  For the following reasons, the Motion is GRANTED. [503]

I. BACKGROUND AND SURVIVING CLAIMS

Plaintiff filed his complaint on January 15, 2016, in the Northern District of Illinois alleging various Defendants violated his constitutional rights at both Stateville Correctional Center and Illinois River Correctional Center. [1]. On November 29, 2016, the Court dismissed all Stateville Defendants and Count IV, a state law claim for indemnification. *See* November 29, 2016 order. The case was then transferred to the Central District of Illinois for proper venue on February 15, 2017. *See* February 15, 2017 Minute Entry.

Plaintiff's surviving claim alleged 14 Medical Staff Defendants and three Illinois Department of Corrections (IDOC) employees were deliberately indifferent to Plaintiff's chronic kidney disease causing him to suffer acute renal failure in January of 2014. [1].

The parties engaged in protracted and contentious discovery. *See i.e.* January 29, 2021 Case Management Order, p. 1 ("docket reflects a troubling display of acrimony between the parties and extensive delays in resolving this litigation."); April 20, 2021 Order, p. 2-3 (noting 27 motions addressing discovery disputes, and 23 separate hearings before the Magistrate Judge concerning discovery disputes).

On February 18, 2022, the Plaintiff and Medical Defendants filed a Stipulation of Dismissal after reaching a settlement agreement. [526]. Currently, the remaining Defendants including IDOC employees Warden Gregory Gossett, Correctional Counselor Corey Wise, and Correctional Counselor Robbie Johnson.

Before considering the Motion to Bar Expert Witnesses, the Court must review the specific claims against the three Defendants. [1]. In short, Plaintiff maintains Defendants Gossett, Wise, and Johnson had "ample notice" Plaintiff had a serious medical condition, but they were deliberately indifferent to that condition. (Comp., p. 17, para. 104). Plaintiff further alleges Defendant Warden Gossett "was aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to (the Plaintiff.)" (Comp., p. 17, para. 103).

Ten of the 166 paragraphs in Plaintiff's complaint pertain directly to the alleged actions of the three Defendants. (Comp., p. 16-18, para. 94-104 ). Specifically, Plaintiff claims the Defendants had notice of his need for medical care due to three grievances he submitted on December 22, 2013; December 28, 2013; and January 8, 2014. (Comp., p. 16, para. 94).

2

**Appendix A6**

Plaintiff also alleges the Warden was responsible for the overall operation of Illinois River Correctional Center including the provision of medical services, and therefore he would have knowledge of the inadequacies in medical treatment. (Comp., para. 102, 103).

## II. LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009) *citing Naeem v. McKesson Drug Co.,* 444 F.3d 593, 607 (7th Cir.2006). Federal Rule of Evidence 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony if certain conditions are met. Fed.R.Evid. 702.  The proposed expert testimony must be "based on sufficient facts or data" using "reliable principles and methods" which are "reliably" applied to the specific facts of the case. Fed.R. Evid. 702.  The *Daubert* case provides additional guideposts to assist courts in determining whether the proffered expert testimony is both relevant and reliable. *Ervin v. Johnson & Johnson,* 492 F.3d 901, 904 (7th Cir.2007).

A "district court must engage in a three-step analysis" before admitting expert testimony.  *Kirk v. Clark Equipment Company*, 991 F.3d 865, 872 (7th Cir.  2021). "It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard*

3

**Appendix A6**

*Company*, 877 F.3d 771, 779 (7th Cir. 2017), *quoting Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

"The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis,* 561 F.3d at 705. Consequently, both Rule 702 and *Daubert* require a district court judge to function "as a gatekeeper" to ensure proffered expert testimony "is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) *citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Nonetheless, this initial *Daubert* inquiry is "not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012). "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id. quoting Daubert,* 509 U.S. at 596.

### III. MOTION TO BAR EXPERT WITNESSES

The IDOC Defendants ask to bar two of Plaintiff's expert witnesses: Dr. Manpreet Samra and Ralph Salke. [503].

### A. DR. MANPREET SAMRA

The IDOC Defendants argue Dr. Samra's report and testimony should be barred because "1) she lacks the required specialized expertise in the field necessary to elicit the opinions she offered; 2) she impermissibly reaches legal conclusions about what

4

constitutes 'deliberate indifference;' and 3) her conclusions are not the product of reliable principles and methods and were not drawn by reliably applying any discernible scientific methodology pursuant to FRE 702." (Def. Mot.,[503], p. 2).

Defendants maintain Dr. Samra is not qualified to offer expert testimony concerning the specific claim against the IDOC Defendants. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010), *quoting Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). "The question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Gayton*, 593 F.3d. at 616. Therefore, "[t]he crucial question is, on *this subject* can a jury from *this person* receive appreciable help." *Cox as Trustee for Estate of Central Illinois Energy Cooperative v. Evans*, 457 F.Supp.3d 634, 649 (C.D.Ill. May 1, 2020)(quotation omitted)(emphasis in original).

Dr. Manpreet Samra has extensive experience in internal medicine and nephrology, a subspeciality of internal medicine focusing on the diagnosis and treatment of kidney disease. (Plain. Resp., [510], Ex. A., Samra Rpt., p. 1-2;  Ex. B, Samra Cir. Vit.).  Dr. Samra's report offers 53 separate expert opinions based on her experience and training "to a reasonable degree of medical certainty in the fields of Internal Medicine and Nephrology."[1] (Plain. Resp., [510], Ex. A., Samra Rpt., p. 19, 19-40).  The

---

[1] Defendants' motion does not ask the Court to exclude specific opinions, but instead appears to be asking the Court to bar any testimony from Defendant Dr. Samra.

**Appendix A6**

facts each pertain to Plaintiff's medical condition, the treatment needed, and the care, or

lack of care, provided by medical staff. (Plain. Resp., [510], Ex. A., Samra Rpt., # 1- 53).

However, six of Dr. Samra's expert opinions pertain directly to Defendant Warden

Gossett or Plaintiff's grievances:

> 17) Since the Illinois River medical staff did not have the expertise nor
> training to treat kidney disease, Wexford and the Warden should have
> arranged for (Plaintiff) to be transferred to a prison with a medical staff that was
> more familiar with kidney disease or he should have been referred to an off-site
> Nephrologist. … (Plain. Resp., [510], Ex. A., Samra Rpt., p. 26)

> 26). In (Plaintiff's) written grievances, the symptoms he reported were indicative
> of uremia and should have been recognized as such, given his history of CKD:
> 12/22/2013 – high blood pressure, lightheadedness, sleepiness all day, unable to
> perform throughout the day, vomiting, inability to keep food down, bad
> medicinal taste in his mouth (known as dysgeusia); 12/26/2013 - high blood
> pressure, lightheadedness, vomiting, inability to keep food down, swelling of
> face, chills, chest pains, vomiting, decreased urine output (every 3 days), no
> energy to exercise; 1/8/2014 - high blood pressure, lightheadedness, dizziness,
> vomiting, inability to keep food down, and decreased urine output/not using the
> bathroom regularly. (Plain. Resp., [510], Ex. A., Samra Rpt., p. 28)

> 27). Warden Gregory Gossett, who testified he has a high school education, was
> not competent to determine as he did on 1/3/2014 that "an emergency is not
> substantiated" by (Plaintiff's) grievance of December 26, 2013. Had he conferred
> with a competent medical doctor, even one who was not a Nephrologist, he
> would have learned that (Plaintiff) was uremic and the situation was indeed
> emergent. If that had occurred, (Plaintiff) could have been rendered the proper
> care in time to avert the strokes and seizures and protect (Plaintiff's) kidneys
> from the permanent damage he sustained leading to dialysis dependency at such
> a young age. (Plain. Resp., [510], Ex. A., Samra Rpt., p. 28-29)

> 29). It was a substantial departure from the accepted standards of medical care
> for Wexford and the Warden not to provide for and the Director of Nursing,
> Edna Greenhagen, not to perform a review of (Plaintiff's) medical chart until
> 2/27/2014, when responding to (Plaintiff's) grievance. The 2-month delay was
> an ineffective response to an emergency situation. By 2/27/2014, (Plaintiff's)
> kidneys had failed, he had suffered seizures and strokes, and he was in a coma.
> (Plain. Resp., [510], Ex. A., Samra Rpt., p. 29).

**Appendix A6**

30). In my experience, it was reasonable and not unexpected for (Plaintiff), who was not medically trained, not to know when he wrote his grievances in December 2013 and January 2014 that he was uremic and that his kidneys were failing. In his grievances, he described classic symptoms of kidney failure (high blood pressure, lightheadedness, dizziness, fatigue, vomiting, nausea, bad taste in mouth, swelling of face, chest pains, chills, failure to urinate) and, given his well-documented history of CKD, it should have been evidence to the medical staff…that his kidney disease had progressed and he needed immediate treatment. (Plain. Resp., [510], Ex. A., Samra Rpt., p.  29-30)

42) It was a woefully insufficient response and a blatant disregard for the ill inmates' well-being on the part of Wexford and the Warden to fail to arrange for a doctor to come to the prison for triage given Dr. Greby's horrible attendance record. …  The failure to have a doctor on site … appears to be the reason (Plaintiff) was not seen by a doctor at all after his 1/2/2014 visit with Dr. Greby and did not receive any medical attention at all from 1/8 - 1/15/2014. (Plain. Resp., [510], Ex. A., Samra Rpt., p. 33-34.

In her deposition, Dr. Samra explained it was her opinion Defendant Warden Gossett was "not competent" to determine Plaintiff's grievance because "he did not have a medical degree." (Plain. Resp., [510], Ex. A., Samra Rpt.. #27; Ex. C, Samra Depo., p. 276).  However, Dr. Samra admitted she was unaware there was no medical degree requirement for the Warden, nor any educational requirement for IDOC staff involved in grievance reviews.  (Plain. Resp., [510], Ex. C, Samra Depo., p. 276-277).  In addition, the Dr. Samra knew Defendant Warden Gossett was not providing medical care and he was not "sought after for his medical expertise." (Plain. Resp., [510], Ex. C, Samra Depo., p. 278).

Dr. Samra admits she had not reviewed IDOC policies and procedures for medical care or grievances before submitting her report. (Plain. Resp., [510], Ex. C, Samra Depo., p. 61, 64, 274).  The Doctor was not provided a copy of the procedures, and she was not aware there was a statute controlling how grievances, including

7

**Appendix A6**

emergency grievances, were processed. (Plain. Resp., [510], Ex. C, Samra Depo., p. 274-275).

Dr. Samra testified she believed Defendant Gossett should have found Plaintiff's grievance was an emergency based on her medical opinion, not on her knowledge of the grievance process or its requirements. (Plain. Resp., [510], Ex. C, Samra Depo., p. 277-278). Dr. Samra further admitted she did not know how the grievance process would have changed if the Defendant Warden had found Plaintiff's grievance was an emergency.

Dr. Samra admitted she should have known the specific requirements of the grievance process before giving her expert opinion. (Plain. Resp., [510], Ex. C, Samra Depo., p. 277, 278).  Finally, Dr. Samra admitted she was not competent to give an opinion on whether the IDOC Defendants follow the administrative process because of her unfamiliarity with that process. (Plain. Resp., [510], Ex. C, Samra Depo., p. 282-283).

Plaintiff's response to Defendants' Motion to Bar Expert Witnesses again raises concerns about misrepresentations of both law and fact. *See i.e.* January 29, 2021 Case Management Order, p. 6, 8, 15, 25; April 20, 2021 Order, p. 4.  For instance, Plaintiff argues Defendants have incorrectly maintained Dr. Samra is not qualified as an expert because she has not worked in a prison or provided medical services in a prison. Plaintiff says "[d]istrict courts in this Circuit have expressly rejected the precise argument." (Plain. Resp., [510], p 5).  However, the cases cited by Plaintiff involve allowing an expert medical witness to testify concerning the appropriate standard of medical care for *medical provider defendants,* not correctional staff. *See i.e. Tolliver v.*

8

**Appendix A6**

*Wexford Health Sources, Inc.*, 2021 WL 4478674, at *2 (S.D.Ill. Sept. 30, 2021) ("Experience providing medical care in a correctional setting is not required to satisfy *Daubert*" for doctor providing expert testimony "regarding medical care*."); Johnson v. Dart*, 2020 WL 8255194, *13 (N.D. Ill., Dec. 18, 2020)(doctor qualified to testify regarding "medical staff's compliance with the relevant standards of care."); *Gomez v.Palmer*, 2016 WL 212952, at *4 (N.D. Ill. Jan. 19, 2016)(doctor can offer expert testimony concerning medical care provided by a nurse); *Nolan v. United States*, 2015 WL 5159888, at *5 (N.D. Ill. Sept. 1, 2015)(clinical psychiatrist may provide expert testimony regarding whether two doctors "breached the established psychological or psychiatric standard of care."). The question is not whether Dr. Samra is a qualified medical expert, but whether she has an expertise which is beneficial to a jury regarding the claim against the nonmedical Defendant Warden. *See Cox*, 457 F.Supp.3d at 64.

Plaintiff further argues Dr. Samra is qualified to provide an opinion concerning Defendant Warden Gossett's failure to consult with medical staff "before denying an emergency grievance that so clearly described serious signs and symptoms of renal failure." (Plain. Resp., [510], p. 8). Plaintiff maintains "case law supports Dr. Samra's opinion that it was incumbent upon Warden Gossett to consult with medical personnel." (Plain. Resp., [510], p. 8).

First, Plaintiff has cited to two cases which clearly do not support this statement. Neither specifically requires a warden, as opposed to a grievance officer, to contact medical staff, nor does either case hold contact with medical staff must occur prior to determining whether the document qualifies as an emergency grievance. (Plain. Resp.,

9

**Appendix A6**

[510], p. 8, *citing Thomas v. Wexford Health Services, Inc.*, 414 F.Supp.3d 1154, 1163-1164

(N.D.Ill. Oct. 9, 2019)( "no evidence (warden), or any of his subordinates, conferred with

medical staff."); *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 992 (N.D.Ill Nov. 24, 2012)(while

warden or his subordinates did contact medical staff, no explanation was given for

delays in medication).

Second, Plaintiff is asking this Court to allow his medical expert to testify the

symptoms listed in Plaintiff's grievance "clearly described" renal failure to the Warden,

a layperson with no medical expertise. (Plain. Resp., [510], p. 8). At the same time,

Plaintiff's expert witness maintains "it was reasonable and not unexpected for

(Plaintiff), who was not medically trained, not to know when he wrote his grievances in

December 2013 and January 2014 that he was uremic and that his kidneys were failing."

Plain. Resp., [510], Ex. A., Samra Rpt., p. 29, Fact #30).  Plaintiff seeks to use his medical

expert to impart medical knowledge to the Defendant who, like the Plaintiff, is not

medically trained.

Third, Plaintiff is asking this Court to allow his medical expert to testify

concerning the requirements of the emergency grievance review procedure, which Dr.

Samra admits she did not review, is not familiar with, and is not an expert.

Plaintiff next argues both Expert Witness Dr. Samra and Wexford HealthCare's

nephrology expert agreed Plaintiff's care should have been managed by a nephrologist.

 (Plain. Resp., [510], p. 9).  In addition, Plaintiff maintains Dr. Samra should be allowed

to testify there was inadequate medical staffing to address Plaintiff's condition when

Dr. Greby was not at the facility.

**Appendix A6**

The issue before the jury in considering the claims against the IDOC Defendants is not what medical staff knew or what medical experts believe, but what the non-medical IDOC Defendants knew based on the information available to them.

Dr. Samra is qualified to give her opinion concerning the care provided by medical defendants.  However, the Seventh Circuit has specifically held "[t]he position of non-medical defendants is different." *Hayes v. Snyder*, 546 F.3d 516, 526 (7th Cir. 2008). "Non-medical officials are presumptively 'entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care.'" *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021), *quoting Hayes,* 546 F.3d at 527; (7th Cir. 2008); *see also Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants ... can rely on the expertise of medical personnel.").

"A plaintiff may rebut this presumption by showing that the 'jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate.'" *Eagan,* 987 F.3d at 694, *quoting Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018).  For instance, correspondence or grievances sent "to a prison administrator may … establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation," *Perez v. Fenoglio*, 792 F.3d 768, 781–82 (7th Cir. 2015). "Deliberate indifference might also exist if 'it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment.'" *Clasen v. IDOC*, 2008 WL 835468, at *2 (C.D.Ill. March 27, 2008), *quoting Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920–21 (N.D. Ill. Oct. 31, 2002).  In short, "[t]he

**Appendix A6**

question is whether the non-medical defendants had any duty to do more than they did, in light of *their knowledge* of the situation." *Hayes*, 546 F.3d at 527 (emphasis added). This knowledge is based on the information a prisoner-plaintiff provided to a non-medical defendant or information obvious to a lay person.

"Expert testimony is helpful to the jury if it concerns a matter beyond the understanding of the average person." *Davis v. Duran*, 276 F.R.D. 227, 231 (N.D.Ill. May 10, 2011), *citing United States v. Allen*, 390 F.3d 944, 949–950 (7th Cir. 2004); *see also United States v. Welch*, 368 F.3d 970, 974 (7th Cir. 2004), *vacated on other grounds*, 543 U.S. 1112 (2005).  In other words, "[e]xpert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Aponte v. City of Chicago*, 2011 WL 1838773, at *2 (N.D.Ill. May 12, 2011); *see also U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996)("[u]nless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury …").

Plaintiff has not demonstrated there is a need for specific scientific, technical, or specialized knowledge to assist the trier of fact. *See i.e. Flournoy*, 881 F. Supp. 2d 980, 992 (warden's summary judgment motion denied, although medical staff was contacted, "[e]ven someone with no medical training could have concluded based on (plaintiff's) grievances that something might be seriously wrong with the way that prescription medications were being provided."); *see also Estate of Perez v. Morgan Cnty. Sheriff*, 2018 WL 4590967, at *1 (S.D.Ind. Sept. 25, 2018)(granting unopposed motion to exclude

**Appendix A6**

expert doctor noting witness "has no demonstrated expertise in what would be apparent to reasonable Jail officers" and the issue does not require expert testimony).

Plaintiff's complaint alleges the Defendants were deliberately indifferent based on information provided in three grievances or information concerning Plaintiff's condition and medical care which was obvious to a layperson. Plaintiff did not allege Defendants Gossett, Wise, or Johnson had medical training, provided medical care, or reviewed medical records. Instead, the only specifically alleged contact between Plaintiff and Defendants was through the grievance process.

Dr. Samra is not familiar with IDOC policies and procedures, the grievance process, or emergency grievances. Instead, Dr. Samra admits she based her expert opinions solely on her medical expertise, an expertise the IDOC Defendants do not have and are not required to have.

Further, Dr. Samra's testimony would likely confuse and unduly influence the jury. *Hall,* 93 F.3d at 1343. Dr. Samra's opinions provide inaccurate information concerning the requirements of the grievance process and the Warden's qualifications to review a medical grievance; insist the Warden should appreciate the medical significance of symptoms while claiming the Plaintiff would not have this knowledge; and apply "accepted standards of medical care" to a non-medical Defendant. (Plain. Resp., [510], Ex. A., Samra Rpt. #17, 26, 27, 29, 30, 42).

The Plaintiff has not met his burden of establishing Dr. Samra's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis,* 561 F.3d at 705. Dr. Samra's expert opinion would not assist the trier of fact to understand the evidence

13

**Appendix A6**

or to determine a fact in issue.  The motion to exclude Expert Witness Dr. Samra is granted. [503].

B.  RALPH SALKE

Defendants argues the Court should also bar Expert Witness Ralph Salke.  Salke is a certified nurse and a certified correctional healthcare provider with extensive experience providing health care within a prison setting. (Plain. Resp., (510), Ex. D, E). He is also Managing Director of Salke Advisory Group which provides expert witness services regarding "correctional healthcare in nursing," and "other health care operations." (Plain. Resp., (510), Ex, E, P. 1).  The Court again considers whether Witness Salke can offer opinions which are helpful to the trier of fact in this case.

Salke's Expert Report provides more than 130 paragraphs of opinions mainly centered on the Medical Defendants.[2] (Plain. Resp., [510], Ex. D, Salke Rpt., p. 75-104). However, Salke also includes 35 paragraphs regarding Defendant Warden Gossett.[3] (Plain. Resp., [510], Ex. D, Salke Rpt., p. 83-90).  The first few opinions contain IDOC Administrative Directives and Institutional Directives as they pertain to the facility warden. (Plain. Resp., [510], Ex. D, Salke Rpt,, p. 83, #1-4).  Even assuming the directives are relevant and admissible, it is unclear why an expert opinion is needed to decipher the written directives. *See Sullivan v. Alcatel–Lucent USA Inc.*, 2014 WL 3558690,

---

[2] Salke's report includes sections concerning the "facts" related to each Defendant, followed by sections entitled "opinions." (Plain. Resp., [510], Ex. D, Salke Rpt.).  The opinion section concerning the Warden begins with a general statement concerning Salke's opinion, followed by several numbered paragraphs. *See i.e.* (Plain. Resp., [510], Ex. D, Salke Rpt., p.73-104).  Since all are listed in the "opinion" portion of the report, it appears both the statement and paragraphs are intended as Salke's stated opinions.
[3] Neither Witness Samra, nor Witness Salke provide any opinions concerning Defendants Johnson or Wise. (Plain. Resp., [510], Ex. A., Samra Rpt.; Ex. D, Salke Rpt.)

**Appendix A6**

at *5 (N.D.Ill. July 17, 2014)(expert "simply reads and interprets documents….he does not draw on any expert qualifications or experience" and therefore his opinions "are merely gratuitous, and would be unhelpful to a prospective jury.").

Salke next opines Defendant Gossett was "underqualified for the job of Warden" based on his lack of education, licenses, certifications, or medical training or experience. (Plain. Resp., [510], Ex. D, Salke Rpt, #5, 6).  Salke further states the Defendant Warden "did not have the critical thinking skills to manage a 2100-bed Medium Security Facility." (Plain. Resp., [510], Ex. D, Salke Rpt., p. 84, #5, 6).

In his deposition, Salke admits he has no experience in running a prison outside of the Health Care Unit. (Plain. Resp., [510], Ex. F, p. 283).  Therefore, Salke explained his opinion Defendant Gossett was underqualified for his job was based on a review of the warden's job description which "prefers a college graduate." (Plain. Resp., [510], Ex. F, p. 273).  Salke notes Defendant Gossett's did not have either a college degree "or any advanced designations." (Plain. Resp., [510], Ex. F, p. 273).  Salke admits he did not consider the Warden's extensive prior experience. (Plain. Resp., [510], Ex. F, p. 279).   In addition, Salke himself has no experience hiring wardens. (Plain. Resp., [510], Ex. F, p. 276).

> You know, it's not for me to determine who hires, you know, wardens. I just gave my opinion, Counselor.  Obviously, a hiring committee or somebody felt he was competent enough to run Illinois River Correctional Center. (Plain. Resp., [510], Ex. F, p. 277).

Salke also admits his opinion that Warden Gossett did not have the appropriate "critical thinking skills" was not based on any specific training in this area, or test

15

**Appendix A6**

administered to the Defendant, or any other specific knowledge. (Plain. Resp., [510], Ex. F, p. 279-281).  Instead, his decision was based on "common sense." (Plain. Resp., [510], Ex. F, p. 282-283).

   None of these statements are expert opinions pursuant to Rule 702. See Fed.R.Evid. 702. "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *U.S. v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1998), *citing United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991).  Expert Witness Salke has no expertise in the qualifications of prison administrators, nor a warden's required critical thinking skills.

   Salke also offers several opinions under the heading: "The Warden had Supervisory Liability" which could cause confusion since the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under 42 USC §1983. *See Locke v. Haessig,* 788 F.3d 662, 669 (7th Cir. June 5, 2015)("[f]or constitutional violations under § 1983 ... a government official is only liable for his or her own misconduct."); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011)("[s]ection 1983 does not authorize 'supervisory liability.'"); *see also* (Plain. Resp., [510], Ex. D, Salke Rpt.,p. 84, #7-9).

   Salke then provides several opinions concerning the importance of keeping the Health Care Administrator position filled, the inadequacy of Dr. Grebe, and problems

**Appendix A6**

with the facility's Quality Improvement Program. [4] (Plain. Resp., [510], Ex. D, Salke Rpt.,p. 85-88, #10-28). Within this portion of his report, Salke also offers his opinion Defendant Gossett was on notice of the problems with Dr. Greby, and his opinion concerning the credibility of Warden Gossett's deposition testimony. (Plain. Resp., [510], Ex. D, Salke Rpt.,p. 86, #17, 20-23).

The fundamental questions before the jury in this case are whether the Warden had sufficient notice Plaintiff suffered from a serious medical condition and whether he had sufficient notice Plaintiff was not receiving adequate care for that condition. Therefore, these are questions for the jury. *See Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003)("Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *Client Funding Solutions Corp. v. Crim,* 943 F. Supp. 2d 849, 863 (N.D. Ill. May 6, 2013)("Opinions that amount to legal conclusions do not assist the trier of fact."); *see also Fields v. City of Chicago*, 2018 WL 1652093, at *6 (N.D.Ill. April 5, 2018)("[a]n expert witness may not usurp the jury's function to weigh evidence and make credibility determinations.")(internal quotation omitted);*Davis v. Duran,* 277 F.R.D. 362, 370 (N.D.Ill. June 10, 2011) ("[E]xpert witnesses are not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears.").

---

[4] This was a program "created by an Institutional Directive (Gossett) signed." (Plain. Resp., [510], Ex. D, Salke Rpt.,p. 88, #24).

17

**Appendix A6**

In addition, no scientific or specialized knowledge is needed to determine whether notice was provided to a nonmedical defendant.

Salke further includes opinions stating Defendant Gossett was "deliberately indifferent" to Plaintiff's medical care based on his handling of Plaintiff's grievances. (Plain. Resp., [510], Ex. D, Salke Rpt.,p. 89, # 29-30). Salke opines Plaintiff suffered "classic symptoms of End Stage Renal Disease," the Warden should have personally spoken to medical staff, and the Warden could have met personally with the Plaintiff. (Plain. Resp., [510], Ex. D, Salke Rpt.,p. 89, #29).

Defendants argue Plaintiff is not qualified to offer an opinion concerning the grievance process or the Warden's role in that process. Salke admits he had not reviewed the administrative procedures and he was unaware of the specific requirements. (Plain. Resp., [510], Ex. F, p. 265-268). Nonetheless, Salke offers his opinion concerning the Warden's qualifications, how he should have interpreted the grievance, and how it should have been processed.

In response, Plaintiff maintains Defendants' argument is "irrelevant and a red herring." (Plain. Resp., [510], p. 21). "Mr. Salke's function as an expert in this case is not to show how the IDOC defendants violated the Administrative Code and failed to follow the administrative grievance procedure." (Plain. Resp., [510], p. 21). However, Plaintiff acknowledges the grievances are important because he alleges they provided Defendant Gossett with "notice of the seriousness" of Plaintiff's illness. (Plain. Resp., [510], p. 22). As the Court has previously noted, this is the notice provided to a lay person, not a medical staff member. *See Hayes*, 546 F.3d at 527 ("[t]he question is

18

**Appendix A6**

whether the non-medical defendants had any duty to do more than they did, in light of their knowledge of the situation.") The Defendants are not medical providers and are not expected to have medical expertise.  Plaintiff may not use an expert to suggest Defendants were required to have additional medical knowledge or education, or to suggest grievance procedures based on the Expert's medical or healthcare expertise.

Plaintiff's claim against the Warden is not an uncommon allegation.  District Courts frequently consider summary judgment motions involving prisoner plaintiffs claiming defendant wardens were deliberately indifferent to a serious medical condition. *See i.e. Hobson v. Wexford of Indiana, LLC.*, 2022 WL 992020, at *1 (S.D.Ind. March 31, 2022)(deliberate indifference to serious medical condition); *Arsberry v. Wexford Health Sources, Inc.*, 2021 WL 5232733, at *1 (N.D.Ill. Nov. 10, 2021)(same); *Robinson v. Swalls*, 2021 WL 2186416 (S.D.Ill. May 28, 2021)(same); *McDaniel v. Syed*, 2020 WL 5570401, at *10 (E.D.Wis. Sept 17, 2020)(same); *Pledger v. Wexford Health Sources, Inc.*, 2017 WL 2766446, at *1 (C.D.Ill. June 26, 2017)(same).  Yet, Plaintiff has not cited to any specific case supporting the need for expert testimony to assist the jury.

In fact, similar cases frequently include a claim alleging medical staff members were also deliberately indifferent to the prisoner plaintiff's serious medical condition. Nonetheless, even when an expert witness provided information to assist the trier of fact regarding the claim against medical defendants, no expert opinion was needed or considered for the claim against the nonmedical, defendant warden. *See i.e. Dixon v. Brown*, 2021 WL 1171657, at *9 (S.D.Ill. March 29, 2021)(court considers expert opinion in determining whether doctor defendants were deliberately indifferent, but no expert

19

**Appendix A6**

report provided or considered in denying motion for summary judgment as to warden);

*Miller v. Baldwin*, 2020 WL 7027489, at *22 (S.D.Ill. Nov. 30, 2020)(expert testimony

considered in deliberate indifference claim against doctor, no expert opinion summitted

or considered in related claim against warden); **Flournoy v. Ghosh**, 881 F.Supp.2d 980,

987 (N.D.Ill. July 24, 2012)( while court considered an expert report for deliberate

indifference claim against doctor, no expert report was submitted or considered for

claim against warden, yet court found evidence was sufficient to demonstrate warden

turned a blind eye to unconstitutional conduct).

"The touchstone of admissibility under Rule 702 is helpfulness to the jury." *Cox*,

457 F.Supp.3d at 649, *quoting United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)

*amended on unrelated grounds*, 957 F.2d 301 (7th Cir. 1992).  In short, "[n]ot every opinion

from an expert is necessarily helpful." *Second Amendment Arms v. City of Chicago*, 2020

WL 1157347, at *12 (N.D.Ill. March 10, 2020).  In this case, while Dr. Samra and Salke

each have specialized training and knowledge, there is no indication the expertise of

these witnesses is needed to assist the jury "to understand the evidence or determine a

fact at issue." Fed.R.Evid. 702(a); *see also Aponte*, 2011 WL 1838773, at *2 (jury "is able to

evaluate the same evidence and is capable of drawing its own conclusions without the

introduction of a proffered expert's testimony.").  In addition, allowing the gratuitous

expert opinions could serve to confuse or unduly influence the jury.  Therefore, the

Motion to Exclude both Witness Dr. Samra and Witness Salke is granted. [503].

IV. CONTINUED DISPUTE CONCERNING WARDEN'S EMPLOYMENT

20

**Appendix A6**

The briefing provided demonstrates there is an additional matter which must be addressed.  Plaintiff has maintained there is a discrepancy concerning when Defendant Gossett became Warden at Illinois River Correctional Center, a matter Plaintiff plans to contest at summary judgment and at trial. (Plain. Resp., [510], p. 28)

During Defendant Gossett's first deposition on November 19, 2019, the Defendant testified he came to Illinois River in 2011 as an Assistant Warden and was promoted to Warden in July of 2012. (Plain. Mot., [369], Ex. B, p. 16).  Defendant Gossett later provided supplemental answers to his interrogatories on June 23, 2020, correcting this testimony. (Plain. Mot., [369], Ex. C.  The Defendant provided a later time frame indicating he was actually Assistant Warden of Operations at Illinois River from March 2013 to August of 2013 and became Warden in September of 2013. (Plain. Mot., [369], Ex. C).

During a second deposition on July 16, 2020, Defendant Gossett explained he mistakenly provided the wrong dates because he had been retired for more than five years from IDOC and he had not reviewed his personnel file before his first deposition. (Def. Resp., [495], Ex. 15, p. 72).  The Warden then repeatedly confirmed he began working at Illinois River in March of 2013. (Def. Resp., [495], Ex. 15, p. 31, 34, 64). Plaintiff also deposed Defendant Gossett for a third time on December 11, 2020. (Plain. Resp., [495], Ex. 16).

On September 14, 2020, Plaintiff filed a "Motion for Order Modifying Order of November 28, 2016, Which Dismissed Warden Nicholson From This Action Or, In the Alternative, Because of His Deception, Barring Warden Gossett from Disputing his

Appendix A6

Sworn Testimony That he Arrived at Illinois River Correctional Center in 2011 and Was Warden in 2011." (Plain. Mot., [369]). The Court denied Plaintiff's "frivolous motion" in its entirety. *See* January 29, 2021, Case Management Order, p. 8

Defendants later asked the Court to clarify the order, and in response, Plaintiff maintained "the Court made no factual findings as to the dates when Gossett was Warden at Illinois River." (Plain. Resp.,[457], p. 3).

> However, Plaintiff never asked the Court to make this factual finding, nor was evidence presented which would allow the Court to make this finding. *See* January 29, 2021, Case Management Order, p. 6. Instead, Plaintiff's motion specifically asked the Court to bar Defendant Gossett from presenting testimony regarding dates which conflicted with his deposition testimony. That motion was denied. *See* January 29, 2021, Case Management Order, p. 8. June 30, 2021 Minute Entry.

After reviewing the briefing, the Court now believes this matter must be addressed with the benefit of the additional information provided. Plaintiff maintains the time span of Defendant Gossett's employment is important to his claim, and Plaintiff will be prejudiced if Defendant Gossett is allowed to change testimony he previously provided under oath. Plaintiff intends to argue several emails were sent from Wexford's Regional Manager to "the Illinois River prison administration" as far back as 2011 which notified the administrators of issues with Dr. Greby's inadequate performance providing medical care to inmates. (Plain. Resp., [510], p. 26).

However, Plaintiff was allowed a second and third opportunity to depose Defendant Gossett specifically concerning his knowledge of these and other emails he may have received. *See* February 18, 2020 Minute Entry; (Plain. Resp., [495], Ex. 16). While Defendant's lack of preparation for his first deposition is not commendable, any

22

**Appendix A6**

potential prejudice to the Plaintiff based on the inaccurate information provided was addressed when Plaintiff was given additional opportunities to question the Defendant. On the other hand, it is not clear whether Defendant Dr. Gossett ever provided Plaintiff with a copy of any IDOC record establishing his employment dates.

Therefore, if Plaintiff intends to argue at summary judgment or at trial that Defendant Gossett worked at Illinois River Correctional Center prior to March of 2013, he must present evidence other than Warden Gossett's mistaken, and now corrected, testimony given during the first deposition.  Plaintiff may *only* demonstrate an earlier start date through specific testimony or documents demonstrating Defendant Gossett, not an unnamed administrator, received and reviewed the pertinent emails.

## V. PENDING SUMMARY JUDGMENT MOTION

There is one surviving claim alleging Defendants Gossett, Wise, and Johnson were deliberately indifferent to Plaintiff's serious medical condition.  Plaintiff's response to the pending Summary Judgment Motion currently spans more than 5,000 pages with exhibits. (Plain. Resp., [493, 495].  While the Court has not thoroughly reviewed the arguments of the parties, Plaintiff does repeatedly cite to his expert witnesses and the mistaken testimony given in Defendant Gossett's first deposition. Therefore, the Court will strike Plaintiff's response and allow him time to file a new response in keeping with this order. Defendants will then be allowed time to file a reply.

The Court also previously noted the "contentious, convoluted, and confusing briefing" previously provided concerning the dispositive motion on exhaustion of

23

**Appendix A6**

administrative remedies made "consideration of the single issue of exhaustion difficult." April 20, 2021 Summary Judgment Order, p. 7.  The Court then provided specific instructions for any further summary judgment briefing. The parties are remined of these admonitions. *See* April 20, 2021 Summary Judgment Order, p. 9-11.

IT IS THEREFORE ORDERED:

1) Defendants' Motion to Bar Plaintiff's Expert Witnesses Dr. Samra and Salke is GRANTED. [503].  The expert opinions would not assist the trier of fact. *See* Fed.R.Evid. 702.

2)  If Plaintiff intends to argue Defendant Gossett began his employment as an Assistant Warden and then Warden at Illinois River Correctional Center prior to March of 2013, he may not rely on the mistaken testimony provided in the first, November 19, 2019, deposition.

3) Given the Court's ruling on the Motion to Bar Expert Witnesses, the Clerk is directed to strike Plaintiff's response to the pending motion for summary judgment which relies heavily on these reports. [495].  Consequently, the Clerk is also directed to strike the Defendants' reply. [504]. Plaintiff does not need to resubmit exhibits with his revised response, and instead may cite to a previously provided document by the docket number [*i.e.*, 493 or 495] and exhibit number.

4) Plaintiff must submit a new response to the pending summary judgment motion on or before August 5, 2022.  Defendants must then file a reply on or before August 26, 2022.

**Appendix A6**

4)  Given the need for additional, clarified briefing, the final pretrial conference on July 28, 2022, and the September 19, 2022, jury trial setting are both vacated.

5) Motions for an extension of time will only be allowed with specific, good cause shown given the age of this case.

Entered this 6th day of July, 2022.


s/ James E. Shadid
_____
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE

**Appendix A6**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ERIC OLLISON,                        )
   Plaintiff,                        )
                                     )
vs.                                  )        Case No. 17-1077
                                     )
WEXFORD HEALTH SOURCES, et.al.,       )
   Defendants                        )

SUMMARY JUDGMENT ORDER

This cause is before the Court for consideration of Defendants Gregory Gossett, Corey Wise, and Robbie Johnson's Motion for Summary Judgment. [484]. For the following reasons, Defendants' motion is GRANTED. [484].

I. BACKGROUND

Plaintiff's remaining claim alleges Defendants Warden Gregory Gossett, Correctional Counselor Corey Wise, and Correctional Counselor Robbie Johnson violated Plaintiff's Eighth Amendment rights when they were deliberately indifferent to his serious medical condition. Plaintiff's complaint alleges the three Illinois Department of Corrections (IDOC) employees had notice of Plaintiff's need for medical care due to three grievances he submitted on December 22, 2013; December 28, 2013; and January 8, 2014. (Comp., [1], p. 16, para. 94). In addition, Plaintiff maintains Defendant Warden Gossett was responsible for the overall operation of Illinois River Correctional Center (IRCC) including the provision of medical services and he "was aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to (the Plaintiff.)" (Comp., p. 17, para. 103).

1

**Appendix A7**

## II. CLARIFICATION OF THE RECORD

Before considering the dispositive motion and response, the Court must clarify a few issues in the briefing.

Plaintiff asks the Court to strike prior Warden Walter Nicholson's declaration regarding his employment dates. (Plain. Resp., [535], p. 88-89). Plaintiff argues judicial estoppel prevents a party from "abandoning positions taken in earlier litigation." (Plain. Resp., [535], p. 88, *citation omitted*). Plaintiff claims Nicholson should not be allowed to claim he was the IRCC Warden until August of 2013 because it is inconsistent with earlier statements.

Specifically, Plaintiff says Nicholson "convinced the court to adopt his position" that he left IRCC sometime in 2012, and he was subsequently dismissed from this case. (Plain. Resp., [535], p. 89). Plaintiff cites to a Northern District of Illinois order entered on November 29, 2016, before this case was transferred to the Central District. (Plain. Resp., [535], p. 89, *citing* [133]).

This is not the first time Plaintiff has presented this argument. (Plain. Mot., [369]); *see also* January 29, 2021 Case Management Order, p. 3-8. On January 29, 2021, the Court found "Plaintiff's disingenuous motion mispresents the record before this Court." January 29, 2021 Case Management Order, p. 5.

The Northern District of Illinois Judge specifically stated: "*neither party provides an exact date of Nicholson's departure,* but that is not important because (plaintiff) did not file the Complaint until January 2016." January 29, 2021 Case Management Order, p. 5, *quoting* November 29, 2016 Order, p. 13 (emphasis added).

2

**Appendix A7**

The Court dismissed the claim against Nicholson because it was barred by the two-year statute of limitations period *and* Plaintiff "failed to allege any 'plausible allegations of personal responsibility.'" January 29, 2021 Case Management Order, p. 8, *quoting* November 29, 2016 Order, p. 16.  Therefore, the claims against Nicholson were not dismissed based on an assertion that he left the facility in 2012, and in fact, there was no specific finding or evidence regarding when Nicholson left IRCC.

The Plaintiff's summary judgment response also makes several references to the IDOC Defendants failure to intervene in his medical care and specifically cites to the Seventh Circuit Pattern Instruction regarding the "Failure To Protect" an inmate. (Plain. Resp., [535], p. 93, *citing* Seventh Cir. Pattern Inst. 7.16).  For clarification, Plaintiff's only claim before the Court alleges the three surviving Defendants violated his Eighth Amendment rights based on deliberate indifference to a serious medical condition. (Comp., [1], p. 23).  Plaintiff has not previously alleged a separate claim based on a failure to intervene.

The Court notes Plaintiff has included a heading at the top of his summary judgment response stating: "Oral Argument Requested." (Plain. Resp., [535], p. 1). Plaintiff has failed to comply with local Rule 7.1(A)(2) which states any party requesting oral argument must provide the reason for the request. *See* CDIL LR 7.1(A)(2); *see also Muzzarelli v. United Parcel Service Inc.*, 2017 WL 2786456, at *1, FN. 4 (C.D.Ill. June 27, 2017).  The Court finds oral argument is unnecessary.

Finally, the Court has admonished Plaintiff it would no longer "accept confused and convoluted briefing in any dispositive motion, response, or reply concerning the

3

**Appendix A7**

merits of this case." April 20, 2021 Summary Judgment Order, p. 9; *see also* July 6, 2022 Order, p. 24-25. The Court has provided specific instructions concerning its expectations including admonishing Plaintiff he "MUST NOT review previous history or rulings" and instead must limit his response to the specific issues addressed in the specific motion. April 20, 2021 Summary Judgment Order, p. 10.

Plaintiff was also admonished any asserted facts "MUST BE limited to the facts before the Court" and then provided an example of a previous, irrelevant assertion. *See* April 20, 2021 Summary Judgment Order, p. 10.  "These are the same requirements all litigants are expected to follow in briefing before this Court." April 20, 2021 Summary Judgment Order, p. 11.

The Court struck Plaintiff's previous response to the pending summary judgment motion and allowed him additional time to refile his response in keeping with these admonitions and the Court's ruling on expert witnesses.  *See* July 6, 2022 Order, p. 24-25.

Nonetheless, Plaintiff's revised summary judgment response ignores these warnings and spans nearly one thousand pages with exhibits and cites to several additional exhibits in the record. (Plain. Resp. [535]).  Plaintiff has propounded 232 additional material facts, some of which are clearly unrelated to the one surviving claim against three nonmedical Defendants at IRCC.[1]  For instance, Plaintiff provides a chronology of Plaintiff's medical condition and doctor's findings at previous facilities

---

[1] Defendants maintain at least 137 of the 232 alleged additional facts are no related to the issues currently before the Court. (Def. Reply, [547], p. 154).

including a county jail. (Plain. Resp., [535], AMF #20-31). Plaintiff does not explain how any of this information was available or relevant to the non-medical Defendants.

Plaintiff's additional facts also include statements which are not "undisputed." For instance, Plaintiff says the Defendant Warden knew about the facility doctor's "gross failures and incompetence…but turned a blind eye to it." (Plain. Resp., [535], AMF #54). Furthermore, none of the cited documents in support of this fact clearly demonstrate Defendant Gossett had specific knowledge of an issue with Dr. Carla Greby.

At several points, Plaintiff includes statements of fact which are unsupported by the cited documents. For instance, Plaintiff alleges Defendant Gossett was "underqualified for the job of Warden" because he did not have a college education, "no license or certifications," and "no medical or nursing training." (Plain. Resp., [535], AMF #50, 51). Plaintiff has failed to demonstrate any of the listed items were requirements of the job.[2]

Plaintiff also states this Court "ruled as a matter of law that defendant Gossett came to Illinois River in March of 2013 as an Assistant Warden…" (Plain. Resp., [535], AMF #10). The Court specifically allowed Plaintiff "to argue at summary judgment or at trial that Defendant Gossett worked at Illinois River Correctional Center prior to March of 2013." July 6, 2022 Order, p. 23. However, for the reasons provided in the

---

[2] The job requirements list "knowledge, skill and mental development *equivalent* to completion of four years of college." (Plain. Resp. [495]. Ex. 28)(emphasis added). There is no mention of certificates, a license, or medical training, and Defendant Gossett testified he had 28 years of correctional experience when he applied for the job. (Plain. Resp. [495]. Ex. 14, Goss. Depo., p. 24-25).

**Appendix A7**

order, Plaintiff was advised he could no longer base his argument solely on Defendant Gossett's first, corrected deposition. Instead, Plaintiff was advised he must provide "specific testimony or documents" to demonstrate a different start date. July 6, 2022 Order, p. 23.

Consequently, the Court has not included most of Plaintiff's additional facts in the overview below. However, in the argument section of Plaintiff's response, he cites to specific facts. (Plain. Resp., [535], p. 88-111). In each instance, the Court has reviewed the cited material.

### III. STATEMENT OF FACTS

A doctor diagnosed Plaintiff with chronic kidney disease in March of 2011, prior to his incarceration at IRCC. (Def. Memo., [485], UMF # 2). Plaintiff does not have any medical training, and after his last visit with the doctor on September 20, 2011, he believed his kidney problem "was healed." (Def. Mot., [382], Ex. 2, Plain. Depo, p. 79; Plain. Resp., [535], AMF #2, 21).

Plaintiff was transferred to IRCC in January of 2012 where he remained until January of 2014. (Def. Memo., [485], UMF # 1). Defendant Gossett was the Assistant Warden of Operations at Illinois River from March of 2013 until he became Warden in September of 2013.[3] (Def. Memo., [485], Ex. 3, p. 2). Plaintiff remained in this position until June of 2015. (Def. Memo., [485], Ex. 3, p. 2).

---

[3] Plaintiff has not presented evidence to rebut this claim.

6

**Appendix A7**

The Warden's job description stated he "administers and directs the overall operations, programs and activities of the Illinois River Correctional Center, formulates policy, procedures, rules, regulations and institutional directives for employees and inmates; directs assigns, evaluates work activities and areas of responsibility for all department heads; plans and approves facility's fiscal budget; develops and implements policies and procedures." (Plain. Resp., [495], Ex. 28).

Defendant Gossett does not have medical training, he is not a medical professional, and he does not make determinations concerning what medical care an inmate receives. (Def. Mot., [382], Ex. 4, Goss. Depo, p. 140, 145). Defendant Gossett does not know the symptoms associated with the progression of kidney disease. (Def. Mot., [382], Ex. 4, Goss. Depo, p. 127).

Both Defendant Johnson and Defendant Wise were Correctional Counselors II at Illinois River from December of 2013 to January of 2014. (Def. Memo, [485], UMF #13, 19).

Defendant Johnson served as a Grievance Officer and his job included reviewing and responding to inmate grievances, drafting grievance officer reports, providing recommendations to the Chief Administrative Officer for issues and complaints alleged in inmate grievances, conducting orientation for new inmates, and maintaining safety and security at the facility. (Def. Memo, [485], UMF #14); (Def. Mot. [382], John. Depo., p. 19-21); Def. Memo., [485], Ex. 5).

Defendant Johnson does not have any medical training and is not a medical professional. (Def. Mot., [382], John. Depo., p. 50). Instead, Defendant Johnson relied on

7

**Appendix A7**

medical staff when responding to grievances concerning medical issues. (Def. Memo, [485], UMF #17).

Defendant Wise handled the initial processing of grievances. (Def. Memo, [485], UMF #21). His specific duties included working with inmates to resolve their issues or complaints, forwarding inmates' issues and complaints to the appropriate department at the facility, and responding to inmate's grievances. (Def. Memo., [485], Ex. 6). Defendant Wise says he typically collected grievances in person from inmates. (Def. Mot., [382], Ex. 6, Wise Depo., p. 25-26).

Defendant Wise also confirms he has no medical training, and therefore he would forward any grievances concerning medical care to the Director of Nursing, Edna Greenhagen. (Def. Memo., [485], UMF #24; Def. Memo, [382], Ex. 6, Wise Depo., p. 43). After the Director of Nursing reviewed the grievance, she would send her response directly to Grievance Officer Johnson. (Def. Mot., [382], Ex. 6, Wise Depo., p. 39). Therefore, Defendant Wise would have no further contact with the grievance after forwarding it to Greenhagen. (Def. Mot. [382], Ex. 6, Wise Depo., p. 39-40).

Plaintiff's Complaint alleges he submitted three grievances concerning his serious medical condition during the relevant time. (Comp., [1], p. 16). While Plaintiff knew he needed medical care, he did not know he was suffering from chronic kidney disease when he wrote his grievances. (Def. Mot., [382], Ex. 2, Plain. Depo., p. 163).

Plaintiff's first grievance (Grv. No. 13-1071) was dated December 22, 2013. (Def. Mot., [382], Ex. 7, Grv., p. 1). Plaintiff reported he took medication for high blood pressure and high cholesterol, but the dosage was recently changed. Since that time,

8

**Appendix A7**

Plaintiff claimed he experienced high blood pressure. Specifically, Plaintiff said he was "light-headed, sleeping all day and unable to perform throughout the day as I was before my medication was downgraded." (Def. Mot., [382], Ex. 7, Grv., p. 1). Plaintiff also stated he recently threw up and had problems keeping food down. Plaintiff expressed concerns about his symptoms.

> I am basically begging you to have me fully checked out to make sure nothing is wrong. I am only 30 years old there is no way my body should be reacting this way." (Def. Mot., [382], Ex. 7, Grv., p. 2).

In the "Relief Requested" portion of the grievance, Plaintiff asked for his "medication to be changed back to what I was taking at first, it was working well." (Def. Mot., [382], Ex. 7, Grv., p. 1).

Plaintiff gave his grievance directly to Defendant Wise on December 26, 2013. (Def. Memo, [484], UMF #29). Defendant Wise's response is dated the same day and states only "Sent to D.O.N." or Director of Nursing. (Def. Mot., [382], Ex. 7, Grv., p. 1; (Def. Mot., [382], Ex. 6, Wise Depo., p. 29 -31).

Nursing Director Greenhagen agrees she reviewed all grievances pertaining to any kind of medical issue. (Plain. Resp., [495], Ex. 22, Green. Depo. p. 71-72). Greenhagen says she would typically read the grievance and then review the inmate's medical chart. (Plain. Resp., [495], Ex. 22, Green. Depo. p. 74). However, during her deposition on September 25, 2019, Greenhagen stated she did not remember responding to Plaintiff's December 22, 2013 grievance. (Plain. Resp., [495], Ex. 22, Green. Depo. p. 123). Greenhagen stated she usually kept handwritten documentation of her review, but

9

**Appendix A7**

there was no documentation with Plaintiff's first grievance. (Plain.  Resp., [495], Ex. 22, Green. Depo. p. 121).

The Court notes Plaintiff's medical records at the time indicated he met with Physician's Assistant Connie Sword on December 26, 2013 and discussed his complaints concerning the side effects of his medication.  His medication was changed and a follow-up visit was scheduled in a week.  (Def. Mot., [382], Ex. 7, Grv., p. 1).  This was the same information provided in Defendant Johnson's written response to Plaintiff's grievance on January 1, 2014.

> The offender alleges his meds were changed and he is not reacting well
> to them and requests the meds be changed.  DON Greenhagen states
> his meds were changed on 12-26-13 … and the inmate needs to wait
> to see how he respond to them. He has a follow up apt. on 1-2-14.
> (Def. Mot., [382], Ex. 7, Grv., p. 3).

Defendant Johnson found the grievance was therefore moot and Assistant Warden Stephanie Dorethy concurred with this decision on January 3, 2014. (Def. Mot., [382], Ex. 7, Grv., p. 3). Defendant Gossett did not review Plaintiff's December 22, 2013 Grievance. (Def. Memo., [485], UMF #52).

Plaintiff's second grievance (Grv. No. 14-0140) was dated December 26, 2013, but Plaintiff signed and dated the grievance on January 2, 2014. (Def. Mot., [382], Ex. 7, Grv., p. 4; Def. Mot., [485], UMF # 64).  Plaintiff checked the box indicating he was submitted it as an emergency grievance.  (Def. Mot., [382], Ex. 7, Grv., p. 4).

Plaintiff claimed he had been in and out of the Health Care Unit for the last two weeks to have his blood pressure checked.  Plaintiff reported he was suffering with "light-headedness, vomiting, swelling of the face and shivering ever since I have been

10

**Appendix A7**

placed on these medications." (Def. Mot., [382], Ex. 7, Grv., p. 4).  Plaintiff also said he

began experiencing chest pains and he no longer needed to use the bathroom on a

regular basis. Further, Plaintiff stated others "have been noticing how my performance

in the recreation area has been decreasing since the taking of this pill."  (Def. Mot., [382],

Ex. 7, Grv., p. 5).

Plaintiff said he had complained to medical staff, but they just told him the

medications would not cause the symptoms he reported.  Plaintiff disagreed and said

he "didn't start having these effects until taking this Lisinipril." (Def. Mot., [382], Ex. 7,

Grv., p. 5).  In the "Relief Requested" section, Plaintiff stated he "would like for this

matter to be further investigated and address this matter." (Def. Mot., [382], Ex. 7, Grv.,

p. 4).

On January 3, 2014, Defendant Warden Gossett reviewed the grievance and

checked the box on the form indicating "an emergency is not substantiated. Offender

should submit this grievance in the normal manner." (Def. Mot., [382], Ex. 7, Grv., p. 4;

Def. Mot., [485], UMF #66).  Defendant Gossett says he questioned how ill Plaintiff was

since his grievance stated he was still going to the recreational area where inmates

"[p]lay basketball, lift weights, walk around the track, walk around the gym, whatnot."

(Def. Mot., [382], Ex. 4, Goss. Depo., p.  143). Defendant Gossett believed Plaintiff's

statement indicated he was still able to exercise. (Def. Mot., [382], Ex. 4, Goss. Depo., p.

143-144)

**Appendix A7**

Defendant Wise provided his written response on January 14, 2014 stating only that the grievance was referred to the Director of Nursing with a "fact sheet." (Def. Mot., [382], Ex. 7, Grv., p. 4).

The Defendants have provided a copy of a document entitled "Inmate Grievance Fact Sheet" which is a memorandum from Grievance Officer Dave Long to Nursing Director Greenhagen dated January 14, 2013 and requests a response within ten days concerning Plaintiff's "medical treatment." (Def. Mot., [382], Ex. 7, Grv., p. 7). Plaintiff was transported to the hospital two days later.

Greenhagen did ultimately provide her handwritten response on February 27, 2014. (Def. Mot., [382], Ex. 7, Grv., p. 7).

> I have reviewed his chart. He was seen in the HCU (Connie Sword) did her exam and she stopped his Lisinopril and increased his Atenolol and ordered daily b/p checks on him. This is a chance that every medication could cause nausea or vomiting but you will not know unless it is tried to see if the patient will tolerate.

On March 21, 2014, Defendant Johnson provided the grievance officer response. The Defendant noted Plaintiff complained "the medication he was placed on was not helping him and causing siding effects. Inmate was requesting further care." (Def. Mot., [382], Ex. 7, Grv., p. 6).

> DON Greenhagen states staff were attempting to assist the inmate with his ailment. Medications may have side effects, but you don't know how individual patients will react until a medication is tried. (Def. Mot., [382], Ex. 7, Grv., p. 6).

Defendant Grievance Officer Johnson also stated he was "reasonably satisfied that HCU was attempting to assist the inmate with the medication given. Further care is

**Appendix A7**

available as necessary." (Def. Mot., [382], Ex. 7, Grv., p. 6). The Defendant found the

second grievance was moot and Defendant Gossett concurred with the decision on

March 25, 2014. (Def. Mot., [382], Ex. 7, Grv., p. 6).

Plaintiff's third and final grievance was dated January 8, 2014. (Def. Mot., [382],

Ex. 7, Grv., p. 8).  Plaintiff did not sign or date the grievance, nor was the grievance

submitted as an emergency.  (Def. Mot., [382], Ex. 7, Grv., p. 8).  Plaintiff says he was

not able to put the document in the grievance box because of a flu outbreak at Illinois

River. (Plain. Mot., [495], Ex. 1, Plain. Dec., Para. 55).  Therefore, Plaintiff instead gave

the grievance to a Correctional Officer who was not one of the named Defendants.

(Plain. Resp. [495],. Ex. 1, Plain. Dec., Para. 56).

There is no evidence in the record demonstrating the Defendants received or

reviewed this document. It was not file stamped as received, no grievance number was

assigned, and there is no response from a grievance counselor or officer. (Def. Mot.,

[382], Ex. 7, Grv., p. 8).

Plaintiff's third grievance reports Physician's Assistant (P.A.) Swords went

through the housing unit on January 8, 2014 asking inmates if they had any problems

with vomiting, diarrhea, nausea, or feeling light-headed.  Plaintiff noted he had

suffered on and off with these symptoms for a couple of weeks.  (Def. Mot., [382], Ex. 7,

Grv., p. 8).  Plaintiff spoke to Swords and submitted grievances, but Swords continued

to tell him his medications would not make him vomit.  Plaintiff's housing unit was

now on lockdown quarantine due to several inmates reporting the same symptoms.

(Def. Mot., [382], Ex. 7, Grv., p. 8).

13

**Appendix A7**

Plaintiff claimed the problem could have been avoided if P.A. Swords took his claims seriously. (Def. Mot., [382], Ex. 7, Grv., p. 8).  Plaintiff also complained he had to submit urine and blood tests ordered by the doctor twice on the same day because the first tests were lost.  (Def. Mot., [382], Ex. 7, Grv., p. 8-9).  Plaintiff claimed nursing staff did not take their jobs seriously.

Finally, in the "Relief Requested" section, Plaintiff stated he was "seeking to take these matters to a higher authority and want for my medical records to be handed over to me, I feel my health is a risk and medical don't care." (Def. Mot., [382], Ex. 7, Grv., p. 8).

On January 16, 2014, Plaintiff was taken to the emergency room at Graham Hospital in Canton, Illinois. (Plain. Resp.,[535], AMF #5). Later the same day, he was moved to St. Francis Medical Center in Peoria, Illinois. (Plain. Resp.,[535], AMF # 6). Plaintiff was diagnosed with acute renal failure. (Comp., [1], p. 20).

After stays in various hospitals, Plaintiff returned to IDOC custody on April 4, 2014. (Plain. Resp.,[535], AMF #7, 8)

## IV. LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact."  Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant may not simply rest

14

**Appendix A7**

on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.; Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.*

## V. ANALYSIS

Defendants Johnson, Wise, and Gossett argue Plaintiff cannot demonstrate they violated his constitutional rights. To establish an Eighth Amendment violation, Plaintiff must show he suffered from a serious medical need and the Defendant was deliberately indifferent to that need. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).

"To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind." *Petties v. Carter*, 836 F3d 722, 728 (7th Cir. 2016), *citing Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). In other words, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties,* 836 F3d at 728 (emphasis in original), *citing Farmer v Brennan*, 511 U.S. 825, 844 (1994).

A non-medical prison official "generally does not act with deliberate indifferent 'if she reasonably relied on the judgment of medical personnel.'" *Eagan v. Dempsey*, 987 F.3d 667, 694–95 (7th Cir. 2021), *quoting Miranda v. Cnty. of Lake,*900 F.3d 335, 343 (7th

15

**Appendix A7**

Cir. 2018). Instead, "[n]on-medical officials are presumptively entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care.'" *Eagan*, 987 F.3d at 694 (internal quotation omitted); *see also Hayes,* 546 F.3d at 527 ("The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one.").

"A plaintiff may rebut this presumption by showing (defendants) had reason to know that their medical staff were failing to treat or inadequately treating an inmate.'" *Eagan,* 987 F.3d at 694 (internal quotation omitted); *see Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005)(non-medical staff not deliberately indifferent, but "[p]erhaps it would be a different matter if (defendant) had ignored (plaintiff's) complaints entirely."). Deliberate indifference can also be demonstrated "with evidence that those employees ignored or interfered with a course of treatment prescribed by a physician." *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016), *citing Estelle,* 429 U.S. at 104-105 (deliberate indifference established by prison officials "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."). Mere negligence is not sufficient. *Eagan,* 987 F.3d at 694.

Plaintiff first alleges the Defendants had notice of his serious medical condition due to his three grievances.[4]

---

[4] The Court understands Plaintiff alleges Defendant Warden Gossett turned a blind eye to ongoing problems with the facility's doctor, but Plaintiff also alleges his grievances provided Defendant Gossett with notice of his condition.  In addition, the only basis of Plaintiff's claim against Defendants Wise and Johnson are Plaintiff's three grievances. (Comp. [1], para. 42, 96, 100).

**Appendix A7**

Plaintiff's first grievance on December 22, 2013 focused on the side effects of his medication. Plaintiff begged for medical attention noting he was feeling light-headed, and he was having difficulty keeping food down. The specific "relief" Plaintiff requested asked for medical staff to change his medication to his previous prescription since "it was working well." (Def. Mot., [382], Ex. 7, Grv., p. 1).

Defendant Wise says he immediately submitted Plaintiff's grievance to the Director of Nursing. Defendant Johnson then provided the written grievance response noting Nursing Director Greenhagen confirmed Plaintiff had met with medical staff on December 26, 2013, his medication was changed, and a follow up appointment was scheduled in a week. Plaintiff's grievance was consequently denied.

As noted, the Seventh Circuit has held a grievance officer is not deliberately indifferent if he "investigated the complaints and referred them to the medical providers who could be expected to address (plaintiff's) concerns." *Greeno,* 414 F.3d at 656.

Plaintiff claims there is no proof Defendants Wise or Johnson referred Plaintiff's grievance to medical staff. This is not an accurate statement of the record. Nursing Director Greenhagen stated she did not remember reviewing Plaintiff's first grievance and did not see her typical, handwritten review in the record. (Plain. Resp., [495], Ex. 22 Green Depo, p. 121, 123). Nonetheless, Defendant Grievance Officer Johnson's written response provides a statement from "DON Greenhagen" concerning Plaintiff's medical care, and this statement is an accurate recitation of Plaintiff's relevant medical records. (Def. Mot., [382], Ex. 7, Grv. 3). At the least, the record demonstrates the grievance

17

officers obtained information verified in Plaintiff's medical records before responding to his specific complaints.

Plaintiff next claims his grievance reported symptoms which "were indicative of uremia" and therefore Defendants Wise and Johnson should have set up a meeting with the Plaintiff and directly contacted IRCC's doctor and physician's assistant.  (Plain. Resp., [535], p. 108).

Grievance officers are not required to have medical training and Plaintiff's grievance was insufficient to provide a lay person with notice of any medical condition beyond dissatisfaction with his current medication and related side effects. *See Vance,* 97 F.3d 993 ("plaintiff still has the burden of demonstrating that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety.")(internal quotation omitted); *Demus v. Nickerson*, 2019 WL 1923399, at *5 (N.D.Ill. April 30, 2019)(grievance did not sufficiently notify officer of plaintiff's continuing medical needs or problems obtaining relief).  In addition, while the grievance procedures indicate an officer *may* speak to the inmate or witnesses, it is not a requirement. *See* 20 Ill. Admin. Code §504.830.

Finally, "the law encourages non-medical … administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *see also Degrado v. Carter*, 2021 WL 3737712, at *5 (N.D.Ill. Aug. 24, 2021)("In other words, a nonmedical prison official may find safe harbor by investigating and referring medical complaints to medical staff.").   The

18

**Appendix A7**

Court finds no reasonable juror could find the response to the first grievance demonstrates deliberate indifference.

Plaintiff's second grievance again complained his medications were causing concerning symptoms.  In addition to feeling light-headed and having problems eating, Plaintiff said he had chest pains, he was not using the toilet on a regular basis, and his "performance in the recreation area has been decreasing." (Def. Mot., [382], Ex. 7, Grv., p. 5).  Plaintiff stated he did not have any of the reported symptoms until he started taking a new medication which he identified. (Def. Mot., [382], Ex. 7, Grv., p. 5). Plaintiff filed his grievance as an emergency and asked for further investigation.

Defendant Warden Gossett immediately found the grievance did not qualify as an emergency.  The Defendant did not believe Plaintiff faced immediate danger or harm since Plaintiff admitted he was still going to the recreation yard.  Therefore, Plaintiff was instructed to submit his grievance through the normal procedures.

Defendant Wise received Plaintiff's second grievance on January 14, 2014 and again sent the matter to the nursing director for review.  On March 21, 2014, Defendant Johnson provided a written response.

The nursing director confirmed Plaintiff met with medical staff, they were attempting to address his complaints, but they could not predict how an individual would react to a new medication. Defendant Johnson denied the grievance noting he was "reasonably satisfied" medical staff was attempting to address Plaintiff's complaints. (Def. Mot., [382], Ex. 7, Grv., p. 6).  Defendant Gossett concurred with this decision.

**Appendix A7**

Plaintiff repeatedly argues Defendant Warden Gossett was deliberately indifferent to Plaintiff's medical condition when he failed to consult medical staff before finding Plaintiff's second grievance was not an emergency.   In fact, Plaintiff argue "[i]t was incumbent on Gossett to consult with medical personnel." (Plain. Resp., [535], p. 95).  Plaintiff does not provide any support for this statement. [5]

Instead, courts have specifically held a Warden's finding that a grievance does not qualify as an emergency does not demonstrate deliberate indifference. *See Williams v. Wexford Health Sources, Inc.*, 2021 WL 3722799, at *11 (S.D.Ill. Aug. 23, 2021) ("[d]etermining a grievance is not an emergency 'no more manifests deliberate indifference to the underlying problem than does a judge's decision dismissing a § 1983 suit as barred by the statute of limitations.'"); *quoting Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009); *see also McCorkle v. Brookhart*, 2021 WL 5396067, at *2 (S.D.Ill. Nov. 18, 2021)(failing to find grievance was an emergency does not state a claim of deliberate indifference, warden directed inmate to send his grievance through the normal procedures and there was no indication warden personally denied plaintiff medical care).

---

[5] Plaintiff cites to three cases which do not address or mention a Warden's personal responsibility to consult with medical staff before denying an emergency grievance.  *See Thomas v. Wexford Health Services, Inc.*, 414 F.Supp.3d 1154, 1163 (N.D.Ill. Oct. 9, 2019) (claim against warden survives summary judgment based on warden's personal conversations with plaintiff, plaintiffs emergency grievances, defendant's responsibility over those grievances, and no evidence warden "or any of his subordinates" conferred with medical staff during grievances process); *Flournoy v. Ghosh*, 881 F.Supp.2d 980, 991 (N.D.Ill. July 24, 2012)(ruling did not concern emergency grievance, nor warden's responsibility to personally contact medical department); *Snow v. Obaisi*, 2021 WL 4439421, at *8–9 (N.D.Ill. Sept. 28, 2021)(facility provided no response to grievances and no contact was made with medical staff).

**Appendix A7**

In addition, the grievance procedures do not require a Warden to investigate before determining whether a grievance will be handled on an emergency basis. *See* 20 Ill.Admin.Code. §504.840(c).

Nonetheless, Plaintiff maintains "[t]o the extent the Warden argues that emergency treatment should be afforded only if the Warden, without any medical knowledge, deem is it life-threatening, that is 'illogical and inhumane.'" (Plain. Resp. [535], p. 96).

Throughout his brief, Plaintiff confuses the grievance process with requests for medical care. None of the IDOC employees involved in reviewing grievances are required to have medical training, and none are tasked or qualified to analyze symptoms or determine what medical care an inmate should receive. Instead, grievance reviewers are only required to refer medical complaints to the Health Care Unit to ensure medical staff is aware of and addressing an inmate's concerns. *See Greeno,* 414 F.3d at 655-56 ("We do not think (the grievance officer's) failure to take further action once he had referred the matter to medical providers can be viewed as deliberate indifference."); *see also Adams v. Durai*, 153 Fed.Appx. 972, 975 (7th Cir. 2005) ("An administrator does not become responsible for a doctor's exercise of medical judgment simply by virtue of reviewing an inmate grievance."). This "division of labor between medical staff and administrative staff has been recognized by the courts." *Thomas v. Vaisvilas*, 2009 WL 1307574, at *7 (N.D.Ind. May 8, 2009); *citing Greeno,* 414 F.3d at 656.

**Appendix A7**

Plaintiff also argues a "jury should be allowed to determine whether it was a substantial departure from accepted standards of medical care for there not to be a review of Plaintiff's medical chart until February 27, 2014 when responding to (Plaintiff's) December 26, 2013 grievance." (Plain. Resp., [535], p. 110).   Again, Plaintiff cannot apply "accepted standards of *medical* care" to non-medical Defendants.

The Court also notes Plaintiff was instructed to submit his grievance through the normal procedures. These procedures do not require an expedited reply.  Instead, the grievance officer is directed to report any findings to the Warden "within two months after receipt of the written grievance, when reasonably feasible under the circumstances." 20 Ill. Admin. Code.  § 504.830 (e).

In this case, Defendant Wise received Plaintiff's grievance on January 14, 2014. (Def. Mot., [382], Ex. 7, Grv., p. 4).  On the same day, grievance officers sent a fact sheet to the nursing director requesting a response within 10 days. (Def. Mot., [382], Ex. 7, Grv., p. 7). Two days later, Plaintiff was taken to the emergency room and did not return to IDOC custody until April 4, 2014.  Nonetheless, the grievance officer provided his findings to the Warden on March 21, 2014. (Def. Mot., [382], Ex. 7, Grv., p. 6).

Plaintiff did not know he was suffering from symptoms related to his kidney disease when he submitted his second grievance and consequently, he did not provide the non-medical Defendants with notice of this condition.  Instead, Plaintiff reported his additional problems with a new medication, Defendants referred the matter to medical staff, and medical staff confirmed they were addressing Plaintiff's complaint. Based on the record, Defendants were not deliberately indifferent to Plaintiff's second grievance.

22

**Appendix A7**

There is no evidence suggesting Defendants Wise, Johnson, and Gossett received Plaintiff's third grievance dated January 8, 2014.   While Plaintiff says he gave the document to a correctional officer, there is no indication it was provided to the grievance officers.  Furthermore, Plaintiff's grievance states if medical staff had paid more attention to his symptoms, specifically vomiting, diarrhea, nausea, and feeling light-headed, they might have been able to avoid the flu outbreak at IRCC.  The grievance does not provide notice of kidney disease or a lack of care for kidney disease.

As repeatedly noted, Defendants Wise, Johnson, and Gossett do not have medical training and are not qualified to recognize and diagnose medical conditions. The record demonstrates they were not deliberately indifferent to Plaintiff's complaints and referred each received grievance to medical staff for a response.  In each instance, medical staff reported they were aware of Plaintiff's concerns and had either changed his medication or were working to find a new medication.

The record also demonstrates Defendant Wise's only personal involvement was collecting the first two grievances and immediately forwarding each to the nursing director for a response.  Defendant Johnson then provided a grievance response based on the medical record and consistent with the grievance procedures.  There is also no evidence demonstrating either Defendants delayed or denied prescribed medical care. Since the only claims against Defendants Wise and Johnson are based on the grievance procedure, the motion for summary judgment is granted as to both Defendants.

Plaintiff has also failed to demonstrated Defendant Warden Gossett violated his Eighth Amendment rights based on the Warden's response to his grievances. However,

23

**Appendix A7**

Plaintiff maintains his allegations against Warden Gossett are not limited to these documents.  Plaintiff also alleges a supervisor liability claim accusing Defendant Gossett of turning a blind eye to problems with IRCC medical care.

Defendants argue Plaintiff's summary judgment response relies on radically new factual allegations to support this claim.  The Seventh Circuit has held "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker v. Milwaukee Cnty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014); *see also Chessie Logistics Company v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir.  2017).  Therefore, a plaintiff may not attempt to improperly amend a complaint in response to a summary judgment motion by adding an entirely new factual basis to support a claim. *See Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017)(plaintiff may not proceed with allegations which "require factual bases not adequately pled in the complaint"); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)("plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

Furthermore, district courts need not consider a new factual basis presented in response to a dispositive motion. *See Whitaker,* 772 F.3d at 808 (explaining its decision in *Abuelyaman* supported district court's refusal to consider a new factual basis for a retaliation claim); *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 814 (7th Cir.2011) ("[i]t is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion.").

Plaintiff's complaint specifically alleged Defendant Gossett was responsible for the overall operations at IRCC including medical services and for promulgating rules,

**Appendix A7**

regulations, policies, and procedures. (Comp., [1], p. 18).  As supervisor, Plaintiff maintains Defendant Gossett was "aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to (Plaintiff)." (Comp.,[1], p. 18).  This was the only factual basis Plaintiff provided for any claim based on supervisor liability.

Defendants correctly note Plaintiff's complaint made no mention of the Health Care Administrator's tenure, Dr. Greby's absenteeism, Wexford's consideration of terminating Dr. Greby's employment, an alleged cover up, or Defendant Gossett's knowledge of any specific decencies in the provision of medical care.

Plaintiff was alerted to the problem with the scant factual basis provided for the supervisor liability claim as far back as November of 2016 when the Northern District of Illinois granted Defendant Wardens Hardy and Nicholson's motion to dismiss.  Unlike Defendant Gossett, Plaintiff did not allege either Warden Hardy or Nicholson had any direct knowledge of Plaintiff's medical condition through the grievance process.

> (Plaintiff) argues that (the wardens) are nevertheless liable because they were "aware of the practices that cause[d] (Plaintiff's) injury" and "facilitated and/or turned a blind eye to those practices." Pl.'s Resp. Br. at 11. Furthermore, (Plaintiff) alleges that Hardy and Nicholson "purposefully ignor[ed] their subordinates' misconduct." But these are "mere conclusory statements" that simply recite the elements of supervisory liability, and thus are insufficient to support a plausible claim. It would be one thing if (Plaintiff) had alleged (as some prisoners do) that he wrote letters to the Wardens, informing them of the lack of medical treatment, or that he had spoken with the Wardens about the problem. But (Plaintifff) has provided no factual allegations that suggest Hardy and Nicholson knew specifically of (Plaintiff's) kidney disease and inability to receive treatment. Nor does he allege other instances of deliberate indifference at either facility that would support the inference that Stateville or Illinois Rivers personnel

25

**Appendix A7**

were *systemically* withholding medical care from prisoners. November 29, 2016 Order, p. 15-16 (internal cites to caselaw omitted).

Plaintiff's supervisor liability claim against Defendant Gossett is virtually identical to the dismissed claim against former Defendants Hardy and Nicholson.[6] *See* Comp., [1], Hardy (para. 16-18); Goss (para. 29, 30, 32); Hardy (para. 57-58); Goss. (para. 100-101).  Yet even with this clear warning, Plaintiff made no attempt to amend the initial complaint filed on January 15, 2016 and therefore six years later, it remains the operative complaint.[7]

Plaintiff cannot present new factual allegations in support of his supervisor liability claim in his summary judgment response, and therefore the Court will not consider these arguments. *See Palmer v. City of Decatur*, 2021 WL 7707939, at *40 (C.D.Ill. Sept. 20, 2021)("[p]laintiff did not adequately plead his claims regarding the additional evidence… and introducing them in his Response to Defendants' motion for summary judgment was not sufficient to survive that motion."); *Applewhite v. Deere & Company, Inc.*, 2020 WL 7029889, at *18 (C.D.Ill. Nov. 30, 2020)(court will not consider new basis for retaliation claim, not alleged in complaint); *Alonso v. Weiss*, 301 F.Supp.3d 885, 896

---

[6] There are two differences in the allegations against Wardens Nicholson and Hardy compared to the allegations against Defendant Gossett.  First, there are two paragraphs which refer to Plaintiff's IRCC grievances. (Comp., [1], (para. 100-101)).  The Court has found the grievances did not provide notice of chronic kidney disease, and Defendant Gossett was not deliberately indifferent to Plaintiff's complaints. Second, there is one additional paragraph alleging Gossett was responsible for "reducing strife and enhancing harmony "by enforcing, rules, polices and effective resolution of grievances. (Comp., [1], (para. 31)).

[7] Defendants also note Plaintiff's interrogatory responses provided little additional information concerning the factual basis for his supervisor liability claim. *See* (Def. Memo., [485], Ex. 1, Int. #2; Ex. 2, Supp. Resp. #2).

**Appendix A7**

(N.D.Ill. March 14, 2018)("This is an impermissible attempt to constructively amend the complaint and therefore need not be considered at summary judgment."

Even if the Court were to consider Plaintiff's arguments, Plaintiff has failed to adequately demonstrate his claim.  Plaintiff maintains Defendant Warden Gossett had "Ample Notice That Dr. Greby was Incompetent, Erratic, and a Risk to the Health of Inmates." (Plain. Resp., [535], p. 97).   However, Plaintiff fails to cite to evidence which supports this claim.

For instance, Plaintiff says Wexford Regional Manager Stacy Moore "frequently met with Gossett" and the Assistant Wardens to discuss what happened "that week at the facility regarding healthcare." (Plain. Resp., [535], p. 98, *citing* AMF #115). Plaintiff then cites to two depositions.

Defendant Gossett said he did not remember how often he saw Moore, but she would usually stop by to say hello when she came to IRCC.  He did not testify they had conversations concerning healthcare problems and he specifically stated he did not remember a conversation about Dr. Greby. (Plain Resp., [495], AMF #115, *citing* Ex. 16, Goss. Depo. p. 149-150).

Wexford Manager Moore testified it was her practice to speak to the wardens before she went to the Healthcare Unit, but she did not say how often she went to IRCC, nor what was discussed, and she did not mention specifically speaking to Defendant Gossett. (Plain. Resp.,[495], AMF #115, *citing* Ex. 26, Moore Depo. p. 88).

Plaintiff next claims Moore did discuss problems concerning the facility doctor and "the Warden" expressed his frustration about Dr. Greby and the possibly of locking

27

**Appendix A7**

her out of the facility. (Plain. Resp.,[495], p. 98, *citing* AMF #116).  However, Plaintiff cites only to a portion of Moore's deposition which makes no mention of Defendant Gossett and refers to time periods before he was the IRCC Warden. (Plain. Resp., [495], AMF #116, *citing* Ex. 26, Moore Depo. p. 87-90).  In addition, Defendant Gossett testified he did not know about any prior threats to lock Dr. Greby out of the facility. (Plain. Resp., [495], Ex. 15, Goss Depo., p. 79; Ex. 16, Goss Depo., p 131, 134).  Defendant Gossett also testified as Assistant Warden, he had no "direct oversight" over the Healthcare Unit. (Def. Mot., [358], Ex A, Goss. Depo., p. 63).

Plaintiff further claims Nursing Director Greenhagen "met weekly" with Defendant Gossett to discuss issues or complaints concerning Dr. Greby. (Plain. Resp., [495], p. 97, *citing* AMF #119).  However, Plaintiff cites to a portion of Greenhagen's deposition which pertained to the time period up until April of 2013 and she did not mention speaking to the Defendant. (Plain. Resp., [495], AMF #119 *citing* Ex. 23, Green Depo., p. 64).  The only evidence before the Court indicates Defendant Gossett became the IRCC Warden five months later in September of 2013.

In short, Plaintiff does not clearly cite to evidence demonstrating Defendant Gossett had knowledge of any specific issues within either the healthcare unit or Dr. Greby, nor that the Defendant knew the Plaintiff faced a substantial risk of harm. *See Signature Transportation Group, LLC v. Jacobs*, 2020 WL 1663124, at *2 (N.D.Ill. April 3, 2020)("it simply is not the court's job to sift through the record to determine whether there is sufficient undisputed evidence to support a party's claim or defense as a matter of law."); *T.G. ex rel. T.G. v. Midland School Dist.* 7, 848 F.Supp.2d 902, 912 FN 4 (C.D.Ill.

**Appendix A7**

Jan 27, 2012)("It is Plaintiffs' responsibility to clearly present their arguments, otherwise they run the risk that the Court will not unearth the intended truffle that might carry the day."); *Coffey v. Cox*, 218 F.Supp.2d 997, 999 FN 3 (C.D.Ill. Aug. 20,2002)("While (Plaintiff) is correct that, in ruling upon Defendants' motion for summary judgment, the Court must view the record as a whole and must draw all reasonable inferences in his favor, it is his responsibility to point the Court to where exactly in the record a genuine issue of material fact exists which would preclude the Court from entering summary judgment.").

Plaintiff instead speculates the Defendant Warden must have known based on his supervisory role, the possibility he might have participated in relevant meetings, or he might have received relevant emails, and testimony that "in the Department of Corrections, they're - - you know, everybody knows everything." (Plain. Resp., [495], Ex. 23, Green Depo., p. 64). This is insufficient to defeat summary judgment. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) ("our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture.")(internal citation omitted); *Hall-Bey v Hanks*, 93 Fed.Appx 977, 980 (7th Cir. 2004)("conclusory statements cannot sustain a non-movant's burden on summary judgment."); *Stagman v Ryan*, 176 F.3d 986, 995(7th Cir. 1999)("statements that are the result of speculation or conjecture or merely conclusory" do not meet requirements of Rule 56).

Appendix A7

The Court appreciates Plaintiff's complaint raises a very serious allegation. Plaintiff suffered acute renal failure while in IDOC custody.   Plaintiff's complaint identified several individuals who were directly involved and responsible for providing medical care, and Plaintiff previously reached a settlement agreement with all medical providers.

However, Plaintiff cannot ask the Court to hold non-medical Defendants to the same standard as individuals with both specific medical training and knowledge and direct responsibility for accessing Plaintiff's medical needs and providing medical care. Plaintiff has failed to demonstrate a disputed issue of fact suggesting Defendants Wise, Johnson, or Gossett were deliberately indifferent to his serious medical condition under any theory of liability.  The motion for summary judgment is GRANTED. [484].

IT IS THEREORE ORDERED Defendants' Gregory Gossett, Corey Wise, and Robbie Johnson's Motion for Summary Judgment is GRANTED pursuant to Federal Rule of Civil Procedure 56. [484]. The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff.  This case is terminated.

Entered this 20th day of December 2022.


s/ James E. Shadid

_____

JAMES E. SHADID
UNITED STATES DISTRICT JUDGE


30

**Appendix A7**